NATIONAL JUSTICE CONSULTANTS, INC.

1014 BROADWAY • SUITE 350 • SANTA MONICA, CA 90401 • 310.429-2940 • crchapman@earthlink.net

Mr. Lee H. Roistacher, Esq.
Law Offices of Dean Gazzo & Roistacher, LLP
440 Stevens Avenue, Suite 100
Solano Beach, California 92075

Federal Rule of Civil Procedure 26 (a)(2)(B)
REPORT OF DEFENDANTS' POLICE PRACTICES EXPERT

Re:     *David Couch, Sr., et al. vs. State of California, et al.*
        United States District Court, Eastern District of California Case No.: 4:24-cv-00481-TLN-AC

Dear Mr. Roistacher,

Pursuant to my retention agreement in this matter, the following is my preliminary report based on my review and assessment of the facts presented. As an expert in law enforcement policies, procedures, training, and tactics relevant to police use of force, this report is intended to offer opinions regarding the actions of California Highway Patrol (hereinafter CHP) Officer Ryan Cates (hereinafter Officer Cates) in relation to the shooting incident involving David Couch, Jr. (hereinafter Couch) on February 9, 2023. Should additional information or documentation become available, I reserve the right to amend my findings and conclusions, as necessary.

In forming my opinions to a reasonable degree of professional certainty, I did not make ultimate determinations regarding credibility. I reviewed the available material and relied on facts supported by the record and then analyzed those facts against best practices in the area of police training, protocols, and policies with regard to the use of deadly force in the incident involving Couch. Additionally, all the opinions expressed herein are derived from the foundation of my training, education, and over 50 years of experience as a career law enforcement professional, California Commission on Peace Officer Standards and Training (POST) instructor and consultant and police practices expert retained at the local, State, and federal levels on cases of similar circumstances.

David Couch, Sr. et al. vs. State of California, et al. Case 2:24-cv-00481-TLN-AC Document 36-1 Filed 05/18/26 Page 2 of 23
U.S.D.C. Eastern District of California Case No.: 2:24-cv-00481-TLN-AC
Report of Police Practices Expert Clarence R. Chapman

## I. Overview of Incident:

On February 9, 2023, at approximately 5:30 p.m., Officer Cates was on duty working in full uniform and driving a fully marked CHP patrol vehicle equipped with red and blue overhead emergency lighting and forward-facing Mobile Video/Audio Recording System (MVARS) inclusive of an audio microphone affixed to his shirt. At this time, Officer Cates monitored a radio broadcast reporting a man seen pointing a firearm at motorists on the Interstate 5 highway near the Bonnyview Road exit in Redding California. The suspect vehicle information indicated that it was registered to 3060 Island Drive, in Redding, California.

Based on the serious nature of the call, Officer Cates immediately responded to the registered vehicle's address in an effort to locate the suspect before harm could come to any innocent citizen.

When Officer Cates arrived at the Island Drive address 15 – 20 minutes after receiving the call, he immediately noticed a vehicle parked in the driveway that matched the description of the suspect vehicle that was armed with a rifle. Officer Cates could see that the vehicle's driver's side door was partially ajar and there was a male subject, who matched the description of the suspect, later identified as Couch, seated in the driver's seat.[1]

At that time, Officer Cates had reasonable suspicion to believe that Couch was the individual suspected of brandishing a firearm and that he was potentially armed and dangerous. Officer Cates did not request backup at the time because he had been monitoring radio traffic throughout the shift, and knew that all officers were responding to other calls.[2] Given the gravity of the situation and the potential risk to public safety, Officer Cates acted consistently with his obligation to control the situation and protect public safety.[3] Specifically, Officer Cates was concerned about Couch's intentions and subsequent actions upon Couch arriving at his desired destination.[4]

---

[1] Officer Cates deposition page 70:18-25, 71:17-22.
[2] Officer Cates deposition page 84:2-12.
[3] Officer Cates deposition page 89:1-4.
[4] Officer Cates deposition page 88:18-89:4 154:1-25.

David Couch, Sr. et al. vs. State of California, et al.
U.S.D.C. Eastern District of California Case No.: 2:24-cv-00481-TLN-AC
Report of Police Practices Expert Clarence R. Chapman

Officer Cates activated the overhead emergency lights and positioned his marked patrol vehicle behind Couch's car in the driveway, exited his vehicle and took cover behind the open driver's side door, directing his firearm toward Couch. Officer Cates then issued verbal commands instructing Couch to exit his vehicle and display his hands.[5] Upon exiting, Couch was observed holding a cellphone and wearing military-style clothing along with a tactical combat vest armed with a large KA-BAR style fighting knife,[6] an additional knife, and an empty handgun holster.[7]  Drawing upon his training and experience, Officer Cates noted that individuals wearing gun holsters typically have a firearm concealed somewhere on their person.[8] Based on these observations, Officer Cates assessed Couch as having military training and considered him to be an armed and dangerous suspect.[9]

Officer Cates approached Couch to detain him and prevent him from reentering his vehicle, where he might access additional weapons.[10] While holding his firearm in his right hand for self-protection, Officer Cates contacted Couch, grasped his right arm, and instructed him to get on the ground.[11]

Couch resisted and pulled away.  He then squared up as if preparing to fight, and began yelling insults and threats to Officer Cates, including calling the officer a "faggot" and "shoot bitch."[12] Couch moved toward Officer Cates in an aggressive manner, taking a fighting stance and clenching his fist while continuing to yell in a threatening manner.[13]

---

[5] Officer Cates deposition page 91:7-22. CHP MVARS with enhanced audio at 1:24-1:30.

[6] A "KA-BAR" is c.7 inch carbon steel blade fighting knife produced for and carried by the United States Marine Corp for over 80 years. The Marines characterized it as the best knife for a gunfight. Thew knife is designed for killing in combat and can be considered a deadly weapon. The knife was manufactured in 1923 by the Union Cutlery Company. The name KA-BAR originates from the adventure of a fur trader in Alaska who used the knife to save his life from a grizzly bear attack. When the manufacturer heard of the story, they named their knife, KA-BAR which is an abbreviation for Kill a (KA) Bear (BAR). The knife that Couch had in his possession when confronting Officer Cates was the same design of the one used in three wars and responsible for numerous hand-to-hand combat deaths of enemy combatants.

[7] Officer Cates deposition, page 74:21-75, 92:1-11.

[8] Officer Cates deposition, page 73:14-16.

[9] Officer Cates administrative interview, page 13:1-12.

[10] Officer Cates deposition, page 95:9-12.

[11] Officer Cates administrative interview, page 10:1-3.

[12] Officer Cates deposition, page 98:7-11, CHP MVARS with enhanced audio at 1:30-1:42.

[13] Officer Cates deposition, page 99:12-21.

David Couch, Sr. et al. vs. State of California, et al.
U.S.D.C. Eastern District of California Case No.: 2:24-cv-00481-TLN-AC
Report of Police Practices Expert Clarence R. Chapman

Given Couch's conduct, the presence of a large fighting knife within his immediate reach, and the absence of a search for additional weapons, Officer Cates became concerned for his safety.[14] To create distance and minimize further physical contact, Officer Cates drew his Taser device while maintaining possession of his firearm for protection.[15] Officer Cates discharged the less lethal Taser device; however, it proved ineffective against Couch.[16] Couch continued to walk towards Officer Cates and called Officer Cates a "jackass."[17] Officer Cates fired a second cartridge from his Taser, but this also failed to stop Couch's advance.[18]

Recognizing that the Taser was not working, Officer Cates tried to replace it in the holster, however, during the attempt to re-holster the device, he accidentally dropped it causing it to fall to the ground.[19]

Officer Cates then engaged Couch physically, using his body weight to pin him against the front left fender of his patrol vehicle. While holding him in that position, Officer Cates ordered Couch to get on the ground or he will be shot, and pressed his firearm against the right side of Couch's head; an action that would communicate to a reasonable person that deadly force was being presented and that immediate compliance was required.[20] Throughout the encounter, Couch refused to surrender his hands and continued to shout threats and taunts, including, "Pop a .45 faggot," and "You ain't doing shit dirty cop." You think! I'm scared of you bitch"[21]

Couch then reached up with his right hand and grabbed the top of Officer Cates' firearm, attempting to take it away.[22] Officer Cates immediately pulled the weapon back to retain control.[23] As Officer Cates then attempted to apply handcuffs, Couch spun around and

---

[14] Officer Cates administrative interview, page 10:8-11.
[15] Officer Cates deposition, page 99:12-21.
[16] Officer Cates deposition, page 100:7-17.
[17] CHP MVARS with enhanced audio at 1:39-1:46.
[18] Officer Cates deposition, page 100:7-17.
[19] Officer Cates deposition, page 105:11-16.
[20] Officer Cates deposition, page 106:24-107. CHP MVARS with enhanced audio at 1:52-1:58.
[21] CHP MVARS with enhanced audio at 1:57-2:06.
[22] Officer Cates deposition, page 108:4-20.
[23] Officer Cates deposition, page 110:11-18.

David Couch, Sr. et al. vs. State of California, et al.
U.S.D.C. Eastern District of California Case No.: 2:24-cv-00481-TLN-AC
Report of Police Practices Expert Clarence R. Chapman

broke free.[24] Couch then moved appropriately 8 – 10 feet away and within 20 seconds picked up the fallen Taser off of the ground and immediately extended it out, pointing it at Officer Cates.[25] Based on his training and experience, Officer Cates was knowledgeable that the Taser was capable of causing incapacitation to the body part that it contacted, even without a probe cartridge deployment.[26] Officer Cates was also aware that the device was active, requiring only a trigger pull to deliver a contact electrical shock.[27] Therefore, based on his training and experience, Officer Cates feared that if contacted by the Taser directly, he could lose this ability to maintain possession and control of his firearm and thus be killed with his own gun.[28]

As Couch continued advancing, he yelled at Officer Cates, "*Give me the .45 right now, I'm going to fuck you up.*"[29] Officer Cates, fearing for his life, utilized his last option to protect his safety and fired one round from approximately 10 feet away.[30] Officer Cates' gun jammed; however, he was able to clear the malfunction and restored the weapon to working order. During this brief interval, Couch continued to move toward him.[31]

With the threat ongoing and distance closing, Officer Cates fired four additional rounds from approximately 2 to 4 feet away to stop the threat.[32]

Couch fell forward onto the roadway. Officer Cates moved in, handcuffed Couch, and placed him on his side to assist with breathing while requesting emergency medical aid. He then began providing first aid until additional officers arrived. Couch was transported to a nearby hospital for treatment. Officer Cates had no prior contact with Couch and no knowledge of any personal circumstances that may have contributed to his behavior that day.[33]

---

[24] Officer Cates deposition, page 110:19-23.
[25] Officer Cates deposition, page 112:2-8.
[26] Officer Cates deposition, page 126:6-14.
[27] Officer Cates administrative interview statement, page 19:40-20:5.
[28] Officer Cates administrative statement, page 10:35-41; Officer Cates deposition page 125:18-126:14.
[29] CHP MVARS with enhanced audio At 2:1 5-2:20.
[30] Officer Cates administrative statement, page 10:41-42.
[31] Officer Cates deposition, page 12:2-11.
[32] Officer Cates deposition, page 23:11-24:6.
[33] Officer Cates deposition, page 131:14-132:15.

*David Couch, Sr. et al. vs. State of California, et al.*
*U.S.D.C. Eastern District of California Case No.: 2:24-cv-00481-TLN-AC*
*Report of Police Practices Expert Clarence R. Chapman*

---

II. <u>Data or Other Information Considered in Forming Opinions:</u>

1. CHP Critical Incident Investigation Team Report: C23-101-001 Case Number NS-001-23

2. CHP Northern Division Investigative Services Unit Report Case Number: F004-107-23

3. Department of Justice Bureau of Investigation Shooting Team Report: OIS-2023-0072

4. CHP HPM 70.6 Chapter 1 — Use of Force Policy

5. Shasta County Sheriff's Department Administrative Interview of Officer Ryan Cates – February 23, 2023

6. Redding Police Department Report: 23R008613-1

7. Plaintiffs' Complaint for Damages – State Court 204058

8. Incident Detail Report: 230209RD00105

9. Transcription of Recorded Interview of Officer Cates by Shasta County Sheriff's Department

10. CHP MVARS Video

11. CHP Human Resources Sergeant California Highway Patrol Job Description(8394)

12. Medical Report from Mercy Hospital for David Couch "Discharge Summary"

13. Medical Report from Mercy Hospital for David Couch "Computerized Tomography"

14. Anderson Police Department Incident Report #23A001391

15. Deposition of Officer Ryan Cates

16. Deposition of David Couch, Sr.

17. Deposition of Jeanelle Couch

18. Deposition of Ariel Lynn Couch

19. Deposition of Lauren Metzger

20. Deposition of Lauren Fisher

21. Deposition of Lawrence W. Metzger

22. Shasta County District Attorney's Bureau of Investigation Crime Report #23GC2268 IA-1

23. Response of Defendant State of California by and Through California Highway Patrol

24. Request for Admissions Propounded by Plaintiff David Couch, Sr. (Set One)

25. Defendant California Highway Patrol's Request for Special Interrogatories (Set One)

26. Evidence Log and Measurement Table: 02/09/2023 Case #23R008613-1

David Couch, Sr. et al. vs. State of California, et al.
U.S.D.C. Eastern District of California Case No.: 2:24-cv-00481-TLN-AC
Report of Police Practices Expert Clarence R. Chapman

27. Plaintiff David Couch's, Sr.'s, Responses and Objections to Defendant State of California's Request for Admission, Set One, to Plaintiff David Couch, Sr.

28. Officer Cates Personnel Folder Annual Review (Uniformed)Request for Productions (Set One)

29. Plaintiff David Couch's, Sr's Responses to Request for Admissions Propounded by State of California by and Through California Highway Patrol (Set Two)

30. Plaintiff David Couch, Sr.'s Responses and Objections to the Defendant State of California's Request for Production of Documents (Set 1)

31. Plaintiff David Couch, Sr.'s Responses and Objections to the Defendant State of California Interrogatories (Set 1)

32. Plaintiff David Couch Sr.'s Responses and Objections to the Defendant County of Shasta's Interrogatories (Set 1)

33. Plaintiff Jeanelle Couch's Responses to Request for Admissions by Defendant State of California by and Through California Highway Patrol (Set One)

34. Plaintiffs' Responses to Request for Admissions Propounded by Defendant County of Shasta to Plaintiff Jeanelle Couch (Set One)

35. Plaintiffs' Response to Defendant State of California by And Through California Highway Patrol Request for Production of Documents (Set One)

36. Plaintiffs' Responses to Interrogatories Propounded by Defendant County of Shasta to Plaintiff Jeanelle Couch, (Set One)

37. Plaintiff Jeanelle Couch's Responses to Interrogatories by State of California by and Through California Highway Patrol (Set One)

38. Plaintiffs' Responses to Request for Production of Documents Propounded by Defendant County of Shasta To Plaintiff Jeanelle Couch (Set One)

39. Deposition of Sergeant Kyle Kittlitz (PMK)

40. Deposition of Redding PD Officer Ray Maready

41. CHP MVARS Video – Enhanced Audio

42. CHP HPM 70.6 Policy: High-Risk Apprehensions

43. CHP HPM 70.6 Policy: Electronic Control Devices

David Couch, Sr. et al. vs. State of California, et al.
U.S.D.C. Eastern District of California Case No.: 2:24-cv-00481-TLN-AC
Report of Police Practices Expert Clarence R. Chapman

III.  Exhibits to be Used in Support of Opinions:

1. Peace Officer Standards and Training (POST) Learning Domain #20: Use of Force

2. Peace Officer Standards and Training (POST) Learning Domain #21: Patrol Techniques

3. Peace Officer Standards and Training (POST) Learning Domain #33: Arrest and Control

IV.  Opinions:

1. Officer Cates had reasonable suspicion and justification to locate and detain Couch having received credible information regarding an individual matching his vehicle description, who was reportedly threatening motorists with a rifle on a major highway, a situation that constituted a significant high-risk active shooter threat to public safety.

2. Law enforcement officers, as sworn public safety officials, are guided by their training, duty, and established protocols to respond as first responders to significant threats to public safety.  In this case, the circumstances known to the officer at the time required Officer Cates to immediately confront the high-risk threat created by Couch in order to protect the public pending the arrival of additional units.

3. Officer Cates utilized deescalation techniques appropriately by issuing verbal instructions to couch in an effort to obtain his voluntary compliance and minimize the need for force. However, Couch's lack of cooperation with these verbal directives required Officer Cates to initiate physical contact in order to control the situation and further investigate the potential threat.

4. According to the materials received and reviewed to date, Officer Cates had no previous interactions with or prior knowledge of Couch. Given the significant threat posed by Couch to both the public and the officer, Officer Cates was not obligated to modify his use of controlling or defensive force based on any preexisting condition Couch may have had at that time. As such, Officer Cates had no duty to retreat and consider the motives or physical condition that may have influenced Couch's dangerous and threatening actions.

*David Couch, Sr. et al. vs. State of California, et al.*
*U.S.D.C. Eastern District of California Case No.: 2:24-cv-00481-TLN-AC*
*Report of Police Practices Expert Clarence R. Chapman*

5. Given that Couch had immediate access to an object that was believed to be a weapon. The information conveyed to Officer Cates indicated that a person was pointing a rifle at passing motorists. Based on this information, a reasonable officer could view Couch as a potential active-shooter risk. Under those circumstances, Officer Cates' decision to act quickly and go hands-on to secure and control Couch was justified consistent with his training and the need to address an imminent public threat, based on the totality of the circumstances.

6. Officer Cates adhered to his POST training and CHP HPM policies during his initial efforts to restrain Couch by using control holds and body leverage as lower-level force options. When these measures were ineffective, Officer Cates utilized a fourth less-lethal option of a Taser device for control. However, as Couch continued to resist due to his strength[34] and ability to resist the previous attempts of control, it was justified, objectively reasonable, and necessary for Officer Cates to escalate the level of force to defend his safety.

7. At the point where Couch acquired and confronted Officer Cates with the Taser device the officer reasonably feared for his life from an imminent deadly threat. Based on Couch's actions, any other well-trained officer in the same position faced with similar circumstances would perceive an imminent and serious threat to his life, justifying the use of deadly force.[35]

8. Based on his training and experience, Officer Cates understood that a Taser used in drive-stun mode can cause intense pain, severe disorientation, and create momentary disruption in motor nerve control of the extremities at the point of contact due to neuromuscular incapacitation.[36] Those consequences can result in an officer's inability to maintain physical control during a potentially life or death confrontation. In that context, when a suspect intentionally uses a Taser against a uniformed police officer, it is objectively reasonable for the officer to use deadly force in the protection of his life.

---

[34] Deposition of Officer Cates, page 104:14-17.
[35] Officer Cates interview with Shasta County Sheriff's Department, page 17 of 18, lines 31-35. Bates Stamp CHP - 138.
[36] Officer Cates deposition, page 149:2-9.

David Couch, Sr. et al. vs. State of California, et al.
U.S.D.C. Eastern District of California Case No.: 2:24-cv-00481-TLN-AC
Report of Police Practices Expert Clarence R. Chapman

Specifically, the loss of body control, even momentarily, can expose an officer to further assault and the potential loss of his firearm. Accordingly, a Taser deployed in this manner by a suspect against a police officer with reasonably perceived malicious intent can be viewed as an imminent threat to the officer's life and safety.

9. According to POST Learning Domain #20, Chapter 3, guidelines, state that law enforcement officers are authorized to use deadly force in life-threatening situations when they possess an objectively reasonable belief—based on the totality of the circumstances, that their own lives or safety are in imminent danger. The elements of this training were present and evident to Officer Cates in his confrontation with Couch.

10. After broadcasting the shooting incident, Officer Cates appropriately called for medical assistance for Couch's injuries.


V. Reasons and Basis for Opinions:

My opinions in this matter are based on the summary of the facts as recited above and the following analysis:

1. CHP Policy HPM 70.6, Chapter 1, entitled: Use of Force, defines deadly force as circumstances wherein an officer utilizes a form of self-defense including a firearm, when the officer reasonably believes that his life and safety or the lives and safety of others are in danger. Based on the facts in this case, Officer Cates appropriately complied with this policy in his objectively reasonable belief that he was in danger from the life-threatening assault by Couch.

2. According to POST Learning Domain #20: Use of Force, Chapter 3, pages 3–6 to 3-7, officers are instructed that the type and degree of force applied should correspond to the subject's level of threat. In order to address combative behavior or resistance. POST identifies five categories of subject behavior during police encounters: "cooperative," "passive non-compliance," "active resistance," "assaultive," and "life threatening." When Couch attempted to seize the Officer Cates' handgun and subsequently obtained the officer's Taser while advancing toward the officer, these actions constituted an

David Couch, Sr. et al. vs. State of California, et al.
U.S.D.C. Eastern District of California Case No.: 2:24-cv-00481-TLN-AC
Report of Police Practices Expert Clarence R. Chapman

imminent lethal threat that warranted the use of deadly force by Officer Cates in order to protect his life.

3. POST LD #33 instructs officers to act promptly and decisively to maintain control of their firearms and effectively counter an attack. In this scenario, when Couch attempted to seize Officer Cates' firearm, it was reasonable for Officer Cates to believe that the loss of his weapon could result in his death. Accordingly, it is essential for peace officers to retain possession of their firearms at all times during encounters with aggressively violent suspects seeking to disarm them and to reasonably assume that they pose a lethal threat. Based on this training, Officer Cates was fully aware that losing control of his firearm would result in a serious risk of him being shot and killed.[37]

4. It was not feasible for Officer Cates to provide a warning before discharging his firearm. Specifically, the situation created by Couch was rapidly evolving and presented an immediate deadly threat as he was actively advancing armed with a Taser capable of incapacitating the officer. Under those conditions, any delay prior to acting in self-defense to issue a verbal warning would have increased the risk to Officer Cates' safety by allowing Couch to close the distance and carry out his attack which could have resulted in the death of the officer.

5. From 2005 through 2022, of the 24 California peace officers killed in the line of duty murdered with firearms, one of the peace officers was overpowered and his gun taken away and used to kill him.[38]

6. In police use of force cases, POST training guidelines and CHP HPM policy recognize that the evaluation of reasonableness must account for the reality that officers are often required to make split-second decisions under tense, uncertain, and rapidly evolving circumstances. Accordingly, any use of force, particularly deadly force, is assessed

---

[37] POST Learning Domain #33: Arrest and Control - Chapter 6, page 6-6 reads in part: *"In a physical conflict when a subject may have access to a peace officer's firearm, officers must be able to respond quickly and decisively to maintain control of their firearm and repel the attack.*

[38] Source: Law enforcement officers killed and assaulted in the line of duty report, California Commission on Peace Officer Standards and Training.

David Couch, Sr. et al. vs. State of California, et al.
U.S.D.C. Eastern District of California Case No.: 2:24-cv-00481-TLN-AC
Report of Police Practices Expert Clarence R. Chapman

___

based on what is objectively reasonable in light of the facts and circumstances known to the officer at the time, rather than through hindsight or later-developed information.

7. Commonly accepted law enforcement practices and policy instruct officers that the type and degree of force to use in a given situation must be based upon the perception and state of mind of the officer at the time. In this regard, case law endorses a "reasonableness at the moment" standard that takes into account the unpredictable and rapid dynamics of a life-threatening encounter.[39] This guidance is applicable to the act of Couch picking up Officer Cates' Taser and advancing forward in a manner that could reasonably be interpreted by the officer as a deadly attack on his life.

8. Under POST training and commonly used tactical practices, officers are expected to consider reasonable alternatives to deadly force when circumstances allow. That assessment, however, is grounded in what is feasible in real time, not in hindsight. In this case, the available options of less-lethal control were effectively exhausted. The officer's Taser had already proven ineffective and was no longer in his control. Aerosol pepper spray was not a practical option given the close proximity where it could have created additional risk of cross contamination. Likewise, there was neither the time, nor distance necessary to deploy an impact weapon in an effective manner. Officer Cates was left with no other reasonable defense, other that lethal force.

9. Officers are trained to continually assess whether a person is able and willing to understand and comply with lawful commands. In some encounters, individuals may be affected by mental illness, alcohol, drugs, or some combination of factors that impairs their behavior and judgment. However, when an officer is faced with an objective and clearly identifiable threat to their safety, the immediate priority is to stop and control the threat, regardless of its underlying cause. POST Learning Domain #37, Chapter 1, page 1-7 reinforces this principle, cautioning officers not to compromise their own safety when dealing with individuals who may be unpredictable or violent due to a mental

___

[39] Graham v. Conner

David Couch, Jr. et al. vs. State of California, et al.
U.S.D.C. Eastern District of California Case No.: 2:24-cv-00481-TLN-AC
Report of Police Practices Expert Clarence R. Chapman

condition.[40] Only after the situation has been brought under control does the responsibility shift to reasonably accommodate any medical or psychological condition.

10. Law enforcement training recognizes that officers are routinely required to engage in situations that carry inherent risk to their safety. Specifically, encounters involving suspected armed shooters directly and immediately endanger public safety. POST Learning Domain #23, entitled, Crimes in Progress, Chapter 2, recommends utilizing multiple officers to coordinate communications, and provides tactical approaches inclusive of contact and cover officers and calling in specialized units for assistance to increase the level of safety. However, in this case, Officer Cates was required to accept a significant degree of personal risk without the benefit of backup assistance. Specifically, as the circumstances rapidly developed into a life threatening situation, Officer Cates' actions reflected the expectation that officers must make timely decisions and when necessary, place themselves in harm's way in furtherance of public safety.

11. Case law cautions against evaluating an officer's actions with the benefit of perfect hindsight or second-guessing after the fact whether the force used was absolutely necessary. That kind of retrospective analysis invites a "Monday morning quarterbacking" approach, where decisions made in real time are unfairly judged under far more controlled and deliberate conditions. In reality, use-of-force decisions are often made in rapidly unfolding, life-threatening situations where time is limited and the stakes are immediate and officers are not afforded the luxury of calmly weighing every conceivable alternative. Instead, the actions of officers under threat must be assessed based on what a reasonable officer would do under the same circumstances, given the information available at the moment the decision was made.

12. Police-officers may not always be able to deescalate a situation verbally or persuade a violent and assaultive individual to cease threatening actions and surrender peacefully. Deescalation techniques are effective only when the subject is willing to cooperate. There

---

[40] "Officers should treat a person who has a disability. With the same caution that they would use with any other suspect regarding judgments about enforcement of the law and personal safety. Although the individual may have a disability, that individual may still be capable of harming the officer."

David Couch, Sr. et al. vs. State of California, et al.
U.S.D.C. Eastern District of California Case No.: 2:24-cv-00481-TLN-AC
Report of Police Practices Expert Clarence R. Chapman

___

is no guaranteed outcome in contentious and high-risk threatening encounters, and it is not always possible for an officer to gain compliance from an uncooperative individual, regardless of cause or motivation. When a suspects escalates a situation to a deadly threat level, the officer is forced to employ defensive tactics to ensure their safety and the safety of others. Training and policy recommendations are designed to improve outcomes, but there are no universally effective verbal phrases or calming approaches that can be depended on as guaranteed successful tactics in every situation. Expecting complete success by using deescalation tactics alone, including those involving dangerous individuals later found to have mental disabilities, is unrealistic in life and death encounters. POST training warns that in certain cases, violent and aggressive actions by suspects may raise to a level that necessitates a proportionate use of force response by officers, as occurred in this instance.

13. Many Law enforcement agencies nationwide recognized that the use of deadly force is justified under circumstances known or reasonably believed by the officer when the following conditions apply:
   a. There is an objective threat of serious bodily harm or death to any person.
   b. Generally, as a means of self-defense from death or serious injury.
   c. Defend another officer or citizen from death or serious bodily injury.
   d. Prevent a crime which endangers safety or life as a result of a suspect's actions.
   e. The officer has probable cause to believe that a suspect poses a significant threat.

Officer Cates complied fully with the intent of this training in his decision to use deadly force in response to what he reasonably perceived as a situation that endangered his life.


VI.    Qualifications:

Please see attached curriculum vitae.


VII.    Compensation:

Please see attached fee schedule.

*David Couch, Sr. et al. vs. State of California, et al.*
*U.S.D.C. Eastern District of California Case No.: 2:24-cv-00481-TLN-AC*
*Report of Police Practices Expert Clarence R. Chapman*

_____

VIII.    Experience:

A supplemental attachment is included listing prior trial and deposition testimony.

Executed on the 5th day of May 2026, in Los Angeles County, California.

_____
Clarence Robert Chapman

David Couch, Sr. et al. vs. State of California, et al.
U.S.D.C. Eastern District of California Case No.: 2:24-cv-00481-TLN-AC
Report of Police Practices Expert Clarence R. Chapman

---

# C U R R I C U L U M   V I T A E

## Clarence Robert Chapman
### Police Practices Expert

---

## EMPLOYMENT HISTORY

**Chief of Police (Retired)**       **University of California Los Angeles Police Department**
*Date of Appointment:*              June 1994
*Date of Retirement:*               December 2004

**Station Commander (Retired)**     **Los Angeles County Sheriff's Department**
*Date of Appointment:*              May 1966
*Date of Retirement:*               June 1994

**POST Use of Force Paid Consultant:**   California Commission on Peace Officer Standards and Training
                                          SB 2 Accountability Division Professional Conduct Central Bureau
*Dates of Contract:*                      June 1, 2024 – June 2025

## SUMMARY OF EXPERIENCE

To date, I have consulted on over one thousand cases involving law enforcement related civil litigation, criminal prosecution and employment practices and have given court and deposition testimony in over 500 cases. I served over 50 clients from municipal, county, State and federal agencies and private enterprises throughout the country and have been certified as an expert witness and testified in State and federal court in the areas of:

*-Police Policy, Procedures and Practices*
*-Peace Officer Standards and Training*
*- Use of Force*
*- Officer Involved Shootings*
*-Pursuit/Emergency Driving*
*-In-Custody / Restraint Deaths*
*-Active Shooter Policies and Procedures*
*-Search Warrants*
*-Taser Policy & Training*
*-Crowd and Riot Control Policies and Procedures*
*-Racial Discrimination*
*-Police Employment Practices*
*-Jail & Custody Practices*

During my 42 years as a sworn active uniformed law enforcement officer, I supervised, managed, and commanded a vast number of police personnel and units covering a wide range of assignments. As a Captain/Station Commander with the Los Angeles County Sheriff's Department for close to 30 years and a California State Chief of Police for over 10 years, I served in the capacity of an executive level administrator in the areas of field patrol, criminal investigations, officer involved shooting investigations and use of force training and policy.

David Couch, Sr. et al. vs. State of California, et al.
U.S.D.C. Eastern District of California Case No.: 2:24-cv-00481-TLN-AC
Report of Police Practices Expert Clarence R. Chapman

---

I have been retained and testified as an expert witness in the states of Alaska, Alabama, California, Colorado, Illinois, Nevada, New Mexico, New York, Ohio, Oregon, Texas, Arizona, Florida, Oklahoma, and Washington State.

CAREER HIGHLIGHTS:

Between 1980 and 1982, I was appointed to the California State Governor Jerry Brown's Office as Project Manager and served for four years over the criminal identification and tracking project, known as the **California Career Criminal Apprehension Program.**

Between 1987 and 1990, while assigned to the Sheriff's Department Detective Division, Narcotic Bureau, I successfully applied for and managed a $3 million federal drug enforcement grant aimed at targeting Los Angeles area street gangs engaged in mid-level cocaine operations. Under my leadership, this well-regarded and widely publicized initiative—known as the **STAR Grant** (Sheriff's Task Force Against Rock)—employed a multi-agency approach, integrating agents and investigators from the Federal Bureau of Investigation, State Bureau of Narcotics Enforcement, and the Los Angeles County District Attorney's Office. During this project, I was sworn in as a Deputy United States Marshal and served in that capacity for over four years.

In January of 1998, I was selected to participate on a task force with the **UCLA Anderson School of Management** to formulate an executive management curriculum for the Los Angeles Police Department's senior command staff. That effort culminated in the creation of an accredited police management course for all LAPD senior level police administrators.

In June of 1992, the Federal Bureau of Investigation selected me to attend the prestigious **National Law Enforcement Executive Academy** in Quantico, VA.

As a nationally recognized police practices management consultant and instructor in 1999, I was selected by the State of California Department of Justice, Commission on Peace Officers Standards and Training (POST) to serve as a staff instructor for the Center of Leadership Development. In this capacity, I was an instructor in the California State **Executive Development Management Program.**

In January 2000, the City of Los Angeles contracted me to assist the mayor's office in developing a systematic approach to facilitate compliance with a federal court consent decree involving LAPD training and citywide employment practices.

From June of 2001 through 2005, I was appointed as an **independent monitor** by the Federal Court in the District of New Mexico to oversee a class action lawsuit involving civil rights violations by local law enforcement. In that capacity, I was commissioned to monitor claims regarding law enforcement policies, practices, and training in the areas of racial profiling, search and seizure, arrests and detention statistics and occurrences of police use of force.
*[Refer: Johnson, et al. vs. City of Hobbs, et al., CIV 99-00348 MV/JHG-ACE]*

PUBLICATIONS:

Los Angeles Times Editorial: **"Silence Code Doesn't Exist"** - December 1992

David Couch, Sr. et al. vs. State of California, et al.
U.S.D.C. Eastern District of California Case No.: 2:24-cv-00481-TLN-AC
Report of Police Practices Expert Clarence R. Chapman

---

NATIONAL TELEVISION APPEARANCES:

McNeil / Lehrer News hour: **Street Gangs & the Drug Trade** – April 1988

LECTURES, SPEAKING APPEARANCES & TRAINING ATTENDED:

- UCLA Law School: **Community Crime and Drugs** - October 2000

- New Mexico Law Enforcement Training Conference, "Policing 2000: Entering the New Millennium": Guest Lecturer on: Police Use of Force & Racial Profiling – December 2000

- Los Angeles County Professional Peace Officers Association: Guest Speaker: **The Media and Law Enforcement** – March 2001

- Seminar panelist with Professor James Q. Wilson: **The LAPD and the Community** - UCLA – July 2001

- POST sponsored training seminar, guest lecturer to the San Bernardino Sheriff's and Chief's Association on the topic of **Racial Profiling** – January 2002

- Taser Use of Force, Risk Management and Legal Strategies, Taser International, March 16, 2009

- Seminar panelist on Taser use and in-custody death related to Excited Delirium syndrome – October 2009

- 40 hours Force Science Institute Training Course, Henderson, Nevada, 2016

- Force Science Instructors Course, Containment and De-Escalation, Los Angeles, California, 2019

EDUCATION:
- Master of Business Administration: UCLA Executive Program, Los Angeles, CA, 1997
- Postgraduate Certificate: (Criminal Justice Ed.), University of Virginia, Quantico, VA. 1992
- Bachelor of Science: (Public Affairs), Pepperdine University, Malibu, CA, 1980
- Postgraduate Studies: (Public Administration), University of Southern California

RECOGNITION:
- **Career Achievement Award:** National Organization of Black Law Enforcement Executives, 2002

- **Law Enforcement Achiever Tribute Award** from California Governor Gray Davis, 2002

CALIFORNIA POST CERTIFICATES HELD:
*-Basic Certificate*
*-Intermediate Certificate*
*-Advanced Certificate*
*-Supervisory Certificate*
*-Management Certificate*
*-Executive Certificate*

David Couch, Sr. et al. vs. State of California, et al.
U.S.D.C. Eastern District of California Case No.: 2:24-cv-00481-TLN-AC
Report of Police Practices Expert Clarence R. Chapman

---

## TRAINING AND CERTIFICATIONS ATTAINED:

- *Teaching Credential*, State of California Vocational: Police Science, 1982
- *Police Personnel Management* (POST 1990)
- *Hostage Negotiations*, Rio Hondo Community College, 1990
- *Certificate of Achievement*, Criminal Justice Education, (University of Virginia), 1992
- *Executive Development Program* (POST 1995)
- *Law Enforcement Southwest Command College;* Federal Bureau of Investigation, 1996
- *Law Enforcement Executive Development Program;* Federal Bureau of Investigation, 1998
- *Axon Enterprises Taser Defensive Strategies Course, 2023*
- *Expert Witness Symposium, 2023*
- *Association of Lawyers Defending Business (dri) Civil Rights and Governmental Tort Liability Seminar, 2024*

## AFFILIATIONS:

*Graduate*, FBI National Academy, United States Department of Justice
*Staff Instructor*, Peace Officer Standards and Training – Executive Development Program
*Member*, California Peace Officers Association
*Member*, Los Angeles County Black Peace Officers Association
*Member*, FBI Law Enforcement Executive Development Association
*Member*, FBI National Academy Graduates
*Member*, International Association of Chiefs of Police
*Member*, National Organization of Black Law Enforcement Executives
*Ex-Board Member*, Santa Monica Community College Citizen's Bond Oversight Commission
*Associate Member*, California State Sheriff's Association
*Ex-Commissioner*, City of Malibu Public Safety Group
*Subscriber*, American for Effective Law Enforcement
*Past Member*, International Union of Police Associations
*Past Member;* Los Angeles County Management Council
*Past Member*, National Sheriff's Association
*Past Member*, Los Angeles County Chiefs of Police Association
*Past Member*, University of California Association of Black Administrators
*Past Member*, International Association of College Law Enforcement Administrators
*Past Member*, Los Angeles County Sheriff's Executive & Command Support & Advisory Group
*Past Member*, Board of Directors – Peace Officer Association of Los Angeles County

*David Couch, Sr. et al. vs. State of California, et al.*
*U.S.D.C. Eastern District of California Case No.: 2:24-cv-00481-TLN-AC*
*Report of Police Practices Expert Clarence R. Chapman*

# F E E   S C H E D U L E

### NATIONAL JUSTICE CONSULTANTS, INC
[Federal Tax ID# 95-4413728]
## CLARENCE ROBERT CHAPMAN
POLICE PRACTICES EXPERT

### CASE RETAINER                                                              $10,000.00
This nonrefundable retainer fee is due prior to the start of work and is an advance payment against future billing.  Upon depletion of the retainer, appropriate billing will commence at the indicated hourly rate. No opinions, reports or testimony will be provided prior to receiving receipt of the retainer fee, except when otherwise indicated or negotiated.

### CASE WORK / HOURLY RATE                                          $600.00 per hour
This hourly fee applies to all directed activities associated with case review, analysis, research, and preparation. Included in this category are administrative and operating expenses, organizational audits, production of reports, witness interviews, site surveys, client meetings, production of exhibits / visual aids, and teleconferencing expenses and reports.  Payment is due upon receipt of the invoice and payable within 30 days. *I reserve the right to suspend all work and refuse delivery of services until outstanding balances over 60 days past due are paid in full.*

### COURT APPEARANCES          *Half Day Flat Fee of $4,000.00  - Full Day Flat Fee of $8,000.00*
This fee applies to all court appearances and case related hearings regardless of whether testimony is given.  Appearances lasting less than four hours will be billed at the ½ day rate. Any required appearance time beyond the morning sessions will be billed at the full day rate.

### DEPOSITION APPEARANCES                                          $600.00 per hour
Expert elects to have all depositions taken virtually.  All depositions are subject to a four hour minimum preparation fee *(Miller v. Sawat, 114 F.4ᵗʰ 1071 (9ᵗʰ Cir. 2024)* in addition to a four hour minimum for deposition appearance.  In cases where there is a demand by opposing counsel and a subsequent agreement for an in-person deposition appearance, payment of a four-hour minimum for the appearance plus payment for case preparation and all anticipated expenses must be received three days prior to the scheduled deposition date.  Failure to receive such payment will result in a non-appearance by expert.

### REQUIRED TRAVEL                                                              [AT COST]
Travel related expenses including hotel accommodations, airline tickets, taxi/limousine services and parking fees will be billed at cost. Business Class air travel is required for flights more than 2 hours in duration. Travel by car will be billed at a rate of $0.75 per mile.  Travel time to and from scheduled meetings and appearances is billed at my hourly rate.

### REQUEST FOR EXPEDITED REPORTS                          $1,200.00 per hour
There will be a surcharge of three times the hourly rate for expedited F.R.C.P. Rule 26(a) expert reports required to be produced and submitted in less than 30 court days.

*David Couch, Sr. et al. vs. State of California, et al.*
*U.S.D.C. Eastern District of California Case No.: 2:24-cv-00481-TLN-AC*
*Report of Police Practices Expert Clarence R. Chapman*

RECORD OF COURT & DEPOSITION TESTIMONY APPEARANCES

COURT APPEARANCES

**2022**

| | | | | |
|---|---|---|---|---|
| Brenes | v. | Las Vegas Metro Police | (F) | 2:12-cv-01635 JCM (VCF) |
| Elkins | v. | CHP | (F) | 1:13-cv-01483-AWI-SAB |
| Perez | v. | Tulare County | (S) | VCU285108 |
| Ochoa | v. | Kern County | (F) | 1:18-cv-01599-LJO-JLT |

**2023**

| | | | | |
|---|---|---|---|---|
| Carcamo | v. | County of Los Angeles | (S) | TC 028078 |
| Gonzalez | v. | County of Fresno | (S) | 18CECG03672 |
| Waddell | v. | City of Burbank | (S) | 21stcv34560 |
| Hermann | v. | San Bernardino County | (F) | 5:20-cv-01682-JAK (SPx) |
| Toland | v. | City of Pasadena | (F) | 2:21-cv-04797-AB-AGR |

**2024**

| | | | | |
|---|---|---|---|---|
| Hurtado | v. | CHP | (F) | 2:19-cv-02343-TLN-AC |
| Moller | v. | San Bernardino County | (F) | 5:22-cv-01306-DSF-MARx |
| Smith | v. | Bakersfield | (S) | 1:21-cv-00494-JLT-CDB |
| Rushing | v. | Chico | (F) | 2:18-cv-01692-DAD-AC |
| Hurtado (Retrial) | v. | CHP | (F) | 2:19-cv-02343-TLN-AC |
| Pitts | v. | CHP | (F) | 2:20-cv-01243-WBS-JDP |
| Sesman | v. | CHP | (F) | 5:21-cv-1694-JWH-(KKx) |

**2025**

| | | | | |
|---|---|---|---|---|
| Riaz | v. | City of Visalia | (F) | 1:23-cv-00068-KES-CBD |
| Lewis | v. | County of Kern | (F) | 1:21-cv-00378-KES |
| Padilla | v. | CHP | (F) | 22STCV00661 |
| Gold | v. | CHP | (F) | 3:23-cv-03414-RFL |
| Cortez | v. | USC | (S) | 22STCV20234 |

**2026**

| | | | | |
|---|---|---|---|---|
| Johnson | v. | City of Santa Rosa | (F) | 3:23-cv-02478-JSC |

(F) Indicates Federal Court Appearance
(S) Indicates State Court Appearance
(P) Indicates Plaintiffs Case
(A) Indicates Arbitration Hearing
(E) Indicates Employment /Adverse Action Case

David Couch, Sr. et al. vs. State of California, et al.
U.S.D.C. Eastern District of California Case No.: 2:24-cv-00481-TLN-AC
Report of Police Practices Expert Clarence R. Chapman

## DEPOSITION APPEARANCES

**2022**

| | | | | |
|---|---|---|---|---|
| Astorga | v. | County of Los Angeles | (F) | 2:20-cv-09805-AB-(AGR) |
| Bender | v. | City of Rialto | (F) | 5:20-cv-02171-JWH (SPx) |
| Cooper | v. | Cabral | (S) | 19STCV22891 |
| Crawford | v. | City of Bakersfield | (F) | 1:18-cv-00307-DAD-JLT |
| Hurtado | v. | CHP | (F) | 2:19-cv-02343-TLN-AC |
| Carrasco | v. | City of Glendora | (F) | 2:21-cv-05965-MWF-AS |
| Sesma | v. | CHP | (F) | 5:21-cv-01694-JWH-KK |
| Hermann | v. | San Bernardino County | (F) | 5:20-cv-01682-JAK (SPx) |
| Carcamo | v. | County of Los Angeles | (S) | TC 028076 |

**2023**

| | | | | |
|---|---|---|---|---|
| Standt | v. | City of Los Angeles | (F) | 2:21-cv-09301-FLA-JPR |
| Williams | v. | Las Vegas Metro Police | (F) | 2:21-cv-03465 |
| I.M. | v. | CHP | (F) | 2:20-cv-11174 FMO |
| Waddell | v. | City of Burbank | (S) | 21STCV34560 |
| Toland | v. | City of Pasadena | (F) | 2:21-cv-04797-FWS |
| TUHSD | v. | City of Taft | (S) | S-1500-cv-283804 |
| C.R. & D.R. | v. | Kern County | (F) | 1:21-cv-01593-DAD-BAK |
| Stern | v. | LAHPM | (F) | 2:21-cv-04525-CBM-AS |
| Wilson | v. | CHP | (F) | 3:21-cv-03824-MMC |
| Savage | v. | City of Whittier | (F) | 2:21-cv-08067-VAP-HPM |
| Astorga [V.II] | v. | County of Los Angeles | (F) | 2:20-cv-09805-AB-(AGR) |
| Hernandez | v. | County of Los Angeles | (S) | 19STCV33158 |
| James | v. | LAPD | (F) | 2:21-cv-04525-CBM-AS |
| Mendoza | v. | Kings County | (F) | 1:21-cv-00721-JTL-BAM |

**2024**

| | | | | |
|---|---|---|---|---|
| Cooper | v. | County of San Bernardino | (F) | 1:21-cv-0949-PSG-(PLAx) |
| Hernandez | v. | City of Rialto | (F) | 5:22-cv-01807-SSS-SP |
| Mullins | v. | County of Fresno | (F) | 1:21-cv-00405-AWI-SAB |
| Pitts | v. | CHP | (F) | 2:20-cv-01243-WBS-JDP |
| A.L. | v. | City of Bakersfield | (F) | 1:23-CV-00885-AWI |
| Padilla | v. | CHP | (S) | 22STCV00661 |
| Coyle | v. | County of Los Angeles | (S) | 21STCV27463 |
| Gold | v. | CHP | (F) | 3:23-cv-03414-RFL |
| Gutierrez | v. | Visalia | (F) | 1:21-cv-01700-JLT-HBK |

**2025**

| | | | | |
|---|---|---|---|---|
| Land | v. | County of Los Angeles | (S) | 21STCV32725 |
| Caesar | v. | CHP | (S) | 22CV0119193 |

David Couch, Sr. et al. vs. State of California, et al.
U.S.D.C. Eastern District of California Case No.: 2:24-cv-00481-TLN-AC
*Report of Police Practices Expert Clarence R. Chapman*

| | | | | |
|---|---|---|---|---|
| Salgado | v. | Huntington Park | (F) | 2:23-CV-09412 CBM |
| D. B. | v. | Stockton | (F) | 2:21-cv-02154-DJC-SCR |
| Yuriar | v. | CHP | (F) | 4:23-cv-06438-KAW |
| Catcott | v. | State Parks & Recreation | (S) | 37-2023-00008122-CU-PO |
| | | | | 37-2023-0029948-CU-OA |

**2026**

| | | | | |
|---|---|---|---|---|
| Gonzalez | v. | State of California – CHP | (F) | 5:25-cv-00331-KK-DTB |
| Gaeta | v. | City of Stockton | (F) | 2:23-cv-00077-TLN-KJN |