# MATTHEW F. CARROLL, M.D.

501 West Broadway, Suite 1490
San Diego, California 92101
(619) 2827172   Fax (619) 2827626

May 5, 2026

Dean, Gazzo, Roistacher
440 Stevens Avenue, Suite 100
Solana Beach, CA 92075

Re: David Couch Sr. and Jeanelle Couch V State of California et al.

Dear Sirs,

At your request, I have reviewed records in this matter. The purpose of this report is to address psychiatric issues that are relevant to the complaint, regarding the February 9, 2023 incident involving David Couch.

**Documents Reviewed**

**Summons and Complaint for Damages (Shasta County Superior Court Case No. 204058)**

1. 42 U.S.C. §1983 – Fourth Amendment Excessive Force
2. 42 U.S.C. §1983 – Eighth/Fourteenth Amendment Failure to Provide Medical Care
3. 42 U.S.C. §1983 – Fourteenth Amendment Denial of Familial Relationship
4. Battery (Survival/Wrongful Death)
5. Negligence (Survival/Wrongful Death)
6. Violation of California Civil Code §52.1

This lawsuit arises from the February 9, 2023, fatal shooting of David Couch, Jr. by California Highway Patrol Officer Ryan Cates. Couch was arrested on December 25, 2022. He pleaded guilty/nolo contendere on or about January 10, 2023, and was sentenced and released on February 8, 2023. During his custody he was held in solitary confinement; jail medical staff allegedly prescribed improper medication, failed to provide appropriate mental health treatment, and released him on February 8 without discharge planning or follow up care while he was still in the midst of a manic episode.

The following day, February 9, at approximately 5:45 p.m., Officer Cates responded to Couch's Redding residence. Cates did not respond with lights and sirens, and had no information of an ongoing violent crime or imminent harm. Cates parked his patrol vehicle blocking Couch's car, immediately drew and pointed his firearm at Couch  and began yelling commands.

Couch calmly exited the vehicle, walked slowly to the front of the patrol car, as though he was texting. Instead of calling for backup, using deescalation techniques, or employing less lethal options available to him, Cates aggressively approached, grabbed and pulled Couch with his left hand while holding his cocked firearm pointed at Couch's face and chest with his right hand, without further verbal commands or an arrest announcement. When Couch pulled away in fear, Cates escalated by attacking him and then fired multiple shots, striking and killing Couch.

**Video, February 9, 2023**

Based on my listening to the video of the incident, the following appears to be said. There are unintelligible portions.

(Show me your hands. Show me your hands. Put your hands up).

Fuck you, Faggott, What the fuck is your problem. You're a jackass. You ain't kidding me, bro. Are you fucking kidding me or not?

(Get on the fucking ground or I'll shoot you right now.)

Give me that gun, right now, man.

Pull up a forty five, faggot. You think I'm scared of you, bitch? You ain't doing shit, dirty cop. Hey RPD! You ain't doing shit, bro. Leave me alone, dude. I'm not even resisting arrest. Give me a forty five right now, I'm going to fuck you up. Not working.

**California Highway Patrol (CHP) Northern Division Multidisciplinary Accident Investigation Team (MAIT) Supplemental Investigation Report 499 pages**

"On February 9th, 2023, Officer Cates was on duty, working his scheduled patrol assignment with the California Highway Patrol. During his shift, he was notified of a call for service pertaining to a driver brandishing a rifle at other vehicles. The 911 caller provided the license plate and description of the vehicle responsible. Officer Cates conducted a records check of the suspect vehicle using his patrol vehicle's Mobile Data Computer (MDC). He learned that the vehicle was registered at 3060 Island Drive, In Redding. Officer Cates drove by the location and observed the white Ford sedan, matching the description provided by the reporting party, stopped

in the driveway of the residence. Officer Cates activated his vehicle's emergency lights and conducted a high risk traffic stop on the suspect vehicle in the driveway of the residence. Officer Cates requested radio priority while he conducted the high risk stop. Officer Cates attempted to contact and detain the driver of the vehicle, later identified as Couch. Immediately, Couch refused Officer Cates' commands and became verbally aggressive. Couch told Officer Cates to "shoot" him. During the encounter, a physical struggle ensued between Officer Cates and Couch. Couch was wearing a tactical style vest with knives, a bayonet, and an empty handgun holster attached to the front of the vest.

Officer Cates used various levels of force in an attempt to control and detain Couch. Officer Cates provided verbal commands, he used his hands to attempt to control Couch, and he discharged two cartridges from his department issued TASER at Couch. All efforts at this point were ineffective and he continued to physically struggle with Couch. During the struggle, Couch grabbed ahold of the barrel and slide of Officer Cates' firearm and made statements about using the firearm against Officer Cates. Officer Cates was able to maintain control of the firearm and separated himself from Couch. Couch picked up Officer Cates' TASER, which fell to the ground during the altercation, and advanced towards Officer Cates with the TASER extended towards him. Based on Couch's actions and statements, Officer Cates believed Couch intended to kill him. Officer Cates believed if he was struck by the TASER, Couch could gain control of his firearm and use it against him. Officer Cates estimated Couch was only 46 feet away from him with the TASER extended towards him. Officer Cates could see the safety feature of the TASER was turned off, as the light on the front of the TASER was illuminated.

Officer Cates attempted to shoot Couch with his firearm, however, the weapon malfunctioned. Officer Cates pulled back and released the slide on his firearm, in an attempt to correct the malfunction. He then fired four rounds from his firearm towards Couch, striking him multiple times. Officer Cates immediately administered medical aid on Couch and notified his dispatch of the shooting."

The subsequent investigation included a comprehensive forensic documentation of the scene by the CHP Multidisciplinary Accident Investigation Team (MAIT). Using advanced 3D laser scanning technology and Total Station surveying equipment, the MAIT team created precise diagrams and captured 145 photographs showing the exact locations of all physical evidence. This evidence included multiple .40 caliber casings, extensive Taser components such as wires, probes, and cartridge parts, Couch's tactical vest with the attached knives, a separate green pocketknife, clothing, and other personal items. Officer Cates later provided a voluntary statement and participated in a formal interview.

Investigators reviewed his MVARS footage, CHP Air Operations video, conducted numerous witness and family interviews, executed search warrants on the suspect vehicle and digital

devices, and examined David Couch's prior criminal history as part of the full critical incident review.

The report included records from previous incidents:

**May 10, 2019**, Redding Police Officer Bailey Odell was dispatched to 3091 Island Drive for a report of a male subject vandalizing a vehicle. The reporting party advised that the suspect was his nephew, who had mental health issues, was under the influence of alcohol, and was armed with a metal pipe while breaking windows. The suspect was described as a white male adult wearing a black shirt with black paint on his face and arms. Upon arrival, officers located David Couch in Girvan Park.  He was detained in handcuffs by Officer Leonard and Officer McGinnis.

At the victim's residence, Odell observed the parked vehicle with extensive damage: every window shattered, both headlights and taillights broken, all four tires slashed (with a knife found on the ground nearby), and numerous dents and dings throughout the body. The victim was Couch's uncle and the vehicle owner, estimated the damage at approximately $3,000 or more. He told officers he and his wife were in their bedroom when they heard kicking near the window followed by loud "pops" that sounded like gunshots.

When he went outside, he saw Couch smashing the windows and other items on the vehicle with a large metal pipe. He yelled at Couch to stop, but Couch did not listen. Fearing for his safety, he retreated inside, locked the door, and called police.

In his recorded interview, Couch admitted he had been angry with his uncle because the uncle was being "weird," which made him go over to the house and "beat up" the vehicle. He stated he slashed all four tires, broke all the windows, and damaged other parts of the body. He explained that he heard police were coming so he ran toward Girvan Park, where he complied with officers' commands upon contact. Couch disclosed that he had been diagnosed with Bipolar disorder several years earlier and had consumed alcohol that day.

**December 25, 2022**, at approximately 1:24 p.m., Redding Police Officer Timothy Jaegel was dispatched to the area of Girvan Avenue and Hemlock Street for a report of a male suspect aggressively brandishing a large combat style knife at a passerby while yelling. Jaegel was in full uniform driving a marked patrol vehicle with his K9 partner, Duke. While en route, Officer Ray Maready located two subjects matching the description at the intersection of Highway 273 and Girvan Road. As Maready made a U-turn and activated his overhead lights, he broadcast that the male suspect was uncooperative and had a knife in his hand.

Jaegel arrived seconds later and observed a white male adult (later identified as David Couch) wearing a black sweater and black sweats, yelling at Officer Maready and advancing toward him.

Couch had a belt slung across his chest with a large green handled combat knife (approximately 8–10 inches long with paracord wrapped handle) in a sheath. His hand was on the knife. Maready had his firearm drawn and pointed at Couch, repeatedly ordering him to get on the ground and warning, "you're gonna get shot." Couch stopped advancing but continued yelling, "shoot me" multiple times and "shoot me bitch." Jaegel noted a second subject, later identified as Frankie Kahler, standing nearby near the railroad tracks.

Jaegel deployed K9 Duke on a four foot lead. Duke barked loudly, and Couch looked directly at the dog. Jaegel warned Couch to lie on his stomach or he would send the K9 and "he would get hit." Couch replied, "Send the fucking dog then, I'll fuck him up." When Jaegel repeated the warning, Couch answered, "Fucking do it." Kahler tried to verbally intervene, telling Couch to "be chill". Couch then began reaching for the belt/knife again, prompting multiple commands from both officers to "drop the knife" and "get on your stomach." He refused, remaining hostile and threatening.

Jaegel determined Couch posed an imminent threat and was attempting to access the patrol vehicle that contained firearms. As Couch was distracted trying to remove the belt, Jaegel deployed K9 Duke, who bit Couch on the right thigh. While the dog held on, Jaegel closed the distance and struck Couch in the chest with his forearm, taking him to the ground. Couch smelled strongly of alcohol.

In his recorded statement, Couch admitted he had been walking with his friend when he felt people were following him. He said he pulled out the knife when a white Dodge Charger (driven by victim Dustin Miller) turned around, telling the driver "sup dude" to scare him and trying to pop his tires. He stated he got "pretty close" but didn't want to lose his knife and could have "knifed his whole car." Regarding the officers, he said he was "on edge" about cops in general. He told Maready he had taken three shots of Hennessy and three shots of whiskey.

Victim Dustin Miller said Couch had sprinted toward his car with the "combat knife," got within three feet, and screamed something (he heard "fuck"). Miller feared for his life, accelerated, and swerved to avoid being hit, then called 911.

Officer Maready's supplemental report detailed the initial contact: Couch immediately became upset, walked toward him before Maready could even exit his vehicle, and said, "What the fuck do you want bitch?" When ordered to show hands and get on his knees, Couch refused, grabbed the knife handle, advanced while yelling "Shoot me bitch" multiple times, and challenged, "You're not gonna shoot me, are you." Maready retreated toward the rear of his vehicle, depressed the trigger on his firearm and said "Please don't make me do this." He warned Couch multiple times that if he pulled the knife he would shoot. Couch continued advancing to the open driver's door of the patrol vehicle which contained accessible firearms. After K9 deployment and

takedown, Couch stood up and said something to the effect of, "Is it all you got?" He later made spontaneous statements that he "loved" what the dog did and thought it was "bad ass," laughed, and repeatedly said he understood why officers did what they did.

Frankie Kahler (Couch's companion) was detained but released. He related they had been walking when a white car driver appeared to stare at them, upsetting Couch. Kahler said Couch sometimes gets upset easily and believes people are "rat packing" him. He told officers, "You guys had to do what you had to do" and that his friend can be "hot headed sometimes."

**Anderson Police Department Incident Report Summary**

Anderson Police Department Incident 23A001391 was an assist to the California Highway Patrol for an officer involved shooting that occurred on February 9, 2023, at approximately 17:47–17:49 at 3060 Island Drive in Redding, California. The suspect, a local resident and housekeeper at the Red Lion Hotel, sustained three gunshot wounds — one to the head/neck (with the projectile later recovered in his neck), one to the left chest (perforating the lung and fracturing a rib), and one to the right thigh (severing the superficial femoral artery). He was transported in full cardiac arrest, underwent emergency surgeries and organ donation, and was pronounced brain dead on February 14, 2023. The manner of death was ruled a homicide.

Earlier that day, Couch had visited the Red Lion Hotel around 10:00 a.m. with a male friend to inquire about rehiring after a recent jail stint; he was in a good mood and spoke briefly with his supervisor. He later went to the home of coworker and friend Melanie Avila around 3:40–4:30 p.m., where he repeatedly claimed to be God and spoke at length about the Bible and Corinthians in a sermon like manner, though he remained smiling and appeared happy. Neighbor Jill Stidham heard five gunshots, saw a teenage girl running toward the park, and arrived to find CHP officers performing CPR on Couch; she took a photograph and short video of the scene and later described him as a "troubled child." Red Lion coworkers confirmed he was a reliable, employee with no behavioral concerns or disciplinary issues. Anderson PD collected multiple audio recordings of 911 calls and witness interviews, along with Stidham's scene photo and video. The case was closed as an assist to CHP.

**Administrative Interview – Officer Ryan Cates, February 13, 2023**

"So, on February 9, 2023, at approximately 1730 hours, I was in full CHP cold weather uniform and a blue CHP cap, and I was driving a fully marked CHP patrol vehicle 1484373, which is equipped with a functioning MVARS system. And I was equipped with a MVARS pocket microphone in my left pocket. I had monitored a broadcast from CHP dispatch of a 417 on I5 southbound. The suspect vehicle was described as white Ford sedan with the word 500 on the

side and a California license plate of 8SamTomMary184. Suspect was described as a bald male possibly wearing a grey hoodie who pointed a rifle with a black barrel and brown handle out the window.

I conducted a DMV record check of that vehicle using the patrol vehicle's MDC and observed the vehicle was registered to an address of 3060 Island Drive. I drove to that address. As I drove past that address, I observed a vehicle matching the description of a white Ford 500 with the matching license plate parked in the driveway facing north. As I passed, I observed the driver door was partially open and I could see a male, what appeared to be a male, seated in the driver seat holding an unknown object with his hands. I only observed him briefly because the door was only partially open. As I continued past the house, I notified CHP dispatch that the suspect vehicle was at the address, and I made a U-turn to go back towards the suspect vehicle. I requested an emergency tone. At that time, I knew that all other CHP units were busy on other calls or an extended response time away from me.

And based on the information that the driver of the Ford was armed with a rifle, and had already pointed it out the window, and that the vehicle was a match; I chose to make a high risk stop on the Ford. Made a right turn partially in the driveway behind the Ford and activated the patrol vehicles forward red lights to initiate that high risk stop. I exited the patrol vehicle and I stood behind the driver's door, I drew my service weapon from the holster and pointed it towards the driver in case the driver emerged with a weapon. I yelled to the driver of the Ford to show me his hands. Driver exited the vehicle with a cellular phone in both of his hands.

When he exited the vehicle, I immediately observed that he was wearing a tactical vest. The tactical vest had a very large bayonet style knife on the left side with another knife clipped above it. At that time, I also noticed that there was an empty pistol holster on the right side of the vest. My training and experience led me to believe that most people who wear pistol holsters are typically armed with pistols. And at that time, I believed that he was likely in possession of a pistol and a rifle or had one or both inside the Ford. I ordered the driver to get on the ground and he refused and walked toward the rear of the Ford. As he walked toward me and verbally refused my commands, I chose to leave the door of the patrol vehicle in order to minimize the chance of him returning to the Ford to retrieve the firearm. As I approached him, I maintained my pistol in my right hand. Excuse me or arming himself with one of the knives that's on his vest. As I approached him, I maintained my pistol in my right hand, I grasped his right arm with my left hand, and I attempted to place him in a control hold and ordered him to get on the ground. He clenched his fist and jerked his arm away from me, out of my grasp, and I noticed that he was quite strong. I backed away from the suspect and he clenched both fist and took a combative stance towards me and began yelling at me. The suspect walked toward me in an aggressive manner, and I removed the electronic control device from the holster with my left hand and pointed at the suspect as he continued toward me. Due to his apparent strength and the fact that

he was armed with two knives on his person within easy grasping range, his combative stance, his yelling at me, and his steps towards me; I believed he intended to cause me great bodily injury and had the ability to do so. And I was in fear of being injured.

I maintained my service pistol in my right hand and fired the electronic control device towards his beltline. He swiped away at the ECD prongs and the ECD had no effect on him, and he continued toward me. As he continued toward me, I fired the ECD a second time and again he swiped the ECD prongs away and they had no effect on him. I moved to my left and attempted to place the ECD back in the holster, but I missed the holster and dropped the ECD to the ground. I pushed the suspect toward the left front corner of the patrol vehicle. I was able to push him up against the left front corner and I attempted to pin him against the vehicle with my body weight. Due to the fact that he was still armed with two knives within his grasping distance, and I didn't know whether he was armed with a pistol or not, and I believed that he was, I maintained my pistol in my right hand and I placed the barrel of it against the right side of his head. I gave him multiple orders to give me his hands and he refused. He then reached up with his hand and grasped the top of my pistol and attempted to pull it from me. At which point I jerked it away and was able to maintain control of it. As we struggled, he made numerous statements such as; pop a 45 and kill me. Based on his aggressive actions at that point, the fact that he had grabbed my pistol, the fact that he yelled "kill me" I believe he had the intent of taking the pistol from me and using it against me. I believe that if he was able to get it from me, my pistol from me, he would use it to kill me. I maintained my body weight against him, keeping him pinned against the left front of the patrol vehicle. I used my right arm with the pistol in it to push him farther forward against the patrol vehicle and with my left hand I pulled handcuffs from my belt and attempted to place them on his left arm. He then spun away to the right.

After spinning away, he said something to the effect of give me the 45 and I'll fuck you up. Which I believed meant that he was attempting to take my weapon and use it against me. I then observed him pick up the ECD and point it at me. Based on his previous aggressive actions towards me, his combative resistance thus far, his use of techniques to avoid being affected by the ECD, his attempt to take my service pistol from me, and his threatening statements, and the fact that he armed himself with my ECD I believed he had the intention and the ability to use the ECD to cause me injury, incapacitate me, and ultimately disarm me of my pistol, and use the pistol against me to kill me, and I feared for my life.

I attempted to eliminate the threat to my life by firing my service pistol and depressing the trigger once. And it did not fire. The suspect stated something along the lines of; doesn't work does it, as he stepped toward me with the ECD pointed at me. I performed a malfunction drill and fired four rounds at the suspect to eliminate the threat to my life. He fell forward towards me and landed face down on the roadway. I ordered the suspect to put his hands behind his back and I placed my body weight on him to pin him to the ground and restrict his ability to use a weapon

against me. I holstered my pistol, placed his left hand in handcuffs behind his back, I grasped his right arm and moved it towards his right hand – Excuse me, towards his left hand. As I did that, he grasped the handcuffs with his right hand, but I was able to pull the handcuffs from his grasp and secured his right hand in the handcuffs. I turned him over on to his back, I used my radio to request an ambulance Code 3, but I did not get a response from CHP dispatch.

I looked down and observed my radio power switch was off. I turned it on and requested an ambulance Code 3 again. I advised CHP dispatch that shots had been fired. I observed that the suspect was still breathing and that he had a pulse. I also observed one gunshot wound to his forehead above his left eye, and I did not observe any other gunshot wounds at that time. I observed people who I believed to be his family, standing behind the patrol vehicle. I got up and removed the medical bag from the patrol vehicle, I donned gloves, and removed gauze from the medical bag. I observed that his breathing was labored, I lifted his head to open his airway and his breathing became less labored. I placed a roll of gauze over the gunshot wound on his head and I held his head up to keep his airway open until a Redding Police Department officer arrived on scene and took control of his head from me."

**Deposition of Ryan Cates, November 3, 2025**

Officer Ryan Cates (CHP) responded to a radio dispatch call reporting a suspect brandishing a rifle at another person on the freeway. He recalled the incident began at approximately 1725 hours (5:25 p.m.). His plan upon receiving the call was "to attempt to determine who the owner of the vehicle was or where the vehicle was registered to, and to investigate it further."

Cates parked his fully marked CHP patrol vehicle at an angle to the rear of the suspect's white vehicle "so that when I opened my door, the ballistic paneling in my door... would open out and provide me with ballistic cover in case the suspect emerged with the firearm that he was reportedly carrying in the vehicle, the rifle."

He immediately exited, drew his CHP issued Smith & Wesson M&P .40 caliber pistol, pointed it at the driver (David Couch, Jr.), and activated his red lights . He ordered Couch to "show me his hands and put his hands in the air." Couch exited the vehicle but "failed to comply to show me his hands and put his hands in the air" and was "aggressing towards me." Cates left his position of cover behind the door "because I didn't want him to go back to the vehicle and arm himself with the rifle."

Couch (described as a white male with short/bald hair, possibly in a hoodie) had a large fighting knife/bayonet on his vest "very near his hands" (secured with a button or strap on the sheath), an empty pistol holster "indicating that he had a pistol," and initially held a cell phone in both hands. His hands were "very animated." Cates never saw a gun in Couch's hands.

Cates gave "numerous commands throughout the entire incident," including to show hands and turn around. "I wasn't going to engage him in conversation and attempt to interview him in his driveway before securing his hands and making the situation safe."

Couch refused to comply, looked at his phone, and continued acting aggressive. Before physical contact, Couch called Cates a "faggot" (and possibly other names Cates could not fully recall). Cates initiated physical contact by grabbing Couch with his left hand (pistol in right hand). Couch "pulled his hand away" easily, took "a fighting stance, clenching his fists several times, and tensing his body in an aggressive manner and began yelling at me." Couch said something to the effect of "Don't touch me." Cates backed up, stating: "He doesn't get to choose whether or not I touch him" because Couch was being lawfully detained.

Cates attempted control holds and used body weight to gain compliance and pin Couch against the front/hood of the patrol vehicle. Couch was "very strong." Cates placed the muzzle of his pistol on the right side/back of Couch's head and attempted to handcuff one wrist. Couch reached back with his right hand and "grabbed my pistol" (grasping the top/slide/barrel). Cates pulled the pistol away. Couch then "spun away" to his right. Cates turned his body "to keep him in front of me."

After Couch pulled away and took the fighting stance, Cates drew his Taser. He deployed the Taser twice in probe mode (two cartridges loaded; 25 foot probe range) from an estimated 4–10 feet while backing up. Couch was "moving towards me." Each time, Couch "swiped away at the Taser prongs so that the Taser had no effect on him" Both deployments were ineffective. Cates attempted to holster the Taser; it fell to the ground west of the vehicle (~10–20 feet away, in the street), with wires still attached.

Less than 20 seconds after spinning away Couch bent down, picked up the dropped Taser, and "almost immediately" pointed it at Cates.

Couch then walked toward Cates and quickly closed the distance to a range of 2 to 4 feet. The four shots were fired in less than two seconds while Couch was "walking towards" Cates. Cates performed a malfunction drill on his pistol first (the initial trigger pull malfunctioned; Couch said "Doesn't work" or something similar. Cates then fired four rounds. "I pointed my weapon at the suspect who was attacking me."

He believed deadly force was necessary based on the totality of circumstances

**Tyler Shaffer Audio Transcription (February 10, 2023)**

The interview follows up on Shaffer's 911 call from the previous day regarding a man brandishing a long gun from a moving vehicle on Interstate 5 near Redding, California. Shaffer, who was driving home from work in Palo Cedro, reported seeing the incident while southbound on I5.

She glanced in her rearview mirror and observed a white Ford several car lengths behind her in which the male driver had extended a rifle style firearm—described as having a wooden stock and black barrel, resembling an older style rifle possibly of .22 caliber—completely outside his driver's side window and pointed directly at the rear of her vehicle. She noted a gray SUV traveling alongside the Ford and believed the gun may have been intended to be shown to its driver, though it was aimed at her car. She photographed the vehicle's rear license plate as a precaution.

**Ryan Montana Audio Transcription (February 10, 2023)**

CHP  report February 9, 2023, at 1006 hours, at 3060 Island Drive.

According to Montana, he had just pulled up across the street from the delivery address when a man immediately began banging on and attempting to open the rear rollup door of his full-size UPS truck. The individual emerged from the property to claimed it was "his house," cursed at Montana. "He's just cussing me out and telling me to leave and that he's going to — he's going to shoot me and stuff." He added that the man "said he had a gun" while continuing to advance. "He was going to kill me and — or he was going to — he was going to shoot me and for me to leave. And he was cussing at me, saying, 'This is my house.'" Montana emphasized that these threats occurred immediately upon his arrival and continued noting that the man "would have, you know, done something 100 percent."

**Larry Metzger Interview – February 10, 2023)**

He explains that David has been completely off his prescribed antipsychotic medication, Latuda, for 45 days. The medication costs $3,000 per month and is covered by Medicare; without it, David "thinks he's Jesus, he thinks he's lieutenant colonel in the SEALs," and becomes "a totally different, very aggressive person." Metzger notes that David cannot sleep without the medicine and takes long middle of the night walks from the house to Simpson University and back because "he just can't turn his head off."

"He's — he's just — he's — when he's not on his medicine, first of all, you can tell he just has this menacing look on his face. And it's, it's really hard to be around him."

"he's actually very threatening. He's — he doesn't care. I've seen him fight people and just get clocked and knocked. I saw him one time from afar get hit in the head with a baseball bat and just got up and just kept on going. That's how he is."

Metzger describes David's upbringing. He was repeatedly kicked out of school, placed in special education programs, and later participated in the CCC forestry work program. David has a prior criminal history, including an incident roughly two years earlier in which he believed a neighbor (Alex) was holding his wife hostage and destroyed the couple's car with large boulders.

Regarding law enforcement: "especially when he's [off] medicine, he just thinks you guys are the Antichrist, frankly. And he actually has used that word before."

"So he's always had a problem with authority of any kind."

David said to him: "Yeah. Well, the cop — the punk motherfucker came up and then another cop showed up and I said, 'Come on, motherfucker, we'll do it.' And then they let the dog on him."

Regarding marijuana: "once he was off probation, you know, smoking the weed again, and he wasn't much of a drinker, but he smoked shitloads of weed." "

He used to just smoke "unbelievable amounts of weed."

"But once he found the good weed, that was pretty much where he was at. A couple years, at least."

"He was high all the time."

"His father was also in a mental institution for a long time."

He served jail time and was placed on long term probation with various programs and certificates. David had been released from jail only the day before the shooting. He worked as a "house person" at the Red Lion hotel on Hilltop and was well liked by his boss. When properly medicated, David was "so mellow," but the medication caused him to sleep up to ten hours a day, which he viewed as "unmanly."

**Jeanelle Couch- Interview – February 10, 2023**

 She stated that David "lives at home" and "has a schizoaffective disorder, bipolar." The condition "manifested when he just turned 21." She described manic episodes in which "there is no coming down" and stated, "When he was not medicated, he was manic. There is no alternative." She noted that "he can't function without it. But he just doesn't know that. His, his reality is different." She confirmed symptoms including auditory and visual hallucinations, stating "All of the above" when asked if he hears or sees things. She reported that delusions persist even on medication: "Even when he's heavily medicated and he takes his medicine, which he's been taking it for years, and then all of a sudden he just decided, you know, not going to do it. He always has a thread of altered reality." Specific delusions include beliefs that he is in special forces, that "time had changed, rolled back," and that he is "omnipotent" or "God."

Jeanelle stated that David "has literally never been violent with anybody" and "has never hurt anyone," though he has destroyed property during manic episodes. She said he never threatened suicide or harm to others and, on the day of his release from jail, stated he "will never even harm a bug."

She reported that David "couldn't have" lived on his own. When asked if he ever lived independently, she replied, "No, he couldn't have." "He was just too mentally ill".  "He would be just like those poor people you see on the streets, babbling" when unmedicated.

David had been off psychiatric medication for approximately two months prior to the incident. He was arrested on December 25, 2022, held in Shasta County Jail without medication (including time in solitary confinement), and released on February 8, 2023. Upon release he spoke rapidly and stated "the world is saved, everything is okay now" and that he had "defeated the Antichrist in jail."

On February 9, 2023, Jeanelle left for work before 7:00 a.m. David was not home when she returned at 4:30 p.m. She heard three or four gunshots and saw flashes through sheer curtains but heard no yelling, sirens, or vehicle arrival beforehand.

**Melanie Avila Interview – February 10, 2023**

On February 9, at approximately 8:00 a.m., David arrived at the workplace accompanied by his roommate and best friend, Frankie, to submit paperwork following his recent release from jail. He interacted briefly with Melanie, who was already clocked in and preparing for the day, as well as with supervisor Gilbert Burns. During this encounter, Melanie invited him to visit her home later so they could chat.

Later that afternoon, after 3:30 p.m. when Melanie's son had returned home from school, David arrived unannounced at her residence. According to Melanie, after she emerged from the bath and they began talking, David "put an app—a Bible app on my phone and stuff and was talking about the Corinthians, and that's when he told me he was God." She confirmed that he explicitly stated he was God, noting, "God. Not Jesus, but God." David departed Melanie's home around 4:30 to 5:00 p.m.

**Frankie Kahler Interview – February 10, 2023**

Frankie Kahler is David Couch's roommate and best friend of nearly four years, who shared the small back room at 3060 Island Drive.

On February 9, Mr. Kahler woke up and prepared a cup of coffee. David began discussing his desire to shoot bad guys with the BB gun. Mr. Kahler stated: "He was saying it around like 9:00."

Approximately 11:00 a.m.  The pair ran errands across town and stopped at Liberty Tax. A verbal dispute occurred on the drive home. David accused Mr. Kahler of being tricked and instructed him to shut up. Mr. Kahler recalled:   "He said that I was getting tricked all of a sudden and told me to shut the fuck up."

Mr. Kahler became upset and left the residence to gamble for about one hour. He returned at approximately 1:30 p.m. Upon returning, he observed David wearing a black tactical vest, camouflage pants, a large knife, and the BB gun holstered.

Approximately 2:00–2:30 p.m.  David dropped Mr. Kahler at Clear Creek Market so Mr. Kahler could visit a friend.

Shooting Incident – Shortly After 4:30 p.m. Mr. Kahler heard three to four loud pops. He went outside to investigate and confirmed with David's father, Larry, that gunshots had occurred. Mr. Kahler stated: "I heard that. I was like, yeah, I heard that."

He said David would talk about "war" from the Book of Revelation. David said he wanted to "shoot the bad guys in the butt" with the BB gun, believed he was Michael the Archangel or Abaddon, and claimed an invisible camera was always watching them.

"He thinks there's dirty cops around, and he doesn't like dirty cops, as you can tell. ... He just thinks there's a few dirty cops and ... it's not — it's not like he wants to harm a cop."

**Caleb Coughlin Interview, February 10, 2023**

He explained that David had been prescribed heavy psychiatric medication and noted, "He's a really nice guy. I know he has mental issues. And when he's not on his medication, he can be very paranoid and violent sometimes." David had been released from jail only the day before the interview after approximately two months of incarceration that began shortly before Christmas 2022; during that time he received no medication, and family members had unsuccessfully sought involuntary mental health placement. Caleb recounted a brief telephone conversation the previous day in which David's manic state was evident, stating that he and other family members "knew something bad was going to happen" because David had not been taking his medication consistently.

Throughout the interview Caleb emphasized that David's outbursts had historically been directed at objects rather than people. He observed, "I've never ever seen him hurt anyone, or try to hurt anyone. It's more of like, towards objects," and added that David had always spoken respectfully of law enforcement and military personnel. David possessed BB guns, including one that resembled a real handgun, which Caleb believed may have been in David's hand at the time of the shooting. When asked about the event itself, Caleb expressed genuine surprise, remarking, "it was surprising—Because I know David does get his paranoia and he can be violent when—but I've never ever seen him hurt anyone."

**Deposition of Ariel Lynn Couch, December 1, 2025**

She described a childhood with multiple moves before the family settled for the longest period in Redding, where she and David (approximately 15 months younger) lived together until she left for college at age 18. After leaving home, Ariel had sporadic, contact with David and visited Redding infrequently. In the year before David's death she neither saw nor spoke with him in detail.

She recalled that he was first diagnosed with bipolar disorder and later with schizoaffective disorder, bipolar type, around 2013. She described his delusions: believing it was 20 years in the future, claiming to be a Marine Corps veteran (for which he obtained a tattoo), asserting that his family was not real ("I know you're not really my family, but I love you anyway"), and speaking of a "holy water well under the jail." When off medication he became paranoid, frightened of invisible threats, and once painted his body so he would be visible.

He also expressed beliefs that he was a prophet or Archangel Michael and that medications "muffled his connection to God." She heard secondhand (from her father) that he sometimes reported hearing the "voice of God." Manic episodes (which she observed during her time living at home 2015–2021) involved being awake for up to 40 hours, feeling driven to walk long distances across Redding, buying cheap cars and painting them with whatever paint was available, being overly generous with money, and making grandiose statements.

She sometimes felt unsafe around him, including one incident when he was giving her a ride and, after she commented on his driving, he quickly jerked the car into an oncoming lane.

The main incident she recalled was in 2018 or 2019 when David destroyed their uncle Alex's car because he believed Alex was holding their aunt Ruth hostage. She was aware he had been arrested "a few times." David sometimes drank alcohol becoming louder, more talkative, less inhibited, and more aggressive. He sometimes carried knives and owned BB or pellet guns.

**Deposition of David Couch, Sr., December 2, 2025**

He was previously married to Jeanelle Couch (the coplaintiff and mother of the decedent); they separated in late 1995 in Phoenix, Arizona, and divorced in 2002, with no formal custody or support orders. The last in person contact was around 2009–2010 when they met halfway for the son to return to his mother. Thereafter, they communicated frequently by phone and text. Couch, Sr., learned of the February 9, 2023, incident the next morning when Jeanelle called from the hospital. She described what she had seen, placed the phone to their son's ear so Couch, Sr., could say he loved him, and then stated, "He's gone."

Regarding his son's mental health, Couch, Sr., was aware of serious issues but not the formal diagnosis of schizoaffective disorder. He described conversations in which David Jr. claimed to be a Navy SEAL.

**Deposition of Jeanelle Couch, December 2, 2025**

She related David had been diagnosed with schizoaffective disorder, bipolar type, around age 21 in 2012 after a period of sleeplessness while in the California Conservation Corps. His symptoms included visual and auditory hallucinations, paranoia, and fixed delusions that he was a Navy SEAL and that he was the Archangel Michael. These episodes were often accompanied by carrying knives or other weapons and could be triggered or worsened by stopping his antipsychotic medication, which he frequently did once he began feeling well.

He lived in a granny flat behind his mother's home in Redding and could not live independently. Recent family tragedies—both of his grandparents' deaths in November 2021 and his aunt's death in late October 2022—combined with his stepfather's serious cancer and surgeries, had placed additional stress on him in the months before his death.

"But at the beginning of his issue, he was having hallucinations and he was -- he thought somebody was attacking me. And he was running through the house (with a sword) banging on the doors. And I called the police department. And they came and arrested him and said he needs to live under a bridge now."

On February 8, 2023, David was released from the Shasta County Jail after the Christmas arrest. His roommate and best friend, Frankie, picked him up and brought him home around 5:00 p.m. Jeanelle arrived shortly afterward and found him manic, speaking very rapidly, and unusually eager to talk and "chitchat.". They had dinner together.. The following morning, February 9, she saw him again around 6:00–6:30 a.m.; he again wanted to talk, which was out of character, before she left for work. When she returned home around 5:00 p.m., David was outside rather than inside the house and was possibly with Frankie. She had exchanged texts and emojis with him that day and saw nothing alarming.

Later that evening she heard multiple gunshots very close to the house—the loudest sounds she had ever heard—and immediately ran outside, followed by her husband and Frankie. She did not witness the actual shooting or any struggle that preceded the gunshots.

**Deposition of Lawrence W. Metzger, December 1, 2025**

Lawrence W. Metzger testified that David was his stepson and the son of plaintiff Jeanelle Couch. Metzger first met David around the age of five in 1997 when he began his relationship with Jeanelle, whom he later married in 2002.

As a teenager, David struggled in school and was expelled from high school at approximately age fourteen or fifteen due to "general misbehavior" and truancy. He later earned his GED around the age of twenty eight or twenty nine.

David's mental health issues began with childhood diagnoses of ADHD and depression before progressing to schizophrenia accompanied by manic episodes. The medication regimen that Metzger observed to be most effective was a combination that included Latuda, which Dr. Andrews prescribed beginning around 2019. When David took his medication consistently, he functioned normally, maintained employment, and participated in social activities. However, David frequently stopped taking his medication, sometimes claiming he was still compliant, and noticeable personality changes typically emerged after about one week. Alcohol use complicated his condition during these periods.

David held several jobs over the years. Around age twenty five or twenty six, he spent a few months working with the California Conservation Corps on local lake projects, commuting daily for four or five days each week. Metzger later arranged dishwasher positions for him at the Oak River long term care facility and at the Dry Creek Station restaurant in Bella Vista; David performed well in these roles when he remained on his medication.

In 2018, David was placed on a 5150 hold.  We started wrestling out in the porch. I had him down on the ground. Mom called the cops."


**Deposition of Lauren Fisher, December 3, 2025**

Lauren Fisher is the younger sister of David Couch, Jr. (approximately three years her senior). Fisher described a typical sibling relationship during childhood at the family home. He had a 2012 diagnosis of schizoaffective disorder, bipolar type. She said he was compassionate, particularly toward the homeless population in Shasta County and observed that he refused to kill spiders or bugs.

He referred to himself as a "warrior of God"—and his belief that he was a military veteran (initially claiming Green Beret service, later Navy SEAL). David experienced visual and auditory hallucinations, dressed in distinctive outfits he was proud of (including spray painting himself), and showed her a Christian music video featuring a CGI angel that he insisted was real.

She did not believe he could live independently even while medicated.

**Deposition of Lauren Metzger, December 3, 2025**

Metzger is David's stepsister. She grew up with David at the family home in Redding, California, living together until she moved out around 2018 at approximately age 26. He had a military style tattoo and showed a general fascination with the military but never claimed to her that he was a SEAL or prophet.

The only violent incident she knew of was David smashing their uncle Alex Aikman's car after believing Alex was harming their aunt Ruth. She had heard secondhand about a 2018 physical altercation with their father Larry on the front porch that resulted in David being placed on a 5150 hold but did not witness it.

David was diagnosed with schizoaffective bipolar disorder after a manic episode in which he believed someone named "Matt" was in the backyard and ran around the house. She observed that when off his medications he became manic, spoke very rapidly, could not relax or sleep, and required their mother's assistance with medication adherence, doctor appointments, and daily tasks such as grocery shopping. She believes he could not have functioned independently without medications and their mother's support.

**Shasta County Jail** (December 25, 2022 – February 8, 2023)

From late December 2022 through early February 2023, jail logs show a steady pattern of routine activity—medication rounds (MEDR), general housing feedings (GHF), headcounts, dayroom timeouts, and occasional cell changes—interrupted by four documented behavioral incidents.

On January 1, 2023, at 07:20 hours, Couch was involved in Jail Incident while housed in with another inmate. During a welfare check, deputies observed his light partially covered and ordered him to uncover it and secure his door when it popped. Couch immediately became verbally aggressive, yelling, "Open my fucking door up! It's closed!" When ordered to sit on his bunk, he told Deputy Smith, "Fuck you, don't tell me what to do. This is a free county and I can do and say what I want so fuck you." He continued, "You don't know me and you don't want to fuck with me. You can't do shit to me." After being handcuffed and escorted, he pushed back on staff en route to Booking. He was placed in a holding cell and written up for disrespect to staff and causing a pod disturbance.

On January 21, 2023, at 23:45 hours, Couch was the subject of another Jail Incident. While Deputy Micah Scheibe conducted a welfare check, Couch—lying on the bottom bunk—called out in a high pitched voice, "Oooh. Hi there. Wanna come in here and play with my wiener?"

When asked to repeat himself, he replied, "My wiener is out. Do you want to play with it?" After being told the comment was disrespectful, Couch yelled, "Don't talk to me about disrespect bro. You guys don't know what respect is." When ordered to address deputies properly, he jumped from his bunk, took a stance, and stated, "I don't have to tell you shit." He then told his cellmate not to reveal his name and challenged the deputy to "come in and fight him for the right to know his name." Staff later observed that Couch had on every issued article of clothing and used his mesh bag as shoulder/neck padding, apparently preparing for a fight. He was rehoused and written up for being disrespectful and threatening to fight jail staff.

On February 6, 2023, at approximately 07:15 hours, Couch was written up while on dayroom timeout in housing unit 2C. Deputies heard a loud noise and observed him on the upper tier ripping the shower curtains off both showers. He was ordered to set them down and lock down; he complied without further incident but was cited for destruction of jail property.

Later the same day, February 6, 2023, at 13:00 hours, while collecting lunch trays, Deputy April Kammerzell opened the food port and received a badly bent and broken plastic tray from Couch. When asked why he tried to break it, Couch shrugged and lay on his bunk. He was written up for destruction of jail property and recommended for a soft tray diet.

**Shasta County Jail Psychiatric / Mental Health Progress Notes**

December 29, 2022 – Mental Health Evaluation (Traci Lewis, LMFT)

Subjective
MH Eval – Bipolar. I/M refused and reported, "I used to take meds from Shasta County Mental Health but I don't anymore." When asked about SI, I/M stated, "I was just being rude and uncooperative when I told the cops I wanted them to kill me. I didn't really mean it. I thought they were really mean to me and they let their dog bite me." I/M denied any AH/VH or SI/HI. See signed refusal form in scanned documents section of chart.

Objective
A&Ox3. Casually groomed, talkative with good eye contact; expressive speech. Anxious mood with congruent affect. Logical and coherent with no psychosis noted. Poor insight and limited judgment.

Assessment
Adjustment disorder with anxiety. Appears stable at this time.

January 5, 2023 – Mental Health Follow Up (Traci Lewis, LMFT)

Subjective

7day MH FU follow up with ROI to SCMH/Walmart. I/M shared that he had not been taking his medication, "for quite some time," prior to coming into jail. I/M denied any AH/VH or SI/HI. I/M signed refusal form in scanned documents section of chart.

Objective

A&Ox3, calm and cooperative with good eye contact; speech WNL. Euthymic mood with congruent affect. Logical and coherent with no psychosis noted. Poor insight and limited judgment.

Assessment

Unspecified mood [affective] disorder; Adjustment disorder with anxiety.

January 12, 2023 – Mental Health New Intake (Traci Lewis, LMFT)

Subjective

MH New Intake – 3rd attempt. I/M refused and reported that he is, "feeling pretty good without the medication. I don't really think I need it. I understand things from a very spiritual level that he was taught from my father. He is also a spiritual healer. I can heal myself." I/M denied any AH/VH or SI/HI. I/M signed refusal form in scanned documents section of chart.

Objective

A&Ox3. Casually groomed, talkative with good eye contact, pressured speech. Euphoric mood with congruent affect. Logical and illogical, grandiose with some religious preoccupation. Poor insight and judgment.

Assessment

Unspecified mood [affective] disorder; Adjustment disorder with anxiety; Unspecified psychosis not due to a substance or known physiological condition.

January 19–20, 2023 – Mental Health Follow Up & Initial Special Needs Assessment (Traci Lewis, LMFT)

Patient Statement: "I am doing really good. I don't like being here, but I will make it work." Endorsed living with mother prior to jail and shared that he will "most likely not be able to go back there unless I get on meds. I don't want to take meds though. I feel like I don't need them and I am able to control myself just fine." Endorsed eating/sleep/time outs and ADLs all okay. Denied any contact with external support system and has no access to commissary.

Diagnoses

    Unspecified psychosis not due to a substance or known physiological condition
    Unspecified mood [affective] disorder
    Adjustment disorder with anxiety

February 1, 2023 – Psychiatric Medication Evaluation (Luis Velosa, MD)

31 year-old male with chronic history of psychiatric problems. Diagnosed with "bipolar schizophrenia." Multiple psychiatric hospitalizations. In custody ~40 days. History of Schizoaffective DO, ASPD traits, substance use, family psychiatric history. Previously taken Zyprexa and Lithium. Currently does not want to take MH Rx and has declined to be seen, but is being evaluated for competency.

Current Presentation (Telehealth)

Hypomanic, racing thoughts, paranoid delusions ("I do not trust nobody"). No major behavioral problems in the pod. Agitated, delusional, and psychotic. When possibility of psychiatric medications mentioned, belligerently stated "I do not want to take any medications." Insisted on not taking any despite explanation of need.

Plan

    Patient refused medications. To ensure compliance, will see again in two weeks.
    Therapists and nursing staff to encourage agreement to take medications.

**Legal History**

    August 25, 2007 (Redding Police Department): Burglary and vandalism. No arrest received; handled through probation department diversion.

    September 22, 2007 (Redding Police Department): Battery on a school employee. Informal diversion; case closed September 2008.

    October 24, 2007 (Redding Police Department): Assault on a school employee. Informal diversion; case closed September 2008.

April 10–11, 2008 (Redding Police Department): Disorderly conduct under the influence of drugs or intoxicants (two incidents). Handled through probation diversion.

June 8, 2008 (Redding Police Department): Battery with serious bodily injury. Released and handled informally.

October 7, 2012 (Shasta County Sheriff's Office): Obstructing or resisting a public officer and throwing burning material. All counts dismissed August 2014; arrest relief granted July 2022.

November 29, 2012 (Shasta County Sheriff's Office): Obstructing or resisting a public officer and disorderly conduct. Prosecution declined to file charges; released following detention only.

December 1, 2012 (Shasta County Sheriff's Office): Use or being under the influence of a controlled substance, obstructing or resisting a public officer, disorderly conduct, and contempt of court. All counts dismissed August 2014; arrest relief granted July 2022.

May 10–12, 2019 (Redding Police Department / Shasta County Sheriff's Office): Vandalism (damage to property). Convicted as a felony; sentenced to 60 months' probation with work program and suspended sentence. Reduced to misdemeanor and dismissed December 2021; arrest relief granted July 2022.

**Couch Vehicle Search** February 14, 2023

The following items were recovered from David Couch's vehicle:

Realistic Glock-style air pistol replica with magazine and CO2 cartridge

Folding knife (pistol-shaped) – 3¾-inch blade

Fixed-blade knife – 8-inch blade

Sword – 26-inch blade

Pellet ammunition and BBs

CO2 cartridge

Vehicle keys

**PSYCHIATRIC RECORDS**

**2012–2015 Outpatient Psychiatric Treatment (Dr. Thomas J. Andrews, M.D. and Associates)**

01/29/2013 – New Patient Evaluation
Diagnosis: Bipolar I disorder, rule out ADHD; history of Bipolar disorder and Anxiety disorder NOS.
Clinician: Cindy Nugent (provider); patient interviewed by Carl Gannon, PAC.
Medications: Zyprexa (olanzapine) 20 mg two tablets at bedtime (40 mg total). Baseline labs ordered.
Symptoms: Auditory/visual hallucinations, insomnia, and paranoia (November 2012 onset) resolved after 14 day hospitalization. Denied current symptoms. Family history positive for bipolar disorder, unipolar depression, schizophrenia, and substance abuse. Recent jail stay after armed standoff with perceived intruders (grandiosity noted). Mental status: flat affect, linear thought process with short term memory delay, fair insight/judgment, no suicidal/homicidal ideation. GAF 65.
Substance Use History: Denied current alcohol, smoking, and other illegal drugs. Acknowledged prior marijuana (THC) use; no rehabilitation history.

02/12/2013 – New Patient Follow up
Diagnosis: Bipolar I disorder with psychosis, rule out paranoid schizophrenia; Anxiety disorder NOS.
Clinician: Ornella Addonizio, M.D.
Medications: Zyprexa 40 mg total at bedtime. Possible future transition to less sedating agent discussed.
Symptoms: No hallucinations; eating well, moods stable. Excessive sleep; desire to return to work. Mental status: oriented, no dangerous thoughts/hallucinations/paranoia/delusions, logical thought process. PHQ9 0; GAF 50.
Substance Use History: No new information; historical marijuana use remained the precipitant per continuity.

02/26/2013 – Medication Check
Diagnosis: Bipolar I, Mixed, Severe without psychotic features.
Clinician: Cindy Nugent; patient interviewed by Carl Gannon, PAC.

Medications: Zyprexa reduced to 30 mg at bedtime for oversedation. Family education on warning signs of decompensation.

Symptoms: Doing well; no paranoia/hallucinations. Excessive sleep (12–14 hours). Father concerned about unemployment/self-esteem. Considering truck driving job. Mental status: oriented, no dangerous thoughts/hallucinations, logical thought process.

Substance Use History: No current use reported.

03/12/2013 – Patient Visit Note (Amended/Approved by Thomas J. Andrews, M.D.)
Diagnosis: Bipolar I, Mixed, Severe without psychotic features.
Clinician: Benton C. Kinney (attending); amended/approved by Thomas J. Andrews, M.D.
Medications: Zyprexa 20 mg at bedtime. Jury service excuse note provided.
Symptoms: Sleep improved to 10 hours/night. Denied nightmares/hallucinations/paranoia. Typical routine stable. Mood stable; PHQ9 0. Mental status: oriented, no dangerous thoughts/hallucinations, logical thought process, normal appetite.
Substance Use History: No current use; historical marijuana trigger noted.

04/12/2013 – Medication Check
Diagnosis: Bipolar I, Mixed, Severe without psychotic features; psychosis NOS.
Clinician: Cindy Nugent; discussed with mother present.
Medications: Zyprexa 20 mg at bedtime. Healthy lifestyle/exercise emphasized.
Symptoms: Doing very well; stable moods, no hallucinations. Recent pneumonia (improving); on Singulair. Good appetite; still sleeping more than usual. Mental status: pleasant, full mood, no dangerous thoughts/hallucinations, logical thought process. PHQ9 0; GAF 58.
Substance Use History: No current use documented.

05/02/2013 – Medication Check – Behavioral Health Court Patient
Diagnosis: Bipolar I, Mixed, Severe without psychotic features; personality disorder deferred; Axis IV psychosocial/environmental problems.
Clinician: Ornella Addonizio, M.D.
Medications: Zyprexa increased to 30 mg at bedtime. Patient/mother declined switch to less sedating agent.
Symptoms: Increased irritability and nightmares since prior reduction. Appetite good; sleeping fair. Mental status: full mood, no dangerous thoughts/hallucinations/paranoia/delusions, logical thought process with intact insight. PHQ9 0; GAF 60.
Substance Use History: No current use; historical marijuana use identified as original precipitant.

06/18/2013 – Medication Check
Diagnosis: Major depressive disorder and generalized anxiety disorder (in context of Bipolar I); Axis II deferred; Axis IV psychosocial/social environment problems; asthma.

Clinician: Robert L. Blehm, PAC.

Medications: Zyprexa 20 mg at bedtime. Lifestyle counseling for weight gain.

Symptoms: Doing pretty good. 45 pound weight gain in six months. Episode began with marijuana use (voices, visions, grandiose delusions; arrested after substance mix up). Quit THC since. No current hallucinations (historical Bigfoot belief noted). Improved mood; residual anxiety but coping better. Mental status: anxious mood, no dangerous thoughts/hallucinations, logical thought process. PHQ9 0; GAF 50.

Substance Use History: Precipitated by marijuana (THC); has since quit. No current alcohol, smoking, or other illicit use.

07/30/2013 – Procedure Note (Amended/Approved by Thomas J. Andrews, M.D.)

Diagnosis: Bipolar I, Mixed, Severe without psychotic features; Axis I MDD (in context); Axis II deferred; Axis IV psychosocial/environmental problems; asthma.

Clinician: Robert L. Blehm, PAC (amended/approved by Thomas J. Andrews, M.D.).

Medications: Zyprexa 20 mg at bedtime; Singulair 10 mg daily.

Symptoms: Doing well; attributes improvement to new pickup truck. Good eating/sleep (early bedtime, refreshed). Mental status: oriented, no dangerous thoughts/hallucinations, logical thought process, normal appetite. PHQ9 0; GAF 55.

Substance Use History: Former smoker; no current marijuana, alcohol, or other substance use.

08/27/2013 – Procedure Note (Approved by Thomas J. Andrews, M.D.)

Diagnosis: Bipolar I, Mixed, Severe without psychotic features; Axis I MDD and GAD; Axis II deferred; Axis IV psychosocial/environmental problems; asthma.

Clinician: Robert L. Blehm, PAC (approved by Thomas J. Andrews, M.D.).

Medications: Zyprexa 20 mg at bedtime; buspirone 10 mg twice daily added for GAD.

Symptoms: Doing good. Increased anxiety in groups but no paranoid ideation. Better eating. Sleep 12–14 hours/night per mother. Mental status: full mood, no suicidal/homicidal thoughts/hallucinations, logical thought process. PHQ9 0; GAF 55.

Substance Use History: Former smoker; no current marijuana or other substance use.

09/30/2013 – Procedure Note (Amended by Thomas J. Andrews, M.D.)

Diagnosis: Bipolar I, Mixed, Severe without psychotic features.

Clinician: Robert L. Blehm, PAC (amended by Thomas J. Andrews, M.D.).

Medications: Zyprexa 20 mg at bedtime; buspirone discontinued due to irritability; propranolol 10 mg twice daily initiated.

Symptoms: Doing alright. Anxiety improved per patient but mother noted irritability/on edge. Daily anxiety persisted. Mental status: oriented, no dangerous thoughts/hallucinations, logical thought process. PHQ9 0.

Substance Use History: No current substance use; historical marijuana use documented as original precipitant.

10/29/2013 – Patient Visit Note (Thomas J. Andrews, M.D.)
Diagnosis: Bipolar I, Mixed, Severe without psychotic features; Axis I BPD1; Axis II deferred; Axis IV social environment problems.
Clinician: Thomas J. Andrews, M.D.
Medications: Zyprexa 20 mg at bedtime; buspirone 10 mg twice daily; propranolol 10 mg twice daily; Singulair 10 mg daily. UDS ordered for compliance.
Symptoms: No HPI documented. Mood full; good attention/concentration; no dangerous thoughts/hallucinations/obsessions/delusions; logical thought process with intact insight. Sleeping well; normal appetite. PHQ9 0; GAF 60.
Substance Use History: Former smoker; UDS ordered (reason: new patient + compliance). No current marijuana/alcohol/other illicit use reported.

12/04/2013 – Patient Visit Note (Thomas J. Andrews, M.D.)
Diagnosis: Bipolar I, Mixed, Severe without psychotic features; Axis I BPD1; Axis II deferred; Axis III asthma; Axis IV social environment problems.
Clinician: Thomas J. Andrews, M.D.
Medications: Zyprexa 20 mg at bedtime; buspirone 10 mg twice daily; propranolol 10 mg twice daily; Singulair 10 mg daily; Nicoderm CQ for tobacco cessation (patient willing, mother supportive).
Symptoms: "I'm doing nutt'n." Sober with drugs but occasional MJ; chewing heavily; willing to try patch and stop by January 2014. Doing better without chewing; upbeat attitude; weight stable; stopped binge eating. Concentration struggles but improved without chewing. ADD likely. Mood full; fair attention/concentration; no dangerous thoughts/hallucinations; logical thought process with impaired insight. PHQ9 0; GAF 60. UDS reason: history of illicit drug use + compliance.
Substance Use History: Occasional MJ (chewing tobacco heavily; willing to quit); history of illicit drug use noted for UDS. No current alcohol or other substances.

01/15/2014 – Patient Visit Note (Thomas J. Andrews, M.D.)
Diagnosis: Bipolar I, Mixed, Severe without psychotic features; Axis I BPD1; Axis II deferred; Axis III mild obesity; Axis IV primary support group problems.
Clinician: Thomas J. Andrews, M.D.
Medications: Zyprexa 20 mg at bedtime; buspirone increased to 20 mg twice daily; propranolol 10 mg twice daily; Singulair 10 mg daily; Nicoderm continued.
Symptoms: Anxiety better. Lacking appetite control; discussed diet/nutrition/brain power and setting eating limits + exercise. Mood full; fair attention/concentration; no dangerous thoughts/hallucinations/obsessions/delusions; logical thought process with intact insight. Normal appetite/weight; no caffeine/tobacco/alcohol; using marijuana daily for a month or more. PHQ9 0; GAF 55. Drug screen positive for MJ discussed; 215 card mentioned; encouraged to stop as it

decreases motivation. Olanzapine stabilizing (less sunglasses indoors, more verbal). Plan: list 3 daily items, exercise, read.

Substance Use History: Using marijuana daily (for anxiety); positive UDS for MJ; encouraged to stop (decreases motivation). No alcohol/tobacco.

02/17/2014 – Patient Visit Note (Amended by Thomas J. Andrews, M.D.)

Diagnosis: Bipolar I, Mixed, Severe without psychotic features; Axis II dependent personality disorder; Axis IV social environment/occupational problems.

Clinician: Thomas J. Andrews, M.D.

Medications: Zyprexa 20 mg at bedtime; buspirone 20 mg twice daily; propranolol 10 mg twice daily; Singulair 10 mg daily; alprazolam 0.5 mg daily (not with marijuana same day).

Symptoms: Working in painting at Advanced Coating but unable for 18 months; doing pretty good lately; mood better; no hallucinations/delusions. Using MJ; needs 215 card; "I'd rather smoke weed than take pills." Needs alternative to MJ; alprazolam suggested to replace and decrease usage (affects job options). Discussed MJ deleterious effects on motivation/memory/focus. Mood full; fair attention/concentration; no dangerous thoughts/hallucinations/obsessions/delusions; logical thought process with intact insight. Normal appetite/weight; no caffeine/tobacco/alcohol/drugs (per MSE); wearing dark sunglasses/stocking cap (needs to be more open). PHQ9 0; GAF 45. Previous UDS positive for illicit drugs; confronted about MJ; importance of correct regimen emphasized.

Substance Use History: Using MJ (wants 215 card); previous UDS showed illicit drugs; encouraged alprazolam as alternative and to reduce MJ for job options. No current alcohol/tobacco/other.

03/24/2014 – Patient Visit Note (Amended by Thomas J. Andrews, M.D.)

Diagnosis: Bipolar I, Mixed, Severe without psychotic features.

Clinician: Thomas J. Andrews, M.D.

Medications: Zyprexa 20 mg at bedtime; buspirone 20 mg twice daily; propranolol 10 mg twice daily; Singulair 10 mg daily; alprazolam 0.5 mg daily (not with marijuana same day). UDS ordered (compliance + illicit drug history).

Symptoms: "I'm out of medications." "Yes, I'm not paranoid and I'm getting out more and doing better." Daily coffee; no tobacco/alcohol; using marijuana daily for a month or more; sleeping well. Mood full; good attention/concentration; no dangerous thoughts/hallucinations/obsessions/delusions; logical thought process with impaired insight. Normal appetite/weight. PHQ9 0. Previous UDS positive for THC (not prescribed); discussed need for script (no money) and importance of avoiding unprescribed drugs given bipolar/psychosis history.

Substance Use History: Using marijuana daily; previous UDS positive for THC (not prescribed); discussed risks in bipolar/psychosis history. No alcohol/tobacco.

04/29/2014 – Patient Visit Note (Amended by Thomas J. Andrews, M.D.)
 Diagnosis: Bipolar I, Mixed, Severe without psychotic features; Axis I BPD1; Axis II dependent personality disorder; Axis IV psychosocial/environmental problems (managing life skills + SA potential).
 Clinician: Thomas J. Andrews, M.D.
 Medications: Zyprexa 20 mg at bedtime; buspirone 20 mg twice daily; propranolol 10 mg, Singulair 10 mg daily; alprazolam 0.5 mg daily (not with marijuana same day).
 Symptoms: "I'm doing better." Quit smoking so much weed and using Xanax; less paranoid; low dose olanzapine; Singulair helping breathing; propranolol helping anger/fear around others. Mood full; fair attention/concentration; no dangerous thoughts/hallucinations/obsessions/delusions; logical thought process with intact insight. Normal appetite/weight; no caffeine/tobacco/alcohol/drugs; sleeping well. PHQ9 0; GAF 60. Former smoker.
 Substance Use History: Quit/reduced marijuana and Xanax; no current tobacco/alcohol/drugs. Former smoker.

06/04/2014 – Patient Visit Note (Thomas J. Andrews, M.D.)
 Diagnosis: Bipolar I, Mixed, Severe without psychotic features; Axis I psychiatric disorders; Axis II dependent personality disorder; Axis III asthma; Axis IV social environment problems.
 Clinician: Thomas J. Andrews, M.D.
 Medications: Zyprexa 20 mg at bedtime; buspirone 20 mg twice daily; propranolol 10 mg Oneto two per day; Singulair 10 mg daily; alprazolam 1 mg daily PRN; ProAir HFA PRN.
 Symptoms: "Wondering if I could request stronger Xanax." Sleeping 10 hours/day; eats and watches TV; "I don't have much to do." Willing to do some trade; discussed work options. Possible internal stimuli (hears conscious inside head) but denies hallucinations. Gene study DRI near normal (15); could handle pain meds with less addiction risk. Mood full; no dangerous thoughts/hallucinations/obsessions; logical thought process with intact insight; delusions noted in thought content. Normal appetite/weight; no caffeine/tobacco/alcohol/drugs; sleeping well. PHQ9 0; GAF 50.
 Substance Use History: No current use per MSE; previous patterns of marijuana noted in record.

07/23/2014 – Patient Visit Note (Thomas J. Andrews, M.D.)
 Diagnosis: Bipolar I, Mixed, Severe without psychotic features; Generalized Anxiety Disorder.
 Clinician: Thomas J. Andrews, M.D.
 Medications: Zyprexa 20 mg at bedtime; buspirone 20 mg twice daily; propranolol 10 mg Oneto two per day; Singulair 10 mg daily; alprazolam 1 mg daily PRN; ProAir HFA PRN. UDS ordered.
 Symptoms: "No Hallucinations." Not doing any drugs except occasional MJ; thinking of 215 card. Discussed MJ decreasing work motivation; left UDS to observe. Helping with chores/yard work; not on disability; wants local work. Mood full; no dangerous thoughts/hallucinations;

logical thought process. Normal appetite/weight. PHQ9 0. Previous UDS positive for THC (not prescribed); possible alcohol in last 72 hours per prior screen; advised of dangers with medications and noncompliance consequences.
 Substance Use History: Occasional MJ (considering 215 card); previous UDS positive for THC and possible alcohol; encouraged to stop (motivation impact). No current other substances.

08/26/2014 – Patient Visit Note (Thomas J. Andrews, M.D.)
 Diagnosis: Bipolar I, Mixed, Severe without psychotic features; Axis I BPD1; Axis II dependent personality disorder; Axis IV social environment/educational/occupational problems.
 Clinician: Thomas J. Andrews, M.D.
 Medications: Zyprexa 20 mg at bedtime; buspirone 20 mg twice daily; ProAir HFA PRN; Singulair 10 mg daily.
 Symptoms: "Pretty good." Helping GF with patio; lacking motivation directly related to marijuana use; instructed to decrease (has); warned of med/alcohol interactions. Current smokeless tobacco user; no alcohol/drugs; sleeping well. Mood full; fair attention/concentration; no dangerous thoughts/hallucinations/obsessions; logical thought process with intact insight. Normal appetite/weight. PHQ9 0; GAF 65. Side effects of antipsychotics discussed (movement disorders, weight gain, etc.).
 Substance Use History: Marijuana use (instructed to reduce by half; agrees); current smokeless tobacco; no alcohol/drugs. Former smoker per social history.

10/15/2014 – Patient Visit Note (Amended by Thomas J. Andrews, M.D.)
 Diagnosis: Bipolar I, Mixed, Severe without psychotic features; Generalized Anxiety Disorder.
 Clinician: Thomas J. Andrews, M.D.
 Medications: Olanzapine 20 mg at bedtime; buspirone 30 mg twice daily; Singulair 10 mg daily; alprazolam 1 mg daily PRN; ProAir HFA PRN.
 Symptoms: "Had a few questions" (stepdad). Concerned about drug program issues for MJ; frustrated paying for habit; looks worried; not hearing voices; hates being in room full of people; struggling with anxiety. Mood anxious; fair attention/concentration; no dangerous thoughts/hallucinations/obsessions; paranoid thoughts/social anxiety and delusions noted; logical thought process with intact insight. Normal appetite/weight; no caffeine/tobacco; alcohol one beer per week; marijuana daily for a month or more; sleeping fairly. PHQ9 0. Side effects of benzodiazepines discussed (sedation, habit forming, no drinking/driving).
 Substance Use History: Marijuana daily alcohol one beer per week; no tobacco/caffeine. Previous UDS patterns noted.

12/22/2014 – Patient Visit Note (Thomas J. Andrews, M.D.)
 Diagnosis: Bipolar I, Mixed, Severe without psychotic features; Axis I BPD1 mixed type/GAD; Axis II deferred; Axis IV occupational problems.
 Clinician: Thomas J. Andrews, M.D.

Medications: Propranolol 10 mg Oneto two per day; alprazolam 1 mg daily PRN; buspirone 30 mg twice daily; Singulair 10 mg daily; ProAir HFA PRN. UDS ordered (compliance + illicit drug history).

Symptoms: "I quit smoking weed." Getting job at Lithia Toyota; upbeat/positive about future; less depressed/delusional. Father bipolar (hospitalized 4 years, now better/Christian). Mood full; fair attention/concentration; no dangerous thoughts/hallucinations; logical thought process with intact insight. Normal appetite/weight; caffeine/tobacco use; no alcohol/drugs; sleeping well. PHQ9 0; GAF 58. UDS for compliance/illicit history. Side effects of antidepressants, mood stabilizers, and benzodiazepines discussed in detail.

Substance Use History: Quit smoking weed; caffeine/tobacco use; no alcohol/drugs. Previous UDS positive for THC and benzodiazepines (prescribed).

01/28/2015 – Patient Visit Note (Thomas J. Andrews, M.D.)

Diagnosis: Bipolar I, Mixed, Severe without psychotic features; Axis I BPD1 mixed type/GAD; Axis II deferred; Axis IV occupational problems.

Clinician: Thomas J. Andrews, M.D.

Medications: Olanzapine 20 mg at bedtime; propranolol 10 mg Oneto two per day; buspirone 30 mg twice daily; Singulair 10 mg daily; ProAir HFA PRN.

Symptoms: "Trying to get a job at Sell Lumber." Trying to stay healthy; cut down a lot on MJ; not smoking cigarettes; affable/making progress; engaging; getting 215 card for back pain (still uses daily but stopped tobacco). Paranoid thoughts absent; no hallucinations; quit alprazolam a month or more ago. Mood full; fair attention/concentration; no dangerous thoughts/hallucinations/obsessions/delusions; logical thought process with intact insight. Normal appetite/weight; caffeine use; no tobacco/alcohol; using marijuana; sleeping well. PHQ9 0; GAF 60. Previous UDS positive for THC (not prescribed) and benzodiazepines (prescribed). Encourage work plan; pain doctor/PT; 215 card if needed but better without MJ.

Substance Use History: Cut down a lot on MJ (still daily but stopped tobacco); quit alprazolam; no alcohol. Previous UDS positive for THC and benzodiazepines.

03/18/2015 – Patient Visit Note (Thomas J. Andrews, M.D.)

Diagnosis: Bipolar I, Mixed, Severe without psychotic features; Generalized Anxiety Disorder.

Clinician: Thomas J. Andrews, M.D.

Medications: Olanzapine 20 mg at bedtime; alprazolam 0.5 mg daily (not with marijuana same day); buspirone 30 mg twice daily; Singulair 10 mg daily; ProAir HFA PRN. UDS ordered.

Symptoms: "I applied for AC framers this morning." Medications working ok; Xanax helped; still needs 215 card; discussed sobriety importance. Stable; goes to bed/wakes early; happy; made progress; no voices; staying away from drugs but smokes some after work (not at work; foreman dislikes another guy doing it). Mood full; no dangerous thoughts/hallucinations; logical thought process. Normal appetite/weight. PHQ9 0; GAF 50. Previous UDS positive for THC (not

prescribed). Improved since off meth; paranoid thought improved. Needs 215 card but adhere without drugs ideally. Return in 2 months. Side effects of benzodiazepines discussed.
 Substance Use History: Staying away from drugs but smokes some after work; previous UDS positive for THC; improved since off meth. No current other substances.


 05/20/2015 – Patient Visit Note (Thomas J. Andrews, M.D.)
 Diagnosis: Bipolar I, Mixed, Severe without psychotic features; Axis I BPD1; Axis II deferred; Axis III asthma; Axis IV social environment problems.
 Clinician: Thomas J. Andrews, M.D.
 Medications: Olanzapine 20 mg at bedtime; Singulair 10 mg daily; ProAir HFA PRN.
 Symptoms: "I'm working." Working for AC framers (low man but learning); "I don't need Xanax"; needs olanzapine and Singulair; stable; goes to bed/wakes early; happy; made progress with treatment; no voices; staying away from drugs and only smokes some after work (not at work). Mood full; no dangerous thoughts/hallucinations/obsessions/delusions; logical thought process with intact insight. Normal appetite/weight; no caffeine/tobacco/alcohol; drug use after work (smokes; encouraged to taper off); using marijuana; sleeping well. PHQ9 0; GAF 50. Side effects of antipsychotics discussed.
 Substance Use History: Staying away from drugs but smokes some after work (encouraged to taper); using marijuana; no alcohol/tobacco/caffeine. No current other substances.


## 2018 Acute Psychiatric Crisis and Inpatient Hospitalization

Shasta Regional Medical Center Emergency Department – August 24, 2018
year-old male brought by Redding Police Department on a 5150 hold (Welfare & Institutions Code §5150 – danger to others) after stepfather Larry Metzger called 911 reporting verbal threats ("fuck dad up / kick his ass") while the patient had been off his bipolar medication for 1–2 months. Patient had been walking approximately 30 miles over the prior two days and was exhausted. Known history of bipolar disorder; recently fired from a job after pushing an elderly coworker (paranoid belief the man was molesting female staff). Blood alcohol concentration 0.156 g/dL on arrival. Medically cleared and transferred to Restpadd Psychiatric Health Facility under continuing 5150 authority.

5150 Documentation: Completed same day by RPD Officer T. Denham. Probable cause: danger to others (verbal threats to father combined with history of prior psychiatric hospitalization and medication nonadherence). Patient was placed on a 72 hour involuntary hold for evaluation and treatment.

Restpadd Psychiatric Health Facility – August 26 to September 4, 2018

Legal Status & Certification: Admitted on continuing 5150 hold (danger to others). On August 28, 2018, the facility certified the patient for an additional 14 days of intensive treatment under Welfare & Institutions Code §5250 (grave disability + danger to self/others/family). A certification review hearing was held on August 31, 2018; the hearing officer found probable cause to continue the involuntary detention. The patient remained on the 5250 hold through discharge on September 4, 2018.

Admission Presentation (8/26/2018 – Joy Ignacio, FNP under Thomas Swanson, MD): Chief complaint: "I don't need to be here" / "I'm here because my mom wants me to be here." Patient acknowledged stopping Zyprexa because "it made him feel bad" and "he doesn't need sleep." Reported mood swings but minimized them. History of visual/auditory hallucinations and paranoia acknowledged. Denied current suicidal or homicidal ideation.

Interested in obtaining a gunsmith license and parttime work; no desire to live independently. Bio father reportedly may have bipolar disorder (patient disputes this). Calm but guarded, downcast, distracted, poor eye contact, blunted affect, circumstantial thought process, paranoid ideas, poor insight/judgment. Speech mumbled/poorly articulated. No active hallucinations or delusions noted on this exam, but history acknowledged.

Diagnosis at Admission/Discharge: Bipolar disorder, current episode mixed, severe, with psychotic features.

Treatment: Olanzapine 10 mg PO BID (increased to 15 mg qhs at discharge) for psychosis; Lithium carbonate 900 mg qhs. Multiple PRN orders for agitation/anxiety/sleep (lorazepam 1–2 mg q4–6h PRN, haloperidol 5–10 mg q4–6h PRN with contact provider if used, hydroxyzine pamoate 50 mg 1–2 caps q6h PRN, temazepam 15 mg qhs PRN).

**2019–2022 Outpatient Treatment**

Following 2018 hospitalization, he enrolled in the Shasta County Behavioral Health Court (BHC) 4 phase program on September 25, 2019.

**Psychiatric Provider Appointments (2019–2022)**

Initial Diagnosis – Thomas Swanson, MD (Restpadd)
Date: 09/18/2018 (related to psychiatric health facility stay from 08/26/2018 to 09/03/2018)
Diagnosis: Bipolar Disorder, Most Recent Episode Mixed, Severe with Psychotic Features
Clinician: Thomas Swanson, MD

Medications: Not specified in this diagnostic review (external source)

Symptoms: Agitation, paranoia, and visual hallucinations (including seeing dead people) during the index admission; positive toxicology for THC; history consistent with a severe mixed manic episode with psychotic features leading to involuntary hold and hospitalization. Precipitating factors included substance use and acute decompensation.

Psychiatric Evaluation (Adult) – Shepard J. Greene, MD

Date: 10/23/2019

Diagnosis: Schizoaffective Disorder, Bipolar Type; Antisocial Traits

Clinician: Shepard J. Greene, MD

Medications (at evaluation): Lithium (approximately 3 pills twice daily) and Latuda (dose unknown, taken at bedtime). Patient reported good response with no side effects. Plan included obtaining a serum lithium level and considering a Latuda dose increase to address ongoing psychotic symptoms.

Symptoms: Referred by the Behavioral Health Court program following arrest for threatening his stepfather while intoxicated and vandalizing a vehicle. Longstanding history of bipolar disorder since approximately age 21 with prior treatment elsewhere. Prominent psychotic features including auditory and visual hallucinations as well as nonspecific, persecutory, and grandiose delusions centered on an elaborate military history (claimed service across multiple branches including special forces and intelligence roles; asserted he "woke up 20 years later in his living room in 2012" with memory largely erased and that he is actually 49 years old despite documented date of birth in 1991). Mood swings, angry outbursts, and legal impairment when off medications or using alcohol. At evaluation: euthymic mood with full affect range; cooperative but coy regarding hallucinations; linear speech with occasional nonsequiturs; good insight into need for mental health services and intact judgment. Delusions persisted but were not acted upon when sober.

12/04/2019

Diagnosis: Schizoaffective Disorder, Bipolar Type + Antisocial Traits.

Clinician: Tammy White, NP.

Medications: Latuda 120 mg at bedtime; Lithium 300 mg, three tablets twice daily (history of dose reduction due to tremors).

Symptoms: Prominent grandiose delusions (detailed claims of 21 year military career across branches and special forces, CIA involvement, and age discrepancy of being 49 despite being 28). Inconsistent reporting of legal history (initial denial of felony, later admission to intoxicated incident involving a family member's vehicle). Mood stable on current regimen; denied current depression, anxiety, hallucinations, agitation, or paranoia. Good sleep and appetite (vegan diet). Mental status: kempt and cooperative with mostly linear thought process and tangential elements only when discussing military claims; good insight and judgment.

03/26/2020
 Diagnosis: Schizoaffective Disorder, Bipolar Type + Antisocial Traits.
 Clinician: Tammy White, NP.
 Medications: Latuda 80 mg twice daily at dinnertime; Quetiapine 400 mg at bedtime (initiated by family from prior prescription; noted to improve sleep). Lithium previously discontinued.
 Symptoms: Improved lucidity and sleep quality with Quetiapine. Persistent military related delusions but patient acknowledged improvement ("I am better now"). Stable mood without acute depression, anxiety, hallucinations, or mania. Good appetite and functioning in daily activities. Mental status: calm, cooperative, alert and oriented, linear thought process, good insight and judgment.

04/23/2020
 Diagnosis: Schizoaffective Disorder, Bipolar Type + Antisocial Traits.
 Clinician: Tammy White, NP.
 Medications: Latuda 80 mg twice daily; Quetiapine 400 mg at bedtime.
 Symptoms: Stable overall with significantly improved sleep. No acute mood or psychotic symptoms. Continued engagement in Behavioral Health Court despite pandemic restrictions. Historical delusions remained but were nonacute. Good appetite and adherence.

07/29/2020
 Diagnosis: Schizoaffective Disorder, Bipolar Type + Antisocial Traits.
 Clinician: Tammy White, NP.
 Medications: Latuda 80 mg twice daily; Quetiapine 400 mg at bedtime.
 Symptoms: No active concerns; mood and psychosis well controlled. Good sleep and appetite. Continued sobriety and program participation. Delusional beliefs present in background but not interfering with functioning. Mental status: calm, cooperative, linear thought process, good judgment.

06/15/2021
 Diagnosis: Schizoaffective Disorder, Bipolar Type + Antisocial Traits.
 Clinician: Asif Majid, MD.
 Medications: Latuda 160 mg once daily with dinner (with food); Quetiapine 400 mg at bedtime. Fully adherent with no side effects and good benefit for psychosis.
 Symptoms: Psychiatrically stable with no auditory or visual hallucinations, paranoia, depressed or anxious mood, or manic symptoms. Good sleep and appetite. Actively working as a dishwasher and engaged in Behavioral Health Court programming. Historical grandiose delusions (military service and age discrepancy) noted in background but not active. Mental status: no acute distress; linear thought process; denies suicidal/homicidal ideation or

hallucinations; fair insight and judgment; oriented to person, place, and time. No criteria for involuntary hold. Plan: continue current regimen, order annual labs, and follow up in three months.

10/27/2021
 Diagnosis: Schizoaffective Disorder, Bipolar Type + Antisocial Traits.
 Clinician: Asif Majid, MD.
 Medications: Latuda 160 mg once daily with dinner; Quetiapine 400 mg at bedtime. Adherent with no side effects.
 Symptoms: "Doing pretty good." Busy with dishwasher employment, nearing completion of Behavioral Health Court (phase 4), reading the Bible, and spending time with friends. No mood symptoms, hallucinations, paranoia, or mania. Good sleep and appetite. No acute concerns (primarily requesting medication refill). Mental status: linear thought process; denies suicidal/homicidal ideation, hallucinations, or paranoia; fair insight and judgment. Plan: continue regimen, obtain annual labs and urine drug screen at next in person visit, follow up in three to four months.

02/09/2022
 Diagnosis: Schizoaffective Disorder, Bipolar Type + Antisocial Traits.
 Clinician: Asif Majid, MD.
 Medications: Latuda 160 mg once daily with dinner; Quetiapine 400 mg at bedtime. Adherent with good benefit for psychosis and mood stabilization; no side effects.
 Symptoms: Feeling "pretty good." Recent months going well; graduated from Behavioral Health Court, completed probation, and continuing dishwasher employment. Holidays passed without issue. No hallucinations, paranoia, depression, anxiety, or manic symptoms. Good sleep and appetite. No current concerns beyond ensuring medication refills. Mental status: linear thought process; denies suicidal/homicidal ideation or hallucinations; fair insight and judgment; oriented. Plan: continue current regimen, order annual labs at next in person appointment, follow up in three to four months.

12/14/2022 (Telephone)
 Diagnosis: Schizoaffective Disorder, Bipolar Type + Antisocial Traits.
 Clinician: Asif Majid, MD.
 Medications: Latuda 160 mg once daily with dinner (continued); Quetiapine 400 mg at bedtime (discontinued by patient 4–6 months earlier due to weight gain and sedation). Currently adherent to Latuda only, with good benefit and minimal side effects.
 Symptoms: Feeling okay with no issues or problems in recent months. Working at a hotel assisting with management. Stopped Quetiapine independently due to side effects but reports good symptom control on Latuda alone. No auditory/visual hallucinations, paranoia, manic symptoms, depression, or anxiety. Good sleep and appetite. No other concerns. Mental status: no

acute distress; linear thought process; denies suicidal/homicidal ideation or hallucinations; fair insight and judgment; oriented. Plan: discontinue Quetiapine formally, continue Latuda, order annual labs and AIMS assessment at next in person visit, follow up in three to four months. No involuntary hold criteria met.

12/15/2022 (Informational Note – MH, Labs Review)
 Diagnosis: Schizoaffective Disorder, Bipolar Type + Antisocial Traits (per prior documentation).
 Clinician: Asif Majid, MD.
 Medications: Not reevaluated in this note (continuation of Latuda only from prior visit).
 Symptoms: This note contains no new clinical symptoms or mental status findings. It serves solely as a review of laboratory results obtained the previous day (CBC showing mildly elevated white blood cell count, platelets, and absolute lymphocytes; lipid panel with elevated triglycerides; otherwise normal comprehensive metabolic panel, hemoglobin A1c, and thyroid function). Plan: Discuss and review results with the patient at the next scheduled appointment. No acute intervention required.

**Shasta County Probation Department** January 31, 2023
David Lawrence Couch, III, a 31 year-old resident of Redding, California, was sentenced on February 8, 2023, in the Shasta County Superior Court (Hon. Flynn, Dept. 2) to a two year term of formal probation following his no contest plea to one felony count of violating Penal Code § 69 (resisting or obstructing an officer by threat or violence) and one misdemeanor count of violating Penal Code § 417(a)(1) (brandishing a deadly weapon). The negotiated disposition included service of 92 days in the Shasta County Jail, with full credit for time served, and was accompanied by a comprehensive set of probation conditions emphasizing mental health treatment, substance abstinence, and intensive supervision.

Mr. Couch has a documented history of bipolar disorder, for which he has received Supplemental Security Income (SSI) benefits. He has a limited adult criminal history consisting of a single 2019 felony vandalism conviction (Penal Code § 594(b)(1)), for which he successfully completed probation, as well as a juvenile record. Educational attainment is limited; he dropped out of continuation school during his senior year. Employment history includes sporadic work in landscaping, hospitality, and temporary labor positions.

 The defendant, David Couch, reported the following substance use history in the Presentence Investigation Report. He first used alcohol during his teens and continued "daily "use up until the morning of his arrest on December 25, 2022.

On the day of the current offense, he admitted to consuming two shots of Fireball and three shots of "Hypnotic shots" of Konak and vodka (17% alcohol), plus three shots of Hennessy and three

shots of whiskey. He began using MDMA at age 16 and used it "daily" by ingesting "a lot of pills." He first used heroin at age 16, with his last use occurring six years ago; he used it a total of four times by smoking it through a "straw pen."

Ecstasy use started at age 16 and continued until age 18, during which time he consumed "a lot," eating five pills. He began using cocaine at age 16 and last used it at age 18 after snorting it on two occasions. In 2022, he used Psilocybin mushrooms once by ingesting the stem and cap. He also used Vicodin and sleeping pills beginning in his teens and continuing until age 18, though the frequency and amount are unknown; these were taken by ingestion.

He previously completed a Behavioral Health Court (BHC) program, graduating around December 10, 2021. His substance and alcohol issues were noted in the report as appearing to cause him the most problems, especially in relation to his mental health (bipolar disorder) and compliance with treatment.

The Presentence Investigation Report, concluded that Mr. Couch was statutorily eligible for probation.

In summary, the court accepted the negotiated plea and imposed a structured two year term of formal probation designed to address the defendant's mental health and substance use challenges while safeguarding public safety through rigorous treatment mandates, behavioral restrictions, and ongoing supervision. The matter remains open for restitution determination and continued probation compliance monitoring.

**Autopsy Findings**

The body was that of a normally developed, well-nourished 6'1", 154 lb. White male with blonde closely cropped hair, short beard/mustache, hazel eyes, and tattoos (large cross on back; "COUCH" on right forearm; "Seal Team Six" symbol on left forearm).

David Lawrence Couch III, 31 year old White male, was shot and killed by California Highway Patrol officers on February 9, 2023 at 3060 Island Drive, Redding, CA. He sustained three gunshot wounds:

- Head/neck (right temple) — projectile recovered in the neck; caused fatal brain trauma, subdural/subarachnoid hemorrhage, and brainstem herniation.
- Left chest/upper back — perforated left lung and shattered the 10th rib.
- Right thigh — transected the superficial femoral artery (surgically repaired); exit wound in right gluteal fold.

**Opinion.**

Based on my comprehensive review of the extensive psychiatric, medical, jail, criminal, deposition, and collateral records in this case, it is my professional opinion as a board certified psychiatrist that David Couch suffered from a severe, schizoaffective disorder, bipolar type, with prominent psychotic features. This illness, combined with substance abuse substantially impaired his ability to function.

Criteria for Schizoaffective Disorder:

An uninterrupted period of illness during which there is a major mood episode (major depressive episode or manic episode) concurrent with schizophrenia.

Schizophrenia requires two (or more) of the following symptoms, each present for a significant portion of time during a 1 month period (or less if successfully treated). At least one must be from the first three:
 Delusions
 Hallucinations
 Disorganized speech (e.g., frequent derailment or incoherence)
 Grossly disorganized or catatonic behavior
 Negative symptoms (i.e., diminished emotional expression or avolition)

Bipolar type: If a manic episode is part of the presentation (with or without major depressive episodes).

A manic episode is a distinct period of abnormally and persistently elevated, expansive, or irritable mood and abnormally and persistently increased goal directed activity or energy, lasting at least 1 week and present most of the day, nearly every day (or any duration if hospitalization is necessary).

During the period of mood disturbance and increased energy or activity, three (or more) of the following symptoms (four if the mood is only irritable) are present to a significant degree and represent a noticeable change from usual behavior:
1. Inflated self-esteem or grandiosity.
2. Decreased need for sleep (e.g., feels rested after only 3 hours of sleep).
3. More talkative than usual or pressure to keep talking.
4. Flight of ideas or subjective experience that thoughts are racing.

5. Distractibility (i.e., attention too easily drawn to unimportant or irrelevant external stimuli).
6. Increase in goal directed activity (either socially, at work or school, or sexually) or psychomotor agitation.
7. Excessive involvement in activities that have a high potential for painful consequences (e.g., unrestrained buying sprees, sexual indiscretions, or foolish business investments).

His condition was characterized by grandiose military and religious delusions, paranoia, and manic episodes.  He had poor insight into the nature of his illness and had a markedly diminished quality of life long before the events of February 9, 2023.

Mr. Couch met the diagnostic criteria for schizoaffective disorder, bipolar type, through documented concurrent manic episodes and psychotic symptoms over more than a decade.

2012.  First psychotic break featured auditory/visual hallucinations, paranoia, and grandiose delusions of 21 years of military service (including Navy SEAL Team 6) and waking "20 years later." This manic presentation with psychosis led to a 14 day hospitalization and was later reclassified as schizoaffective disorder, bipolar type in outpatient records.

August 2018 Crisis: Placed on a 5150 hold after threatening his stepfather while off medication; he walked approximately 30 miles and exhibited paranoid delusions.  Restpadd Psychiatric Health Facility diagnosed a mixed manic episode with psychotic features.

May 2019 Vandalism: While unmedicated and intoxicated, he destroyed his uncle's vehicle under the delusion that his aunt was being held hostage, demonstrating a manic episode driven by persecutory and grandiose psychosis.

December 25, 2022 Incident: While intoxicated,  he brandished a large combat knife at a passerby and advanced on officers while repeatedly yelling "shoot me bitch."

February 9, 2023 Events: Hours before the shooting, he threatened a UPS driver, claimed to be God, and brandished a rifle style object from a moving vehicle. Then while wearing a tactical vest with knives, engaged in aggressive confrontation with Officer Cates, including grabbing the firearm and pointing a Taser. These behaviors exemplified an acute manic psychotic episode.

Family interviews and  depositions consistently described recurring delusions (Archangel Michael, Navy SEAL, Jesus/God), manic sleeplessness with long walks, pressured speech, and poor insight. Jail mental health notes and Shasta County outpatient records confirmed medication refusals.

Collateral history from family members, describe him as unable to live independently. He required ongoing supervision for medication adherence, medical appointments, and basic daily functioning. When unmedicated, he became grossly  psychotic, with racing thoughts, pressured speech, and religious preoccupations. His aggression caused him to be unable to reasonably function in society at times.

The records further document that Mr. Couch's illness was compounded by polysubstance abuse, which exacerbated his psychotic symptoms, impaired judgment, and aggressive and impulsive behavior.

Even during intervals of better medication adherence, Mr. Couch's functioning remained limited. He held sporadic jobs and relied on Supplemental Security Income due to his mental disorder. His insight remained poor. He frequently minimized or denied the need for treatment. His lack of insight would have led to future relapses and a continuing downward trajectory in life.

In summary, from a psychiatric perspective, Mr. Couch suffered from a severe chronic mental illness that profoundly affected his social and occupational functioning.

In my opinion he presented a significant and ongoing risk of dangerous and unpredictable behavior due to his severe schizoaffective disorder, compounded by substance abuse.

From December 2022 onward, he displayed vacillating dangerous, irrational, and psychotic behavior. This included threatening to kill a UPS driver, pointing a weapon at others, and eventually the altercation which resulted in his death.

Mr. Couch's illness was marked by delusions of grandeur and persecution, with manic episodes characterized by extreme sleep disruption and religious or military themed preoccupations. Family members described a history of stopping treatment.

Substance abuse further heightened the dangerousness and unpredictability of his presentation. Marijuana and alcohol use frequently intensify psychotic symptoms and reduce impulse control in individuals with this disorder.

In the December 25, 2022 incident while intoxicated after consuming multiple shots of liquor, he brandished a knife at a civilian he believed was stalking him, and then advanced on law enforcement officers while yelling threats and inviting them to shoot him. Similar dynamics appeared in the 2019 vandalism of his uncle's vehicle, committed while off medication and intoxicated, under the delusional belief that his aunt was being held hostage.

During his incarceration from late December 2022 through February 8, 2023, jail mental health documentation revealed including verbal aggression, threats to fight staff, sexualized remarks, destruction of property, and refusal of psychiatric medication.

On February 9, 2023, when confronted at his residence, he exited his car wearing a tactical vest equipped with a large knife and pistol holster, and refused to cooperate with the officer.

At the time of his shooting, he was grossly psychotic and dangerous. He was not able to listen to reason, follow directions and behave in a rational manner. His behavior was consistent with a severely manic individual. His behavior was unpredictable, threatening, and posed an imminent risk of serious bodily injury or death to others, including law enforcement.


Matthew Carroll, MD

**MATTHEW F. CARROLL, M.D.**
501 West Broadway, Suite 1490
San Diego CA 92101
(619) 282-7172    Fax (619) 282-7626

FEE SCHEDULE

My fee is $900 per hour.  This includes consultation, record review, examination, report preparation, court preparation, waiting time, etc.

Out of town examinations and testimony will be billed the full-day fee of $9,000 per day.

Court testimony will be billed at either $4,500 per half-day or $9,000 for a full-day.  A no-show fee of $1,800 will be charged for all scheduled evaluations not cancelled within 3 business days; individual exceptions may be made for extenuating circumstances at my discretion.

Deposition time will be billed at $1000 per hour.

Payment is expected in 30 days after invoice receipt.

Sincerely,

Matthew F. Carroll, M.D.
Board certified Psychiatry/Forensic Psychiatry

revised 4/2023

CURRICULUM VITAE

**MATTHEW F. CARROLL, M.D.**
**ADULT AND FORENSIC PSYCHIATRY**
501 West Broadway Suite 1490
San Diego, CA  92101
(619) 282-7172
fax (619) 282-7626
e-mail:  matthewfcarroll@gmail.com

| | |
|---|---|
| **AREAS OF EXPERTISE:** | Fellowship trained and Board Certified Forensic Psychiatrist.  Specializing in civil and criminal cases involving psychiatric issues.  Thousands of evaluations performed, extensive courtroom experience, valuable clinical expertise. |
| **SERVICES:** | Independent Medical Evaluations (IME) ● Disability ● Fitness for duty ● Psychiatric malpractice ● Peer review ● Emotional distress ● Personal injury ● Post traumatic stress disorder ● Testamentary capacity ● Malingering ● Competency ● Insanity ● Pre-sentencing evaluations ● Death penalty ● Military ● Qualified Medical Examiner (QME) ● Workman's Compensation ● Emergency Psychiatry ● Conservatorship evaluations |
| **EDUCATION:** | Cornell University Ithaca, New York B.S. (Honors), Biology, June 1984 George Washington University School of Medicine Washington, D.C. M.D., May 1989 |
| **CLINICAL TRAINING:** | <u>Internship</u> Psychiatry Naval Medical Center San Diego July 1989 - June 1990 <u>Residency</u> Psychiatry Naval Medical Center San Diego July 1993 - July 1996 |

Fellowship
Forensic Psychiatry
Case Western Reserve University
July 1998 - June 1999

EMPLOYMENT:    Forensic Psychiatrist
Private Practice
January 2002 to present

San Diego County Forensic Evaluation Unit
Forensic Psychiatrist
June 2000 to present
Supervisor 2017-2020

Department of Veterans Affairs
San Diego Compensation and Pension Clinic
Psychiatric evaluations, Post-traumatic stress disorder
evaluations (PTSD)
January 2002 to 2013

Medical Board of California
Expert Reviewer 2002-2020

San Diego County Psychiatric Hospital
Emergency Psychiatric Unit
Staff Psychiatrist
July 1999 to 2020

Naval Medical Center San Diego
Forensic Psychiatrist
Staff Psychiatrist
July 1999 - January 2002

Naval Consolidated Brig
Miramar, San Diego
Consulting Psychiatrist
Sex Offender Treatment Program
July 1999 - July 2001

Naval Hospital Bremerton
Inpatient Medical Director
Medical Director Alcohol Rehabilitation
Center
Staff Psychiatrist
August 1996 - June 1998

Matthew F. Carroll, M.D.                                    2

Naval Alcohol Rehabilitation Center
Pearl Harbor, Hawaii
Medical Director
July 1990 - July 1993

**MILITARY SERVICE:**

Armed Forces Health Professions Scholarship
1984 - 1989

United States Navy, active duty
May 1989 - January 2002

**CERTIFICATIONS:**

American Board of Psychiatry and Neurology
Board certified in Psychiatry

American Board of Psychiatry and Neurology
Forensic Psychiatry subspecialty certified

Qualified Medical Evaluator (QME)
State of California 2002-2017

California medical license (active)

DEA registration (active)

**UNIVERSITY AFFILIATIONS:**

Assistant Clinical Professor, University of
California, San Diego (UCSD) School of Medicine
Department of Psychiatry
July 2000 to June 2021

University of San Diego, School of Law
Adjunct Professor
August 2002 – August 2009

**TEACHING:**

Preceptor
Forensic Psychiatry Training
San Diego County Forensic Evaluation Unit
June 2000 to present

Preceptor
UCSD Psychiatry residents and medical students
July 2002 to March 2020

Naval Medical Center Psychiatry residents
Forensic Evaluation Unit
July 2002 to March 2020

Matthew F. Carroll, M.D.                                                3

Lecturer
UCSD Forensic Psychiatry Course

Guest Lecturer
UCSD Psychiatry Department and UCSD School of
Medicine

Guest Lecturer
USD School of Law
Law and Mental Health Course 2002-2009

Capacity / Conservatorship evaluations -  Probate
Attorneys of San Diego December 4, 2015

North City Prevention Coalition- Medical Marijuana-
January 9, 2014

American Academy of Psychiatry and the Law-
International Relations Committee site visit, cultural issues,
death penalty, right to die, PTSD and Traumatic Brain
Injury October 23, 2013

Lecture on Posttraumatic Stress Disorder/ Traumatic Brain
injury Bonnie R. Moss & Associates April 11, 2012

Lecture on Posttraumatic Stress Disorder
County of Riverside Public Defenders Office- July 9, 2010

Lecture on Mental Competency
San Diego Psych-Law Society – May 28, 2010

Lecture on Substance Abuse for Attorneys
Bonnie R. Moss & Associates – March 3, 2010

Forensic Aspects of Posttraumatic Stress Disorder
American College of Forensic Psychiatry -March 19, 2009

Lecture on Alcohol and Drug Abuse
Law Firm of Latham and Watkins (2006-2009)

Presentation on Suicide: Practical patient safety for the
doctor from risk assessment to risk reduction
American Psychiatric Association – May 24, 2007

American Psychiatric Association – May 24, 2007

Matthew F. Carroll, M.D.                                    4

Moderator- Medical Board of California Medical Expert Witness Training

Lecture on Right to Refuse Treatment
Mental Health Department, San Diego County (2006)

Lecture on Psychiatric Malpractice
Kaiser Permanente Medical Staff (2004)

Lecture on Legal Aspects of Psychiatry
U.S. Attorneys, San Diego Office (2004)

Lecture on Posttraumatic Stress Disorder
Mental Health Department, San Diego County (2004)

Lecture on Alcohol Induced Blackouts
Office of the District Attorney, San Diego (2003)

**PUBLICATIONS:**    Carroll MF: Deception in Military Psychiatry. American Journal of Forensic Psychiatry 2002; 22:1:53-62.

Carroll MF:  Malingering in the Military.  Psychiatric Annals 2003;33:11:732-736.

**PROFESSIONAL AFFILIATIONS:**    Fellow of the American Psychiatric Association (FAPA)

American Academy of Psychiatry and the Law

San Diego County Medical Society

Matthew F. Carroll, M.D.                                    5

## <u>MATTHEW F. CARROLL, MD</u>

## <u>LIST OF TESTIMONY</u>

**<u>March 2026</u>**

Fairbain Conservatorship (testimony)

Foerster (Powell) v. Laguna Niguel (deposition)

Hildreth v. CDCR (deposition and testimony)

John Doe BW v. Doe (deposition)

**<u>November 2025</u>**

United States of America v. Girish Subburaman (testimony)

**<u>October 2025</u>**

Katie Gillespie v. San Dieguito Union High School District, et al. (deposition)

**<u>September 2025</u>**

Jeffrey David Yusim (testimony)

**<u>May 2025</u>**

Angela Grover v. The California Department of Parks & Recreation (deposition)

John Beltran v. Priscillia Rabendaputinier (deposition)

**<u>July 2024</u>**

Anthony Copolla v. CDCR (testimony)

Esperanza Perez v. Kaiser Foundation Hospital (deposition)

**<u>June 2024</u>**

La Tonya Bankett v. FTB et al. (testimony)

**<u>May 2024</u>**

LaTonya Bankett v. FTB et al. (deposition)

Anthony Coppola v. California Department of Corrections & Rehabilitation (deposition)

**<u>April 2024</u>**

Fani Ponirou Alnadawi v. Fleming's Prime Steakhouse, et al. (testimony)

State of California v. Bradley Coates (testimony)

**<u>January 2024</u>**

Jadian Altemus v. Amazon (deposition)

**December 2023**

Mark William Depretis and Nansea Anne Depretis v. City of Carlsbad (deposition)

**October 2023**

Debra A. Postil CALPERS Hearing (testimony)

**September 2023**

Joey Zahir v. Apollo Marketing Inc., Welk Resort Group Inc. (deposition)
Joey Zahir v. Apollo Marketing Inc., Welk Resort Group Inc. (testimony)
State of California v. Arkan Shehan (testimony)

**August 2023**

Sarah Bonesteel v. Sarah McDevitt (deposition)
Patrick Rogondino v. City of San Diego (testimony)
Debra Postil CALPERS Hearing (testimony)

**July 2023**

Patrick Rogondino v. City of San Diego (deposition)

**May 2023**

Anthony Dennis v. Synergy Electric Company, et al. (deposition)

**April 2023**

Gordon Klein v. The Regents of California (deposition)
John Doe v. Redlands Unified School District (deposition)

**February 2023**

Roslyn Sanchez CALPERS Hearing (testimony)
Taimara Coleman v. CDCR (deposition)

**January 2023**

Board of Pharmacy Department of Consumer Affairs v. Paolo Dano (testimony)
Bianca Petrinec v. Michael Sukay (deposition)

**November 2022**

Robert J. Foss v. International Institute of Los Angeles (testimony)

**October 2022**

Reba White v. CDCR (deposition)

Silvia Jacobs v. SDG&E (deposition)

**<u>August 2022</u>**

United States v. Luis Ochoa (testimony)

Ponirou Alnadawi v. Fleming's Prime Steakhouse Brands, Inc. (deposition)

**<u>June 2022</u>**

United States v. David Alexis Rodriguez (testimony)

The Estate of Roger Charles Alperin, Howard Alperin v. Davene Gaye Alperin (testimony)

**<u>May 2022</u>**

Thomas Webb v. Kohler Co. (deposition)