# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DAVID COUCH, Sr., and JEANELLE COUCH; both individually and as successors in interest to DAVID COUCH, Jr. Decedent,<br><br>     Plaintiffs,<br><br>v.<br><br>STATE OF CALIFORNIA, by and through CALIFORNIA HIGHWAY PATROL; RYAN CATES; SHASTA COUNTY; and DOES 1-20, inclusive,<br><br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Case No.: 2:24-cv-00481-TLN-AC<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**EXPERT REPORT OF JEFFREY J. NOBLE**

1.  My name is Jeffrey J. Noble, and I make this report at the request of plaintiffs' counsel.

**Qualifications**

2.  I was a police officer in the City of Irvine for 28 years rising to the position of Deputy Chief of Police prior to my retirement. I served as an interim Deputy Chief of Police at the Westminster Police Department for nine months.

  a.  I was a police officer for 28 years and retired in July 2012 as the Deputy Chief of Police with the Irvine Police Department, located in southern California. As a Deputy Chief, I was directly responsible for all police operations including Patrol, Traffic, Criminal Investigations, Emergency Management, Crime Prevention, DARE, K9s, Training, and SWAT. The City of Irvine encompasses over 70 square miles with a population of over 218,000. I served in a wide range of assignments as an Officer, Senior Officer, Sergeant, Lieutenant, Commander and Deputy Chief, including Patrol, Traffic, Detective, SWAT, Training, Internal Affairs, Emergency Management and Crime Prevention. The Irvine Police Department had over 200 police officers and over 100 civilian employees during my employment with the department.

  b.  In April 2014, I was hired by the Westminster, California Police Department as an interim Deputy Chief of Police. My employment with the Westminster Police

1

Department was by means of a temporary contract, and I was asked to review the department's Internal Affairs unit; department policies relating to Internal Affairs investigations, discipline and police officer conduct; conduct department audits and inspections; and act as a liaison with a civilian oversight monitor who was hired during the same period.  My employment was at the request of the Chief of Police, was ratified by the City Council and was sought due to the arrest of a police officer for an off-duty criminal sexual assault, the arrest of an on-duty officer for extortion and a lawsuit filed by three Latino officers alleging discrimination and retaliation.  I concluded this interim position in January 2015. The Westminster Police Department had 87 police officers and 40 civilian employees during my temporary contracted employment.

c.     As a police supervisor and manager, I have extensive knowledge, skills, and experience conducting internal administrative investigations on a wide range of issues including use of force, vehicle pursuits, officer misconduct, criminal interrogations and interviews, harassment and sexual assaults.

3.    I have a Juris Doctor degree, with honors, from Western State University College of Law and I am admitted to practice law in the State of California.  I have a Bachelor's degree in Criminal Justice with an emphasis on Administration from California State University at Long Beach.

4.    As a police consultant and expert witness, I have extensive experience on matters involving police investigative procedures, misconduct and corruption.  For example:

a.     In 2014, I was part of a Carnegie Institute of Peace Think Tank for addressing police use of force in developing countries.

b.     I have consulted with police organizations on a wide range of police practices, procedures, including criminal and administrative investigations.  For instance, I was retained in 2004 as an expert to review and evaluate the internal investigation conducted by the San Francisco, California, Office of Community Complaints of the case widely known as "Fajitagate" involving the indictment of seven command staff members and three officers of the San Francisco Police Department.  In 2007 and again in 2009, I was retained by the City of Austin, Texas to review the police department's internal homicide and Internal Affairs investigation of two officer involved fatal shootings.

c.     I have been retained as both a defense and a plaintiff's expert in over 350 cases and have testified as an expert in state court in California, Washington, Tennessee, Connecticut, Minnesota, Illinois, Florida, Georgia, Oregon, Colorado, and New Mexico and in federal court in Illinois, Tennessee, Georgia, South Carolina, Oregon, North Carolina, Virginia, Texas and California.

2

d.      I have prepared expert reports for cases in the states of California, Washington, Pennsylvania, Georgia, Illinois, Tennessee, Idaho, Arkansas, Texas, Colorado, New York, Oklahoma, Connecticut, Florida, Nevada, Utah, Minnesota, Michigan, Ohio, Kentucky, Louisiana, Indiana, Wisconsin, Virginia, Delaware, Oregon, Arizona, New Mexico, New Jersey, Mississippi, North Carolina, South Carolina, Wyoming, Kansas, Maryland, Nebraska, and Missouri.

e.      I have been retained in criminal cases involving allegations of criminal uses of force by police officers in the states of New Mexico, Delaware, Minnesota, Pennsylvania, California, Georgia, Washington, Colorado and Florida.

f.      I served as an independent policy advisor to the Large City Internal Affairs Project, which was funded by the United States Department of Justice.  This group consists of the 12 largest police agencies in the United States as well as a select group of independent policy advisors and academics.  The project was an effort to develop national best practices in internal investigations for police agencies.  I was the chair of a sub-committee whose efforts were focused on the investigation of allegations of officer misconduct.  Because of this project the COPS Office published a document entitled, "Standards and Guidelines for Internal Affairs: Recommendations from a Community of Practice."

g.      I have given presentations at the International Association of Chiefs of Police conference in 2004, 2009, 2012, and 2014; the national COPS conference on Internal Affairs issues and the Academy of Criminal Justices Sciences annual meeting on tactical reckless decision making in 2009; the American Psychological Association annual conference in 2013; and National Tactical Officers' Association annual conference in 2004.

h.      In 2013, I gave a presentation in Mexico at the request of the Mexican government on preventing corruption in police institutions.

i.      I have published 21 articles on policing which discussed the subject matters of: Internal Affairs, personnel issues, pursuits, use of force issues and investigative procedures.  Those articles are listed in my attached resume.

j.      I have published two chapters for policing textbooks on tactical recklessness and the code of silence.

k.      I have co-authored, along with Geoffrey Alpert, Ph.D., a textbook on police Internal Affairs investigations titled, "Managing Accountability Systems for Police Conduct: Internal Affairs and External Oversight."

l.      As evidence that the opinions in our book are accepted by other experts of police administrative investigations, my book was cited extensively in the COPS 2009

3

publication, "Building Trust Between the Police and the Citizens They Serve: An Internal Affairs Promising Practice Guide for Local Law Enforcement."

    m.    In 2020, I co-authored a textbook, "Evaluating Police Uses of Force," with Seth Stoughton and Geoffrey Alpert.

5. My experience, training and background are more fully described in my attached resume.

6. My areas of expertise in policing include, but are not limited to: police use of force; pursuits; police administration; training; police operations; criminal investigations; interviews and interrogations; civil rights violations and investigations; internal/administrative investigations; criminal investigations; police discipline; citizen complaints; and police policies and procedures.

7. I reviewed the following material in making my opinions:

- Complaint for Damages
- Response of Defendant State of California by and Through California Highway Patrol to Request for Admissions Propounded by Plaintiff David Couch, Sr. (Set One)
- Response of Defendant State of California by and Through California Highway Patrol to Interrogatories Propounded by Plaintiff David Couch, Sr. (Set One)
- CHP Use of Force Policy (CHP 01927-1948)
- Incident Detail Report (CHP 01758-1767)
- Scene Photographs (CHP 01768-1912)
- Officer Cates Training History (CHP 01922-1923)
- Officer Cates Training History (CHP 01924-1926)
- Training Documents (CHP 01913-1921)
- Scene Vehicle Photographs (CHP 0155-1591)
- Cates Processing Photographs (CHP 01304-1443)
- Scene Photographs (CHP 0752-1040)
- Evidence Photographs (CHP 0513-751)
- Follow Up Questions – Officer Cates (CHP 01949-1950)
- Deposition of Officer Cates
  - Exhibit 1 – Second Amended Notice of Deposition of Ryan Cates
  - Exhibit 2 – Photograph of Officer Cates
- MAIT Investigation (CHP 014-24)
- Transcription of Administrative Interview of Officer Cates (CHP 0122-141)
- Helicopter Video (CHP 07)
- Audio of Interview of Cates (CHP 01-2)
- Officer Cates MVAR Video (CHP 08)
- Responding CHP Officer MVAR Video (CHP 09)

4

- Responding CHP Officer MVAR Video (CHP 010)
- Responding CHP Officer MVAR Video (CHP 011)
- Dispatch Radio Audio Recording (CHP 012)
- Officer Cates MVAR – Enhanced Audio (CHP 01951)

8. At this point in the development of this case, I do not know whether I will be using any demonstrative aids during my testimony.  Should I decide to use any such aid, I will ensure that they are made available for review, if requested, prior to their use.

9. My professional charge for this litigation work is an hourly fee of $495 plus expenses including all travel time.  My fees for deposition and trial testimony are a flat rate of $3,000 for the first four hours and $650 per hour for every additional hour, plus travel time and expenses.

10. If I am provided additional materials that change, alter or amend my opinions, I will prepare a supplemental report.

11. To ensure my methodology is reliable and consistent, my opinions in this matter are predicated on a comprehensive review of the material provided, establishing my understanding of the facts of the case, and on the professional and generally accepted principles and practices in policing as of the date of this incident. "Generally accepted principles" refer to those concepts and theories that are widely known, acknowledged, and relied upon in the field. "Generally accepted practices" refers to those protocols, techniques, and procedures that are widely known, acknowledged, and relied upon in the field. A principle or practice is generally accepted when well-educated, well-trained, and experienced professionals would agree that it is conventional, customary, and reasonably standard. By "conventional," I mean based on or in accordance with general agreement, use, or practice.  By "customary," I mean commonly applied as a matter of professional norms. By "reasonably standard," I mean substantially consistent across agencies, informing or representing the professional standard of officer behavior in the applicable scenario.  Generally accepted principles and practices reflect prevailing norms across policing.

12. This methodology—assessing officer actions against generally accepted principles and practices as of the date of the incident—has been broadly used by police practices experts since at least the 1970s.  As Dr. James Fyfe, whose work the Supreme Court

cited in the seminal use-of-force case *Tennessee v. Garner*[1] and who contributed to and was cited in a brief *amicus curiae* submitted in the same case,[2] wrote in 1987:

a.  The major questions put to police experts seek their opinions about whether and why police conduct under litigation was in accord with generally accepted custom and practice. To respond, experts must be able to identify and define custom and practice.

b.  Custom and practice in the institutionalized behavior of the members of an occupation or profession. It is how things are done, and it generally represents an occupational norm that must be both sufficiently broad to fit a variety of settings and circumstances and sufficiently precise to be applied to individual problems.[3]

13.  A core premise of this approach is that "generally accepted" principles and practices are occupational norms, derived from practice and "real problems of field officers rather than the imagined problems emanating from an 'ivory tower.'"[4]

14.  A principle or practice can be generally accepted without rising to the level of an empirically validated best practice (that is, an evidence-informed, outcome-oriented practice that demonstrably outperforms alternatives).  Similarly, a principle or practice can be generally accepted without necessarily being universally adopted. While there is no single standard for establishing generally accepted principles or practices, it does not follow that there are no generally accepted principles or practices. "[A] full understanding of the police role in any domain must look beyond the public statements of police leaders and reformers and study the actual practices of policing in the field."[5]  As far back as 1949, police agencies recognized the existence of "techniques . . . intended as general procedures which must necessarily remain flexible, depending on varying circumstances."[6]

15.  Generally accepted principles and practices may be, but are not necessarily, reflected in Department of Justice consent decrees, publications by professional associations (such as the International Association of Chiefs of Police, the Police Executive Research Forum, the National Policing Institute, etc.), in agency policies, in reputable training materials,

---

[1] 471 U.S. 1, 11 n.10 (1985).

[2] Brief for the Police Foundation, joined by Nine National and International Associations of Police and Criminal Justice professionals, the Chiefs of Police Associations of Two States, and Thirty-One Law Enforcement Chief Executives, as Amici Curiae, Tennessee v. Garner, 471 U.S. 1 (1985).

[3] James Fyfe, Police Expert Witnesses, in EXPERT WITNESSES: CRIMINOLOGISTS IN THE COURTROOM, 107 (1987).

[4] W.F. PARKER, DAILY TRAINING BULLETINS OF THE LOS ANGELES POLICE DEPARTMENT ix (1954).

[5] David Thatcher, The Invention of Urgency: The Transformation of the Police Role in Society's Response to Mental Illness, 1900-1970, ___ POLICING & SOC'Y ___ (2025).

[6] W.F. PARKER, DAILY TRAINING BULLETINS OF THE LOS ANGELES POLICE DEPARTMENT 121 (1954).

and in academic institutions and publications that conduct or reflect reliable research on policing.  Importantly, these sources may *reflect*, but do not serve as the *foundation* of, generally accepted principles and practices. Generally accepted principles and practices typically cannot be inferred from the practices, policies, or training of any single agency viewed in isolation; identifying common practices in policing instead requires "go[ing] to many sources."[7]

16.   To identify and apply the applicable generally accepted principles and practices in policing, I rely on my knowledge, skill, experience, training, and education in law enforcement. This includes extensive work in my field of study as a policing scholar and author; my knowledge of historical and contemporary law enforcement standards and methods; and the relevant professional and academic literature. I employ a similar methodology when I conduct professional evaluations of police officers or agencies as a consultant; when conducting research on, with, or for police agencies or governmental entities such as cities, counties, or the Department of Justice; and when writing for reputable academic publishers.  Relying on these sources is consistent with the longstanding practice of reputable experts in this area:

   a.   A better place to look for definitions of police custom and practice is found in a widely available, and apparently successfully used, body of literature and training materials. These materials do not have the force of law, and do not attempt to prescribe step-by-step measures for *every* possible police problem. The police literature does, however, lay out a set of useful generally principles, is specific enough to be applied in a great number of circumstances, varies in its recommendations only in minor ways, and [is] widely—and apparently successfully—employed throughout the country.[8]

17.   Notably, assessing generally accepted principles and practices by looking broadly at actual field performance and operations is itself a longstanding norm in policing.  August Vollmer, who was the first police chief of Berkeley, CA, and has been described as "the father of modern policing,"[9] wrote in 1949 that looking across a variety of sources, including both officers and subject matter experts in related fields, "pool[s] the knowledge, experience, and wisdom" of policing as a whole, allowing

---

[7] W.F. PARKER, DAILY TRAINING BULLETINS OF THE LOS ANGELES POLICE DEPARTMENT v (1954).

[8] James Fyfe, Police Expert Witnesses, in EXPERT WITNESSES: CRIMINOLOGISTS IN THE COURTROOM, 107-08 (1987).

[9] See Julian Go, The Imperial Origins of American Policing: Militarization and Imperial Feedback in the Early 20th Century, 125 AM. J. SOC. 1193 (2020).

agencies to "use the information thus obtained for purposes of instructing the entire membership of the organization."[10]

18.     In short, the methodology I applied in this case is consistent with the longstanding methodology utilized by reputable experts in the field of law enforcement and police practices when analyzing incidents of this type in the context of litigation.[11]

19.     In applying this methodology, I specifically do not apply legal standards or offer any opinions about whether an officer's actions are lawful as a matter of constitutional, statutory, or common law.  It is well established among police experts that certain words or phrases—e.g., "reasonable" and "unreasonable"—have a legal meaning that is distinct from the meaning ascribed to those words or phrases in the context of generally accepted police principles and practices.[12]  My use of any such terminology is intended to and should be read strictly as references to the professional and generally accepted standards in policing and is not intended and should not be interpreted as references to or the application of legal standards within the sole province of the factfinder or judge.  Similarly, any citations to legal sources are provided only as historical evidence, as sources that may inform generally accepted police principles and practices,[13] or for

---

[10] August Vollmer, Preface, in W.F. PARKER, DAILY TRAINING BULLETINS OF THE LOS ANGELES POLICE DEPARTMENT, at vii (1954).

[11] See, e.g., Zuchel v. City and County of Denver, Colo., 997 F. 2d 730, 742-43 (10th Cir. 1993) (discussing an expert opinion "based on his understanding of generally accepted police custom and practice in Colorado and throughout the United States"); United States v. Meyers, 972 F.2d 1566, 1577 (11th Cir. 1992) (discussing an expert applying "the prevailing standards in the field of law enforcement"); Larez v. City of Los Angeles, 946 F.2d 620, 635 (9th Cir. 1991) (discussing an expert opinion that an LAPD investigation "was not 'in accord with generally accepted police custom and practice"); Samples v. City of Atlanta, 916 F.2d 1548, 1551 (11th Cir. 1990) (describing expert testimony about the use of deadly force as applying "prevailing standards in the field of law enforcement"); Holman v. Walls, No. CIV. A. 86-1 JRR, 1989 WL 66636, at *2 (D. Del. June 13, 1989) (discussing an expert opinion finding "at least 22 separate deviations from generally accepted police custom and policy"); Ford v. Childers, 855 F.2d 1271, 1271 (7th Cir. 1988) (discussing an expert's opinion that a use of force was inconsistent with "generally accepted police practices"); Voutour v. Vitale, 761 F.2d 812, 822 (1st Cir. 1985) (discussing an expert opinion that a police agency's failure to provide training was "violative of generally accepted police practice"); Biscoe v. Arlington County, 738 F.2d 1352, 1363 (D.C. Cir. 1984) (noting that an "the officer is constrained both by regulations and clearly established policy and standards, about which experts can, and have testified"); Stanton v. State, 26 NY 2d 990, 995 (NY Ct. App. 1970) (Burke, J., dissenting) (discussing that "expert testimony, without contradiction in this record, established that the omission to use ordinary, elementary and generally accepted police procedures directly resulted in" a vehicle pursuit).
Note that the sources in this footnote are limited to historical examples (more than 30 years old) of police practices experts applying the described methodology in the litigation context.

[12] See, e.g., Samples v. City of Atlanta, 916 F.2d 1548, 1551 (11th Cir. 1990) (permitting expert testimony that a use of force was "reasonable" because although "the literal wording of the question posed tends to call for an answer that would invade the province of the jury, which in this case was to decide the reasonableness of the officer's actions . . . the questions leading up to this testimony, and the manner in which the expert answered the question, properly informed the jury that the expert was testifying regarding prevailing standards in the field of law enforcement.").

[13] See James Fyfe, Police Expert Witnesses, in EXPERT WITNESSES: CRIMINOLOGISTS IN THE COURTROOM, 107 (1987) ("In most cases, police custom and practice is not specifically defined by law. Certainly, police custom and

other reasons as specified; in no respect should any citations to legal sources be construed as offering legal argumentation or opinions as to the legality of an officer's actions.

20. To identify and apply the applicable generally accepted practices in policing, I rely on my knowledge, skill, experience, training, and education in law enforcement.  This includes work in my field of study as a policing scholar and author; my knowledge of historical and contemporary law enforcement standards and methods; and the relevant professional and academic literature. I employ a similar methodology when I conduct professional evaluations of police officers or agencies as a consultant and when writing for reputable academic and professional publishers. The methodology I applied in this case is consistent with the methodology utilized by other experts in the field of law enforcement when analyzing incidents of this type.

21. I do not opine on the credibility of any witness, as the jury will need to decide for itself whether it believes witness testimony.  Where some evidence conflicts with other evidence, if possible, my opinions will rely upon video or other objective evidence, rather than witness reports or testimony, as that is consistent with police practices for investigating alleged improper uses of force and crimes.

22. The opinions that follow are made within a reasonable degree of certainty within the field of police practices based on over 35 years of professional law enforcement experience and scholarship.

**Summary of Incident**

23. On February 9, 2023, at about 5:30 PM, California Highway Patrol (CHP) Officer Cates was dispatched to a report of a subject brandishing a firearm on the southbound I-5 freeway.  It was reported that the subject pointed a rifle with a black barrel and brown handle out of the window of his vehicle.  The suspect vehicle was described as a white Ford sedan with the number "500" on the side and a California license plate of 8STM184.  The suspect was described as a male, white, who was possibly bald and wearing a grey hoodie.[14]

24. Officer Cates conducted a records check of the license plate and discovered the vehicle was registered at 3060 Island Drive, in the city of Redding.  Officer Cates drove to that address and saw the vehicle parked in the driveway of the residence.  As he drove past

---

practice must accord with law; but the law is only the starting point for analyses of the propriety of police behavior.")

[14] CHP 0130.

the residence, he saw the driver's door was partially opened and there was a male seated in the driver's seat.[15]

25.   Officer Cates notified the dispatcher that the suspect vehicle was at the address, and he made a U-turn to go back toward the residence.[16]

26.   Officer Cates claimed he knew that all the other CHP officers working the area were busy on other calls or had an extended response to his location. Officer Cates said based on the information that the driver was armed with a rifle, had pointed the rifle out of his window, and the vehicle in the driveway matched the description of the suspect vehicle, he decided to make a high-risk car stop on the vehicle. Officer Cates also requested that the dispatcher activate the "tones" on the radio to alert other officers of emergency radio traffic. Officer Cates pulled partially into the driveway behind the suspect vehicle and turned on his red lights to initiate a high-risk stop.[17]

27.   Officer Cates exited his vehicle, stood behind his driver's door, drew his handgun, and pointed his firearm at the driver, Mr. Couch. Officer Cates yelled at Mr. Couch to show his hands and Mr. Couch exited his vehicle with a cell phone in both of his hands. Mr. Couch was wearing what Officer Cates believed to be a tactical vest that had two knives on the left side and an empty handgun holster on the right side. Officer Cates said he believed that due to the empty holster, that Mr. Couch may have a handgun on his person or inside his vehicle.[18]

28.   Officer Cates ordered Mr. Couch to get on the ground, but Mr. Couch did not comply and instead he walked to the rear of his vehicle. Officer Cates said he approached Mr. Couch because he did not want Mr. Couch to return to his vehicle where he may have a firearm.[19]

29.   Officer Cates grabbed Mr. Couch's arm with his left hand while he continued to hold his handgun in his right hand. Officer Cates said Mr. Couch clenched his fist and jerked his arm away. According to Officer Cates, Mr. Couch then took a combative stance and began yelling at him. Officer Cates drew his taser with his left hand, while continuing to hold his handgun with his right hand, and pointed his taser at Mr. Couch as Mr. Couch walked toward him. Officer Cates said he fired both taser cartridges at Mr. Couch, but Mr. Couch swiped the wires away and the taser did not affect Mr. Couch.[20]

---

[15] CHP 0130.
[16] CHP 0130.
[17] CHP 0130.
[18] CHP 0130.
[19] CHP 0130.
[20] CHP 0131.

10

30. Officer Cates said he tried to place his taser back in its holder, but he missed the holster and dropped the taser to the ground. Officer Cates pushed Mr. Couch up against his patrol vehicle and tried to pin him against the vehicle using his body. Officer Cates placed the barrel of his handgun against Mr. Couch's head and ordered Mr. Couch to give him his hands, but Mr. Couch did not comply. Officer Cates said Mr. Couch reached up and grabbed the top of his handgun, but he was able to pull the gun away.[21]

31. Officer Cates said he attempted to handcuff Mr. Couch, but Mr. Couch was able to spin away and said something like, "Give me the .45 and I'll fuck you up." Officer Cates said Mr. Couch then picked up the taser.[22]

32. Officer Cates said, "Based on his previous aggressive actions towards me, his combative resistance thus far, his use of techniques to avoid being affected by the ECD [Electronic Control Device – commonly known by its brand name of "taser"], his attempt to take my service pistol from me, and his threatening statements, and the fact that he armed himself with my ECD, I believed he had the intention and the ability to use the ECD to cause me injury, incapacitate me, and ultimately disarm me of my pistol, and use the pistol against me to kill me, and I feared for my life. I attempted to eliminate the threat to my life by firing my service pistol and depressing the trigger once. And it did not fire. The suspect stated something along the lines of, 'doesn't work does it,' as he stepped toward me with the ECD pointed at me. I performed a malfunction drill and fired four rounds at the suspect to eliminate the threat to my life."[23]

33. Officer Cates said Mr. Couch was 2-4 feet away from him[24] when he pulled the trigger on his handgun the first time the weapon malfunctioned.

34. Mr. Couch died as a result of the gunshot wounds.

### Officer Cates' Tactical Decision Making was Inconsistent with Generally Accepted Police Practices

35. It is well-recognized that an officer's use-of-force decisions (that is, whether, when, and how to use force) are predicated to a significant degree on events that occurred prior to the use of force itself. In most incidents, including the interaction in this case, an officer's use of force is the result of "a contingent sequence of decisions and resulting behaviors—each increasing or decreasing the probability of an eventual use of . . .

---

[21] CHP 0131.
[22] CHP 0131.
[23] CHP 0131.
[24] Cates deposition at 18.

force."[25]  Put differently, "[a]n officer's use-of-force decision . . . will almost always be affected by events that occur prior to the use of force itself, and often prior to the subject's noncompliance, resistance, or other physical actions upon which the use of force is immediately predicated."[26] It follows that the use of force cannot be properly evaluated without considering the preceding actions of officers, subjects, or bystanders.

36.    The operational realities of policing require officers to manage an array of risks and threats. To manage those risks and threats, officers use tactics, which one source has defined as "a sequence of moves that limit the suspect's ability to inflict harm and [that] advance the ability of the officer to conclude the situation in the safest and least intrusive way."[27] "Tactics are the techniques and procedures that officers use to protect themselves and community members by reducing risks, mitigating the likelihood that risks will become threats, and preventing threats from manifesting into harms."[28] As they determine which tactical techniques and procedures are appropriate, officers must balance different and often shifting priorities in dynamic situations. While there is no way to completely ensure safety, police tactics seek to appropriately balance the safety of officers, subjects, and bystanders in light of those priorities.

37.    Police tactics and tactical decision making are highly contextual; an approach that may be entirely appropriate in one context may be entirely inappropriate in another. To use a simplified example, the tactics that officers might use to address an armed, barricaded subject are generally inappropriate in an active shooter situation and vice versa. Context is key, with context being highly dependent on officers' reasonable perceptions of the situation. For a number of reasons, different officers may perceive the same situation differently. Tactically, it follows that those officers may adopt different approaches, each aligning their approach with their perception of the situation. The ultimate question is whether, in light of the facts reasonably available at the time, the potential risks of the officer's decision or action were justified under the circumstances by the potential benefits of that decision or action.

38.    Further, it is generally accepted within policing that there may be a range of reasonable responses in any given situation. The spectrum of options represents the number of ways in which the different priorities of the situation may be balanced. To use a simplified example, an officer may be safer from being physically assaulted if they stand farther away from the subject but may have more opportunity to prevent the subject from fleeing if they stand closer, so there may be a range of reasonable distances at

---

[25] Arnold Binder and Peter Scharf, The Violent Police–Citizen Encounter, 452 ANNALS OF AN, ACAD, POL. & SOC. SCI. 116(1980).

[26] Seth W. Stoughton, Jeffrey J. Noble, and Geoffrey P. Alpert, EVALUATING POLICE USES OF FORCE, New York University Press (2020) at 227.

[27] Jeffrey J. Noble & Geoffrey P. Alpert, State-Created Danger in CRITICAL ISSUES IN POLICING: CONTEMPORARY READINGS at 568 (Roger Dunham and Geoffrey P. Alpert, eds., 7th ed., 2015).

[28] Seth W. Stoughton, Jeffrey J. Noble, and Geoffrey P. Alpert, EVALUATING POLICE USES OF FORCE, New York University Press (2020) at 35.

which an officer could stand depending on their assessment of the risk of potential assault or potential flight. For purposes of this analysis, then, the question is not whether the officers involved adopted the best possible tactics, but whether their tactics fell within the spectrum of tactical options that could be considered reasonable under the circumstances.

39.    Here, Officer Cates said based on the information that the driver was armed with a rifle, had pointed the rifle out of his window, and the vehicle in the driveway matched the description of the suspect vehicle, he decided to make a high-risk car stop on the vehicle.  Indeed, Officer Cates said he considered the situation to be potentially dangerous,[29] and he considered his actions to be a high-risk stop.[30]  Officer Cates said, "A high-risk stop is a stop that obviously has a higher risk of being dangerous to the officer but is not necessarily due to a felony crime. So, the, in this particular case the crime of a 417, brandishing a deadly weapon in this case, a firearm would significantly increase the risk to me when performing that stop. It would not be a stop that I perform as a routine traffic style stop. During a high risk stop we are typically trained to remain back at our vehicle to use the patrol vehicle as cover against ballistic threats posed by subjects and to give them verbal commands either by yelling or utilizing the patrol vehicle's public address system."[31]

   a.    Police officers are trained in high-risk stops and are instructed that "High-risk pullovers are conducted in any situation where patrol officers perceive a greater level of risk. Such perceptions may be based on the officer's observations, information received through communications with dispatch, other officers, or other reliable means."[32]

   b.    High-risk pullovers are generally made when patrol officers have reason to believe that one or more of the occupants of the target vehicle may be armed, represent a serious threat to the officer, or has committed a felony.[33]

   c.    A number of safety precautions are critical when conducting a high-risk vehicle pullover.  Those include using appropriate resources by requesting sufficient personnel and waiting for requested backup to arrive before taking action.[34]

   d.    Officers are trained that when they do make a high-risk stop, they should not rush or become impatient.  They should use available cover and concealment and always maintain a position of advantage.[35]  These tactics are again

---

[29] CHP 0137.
[30] Cates deposition at 86.
[31] CHP 0132.
[32] POST LD 22 at 3-3.
[33] POST LD 22 at 3-3.
[34] POST LD 22 at 3-4.
[35] POST LD 22 at 3-4.  See also, POST LD 23 at 1-10 and 1-11.

13

emphasized in officer safety training instructing officers to rely on their training, experience, and proven tactics such as, but not limited to: planning and considering alternatives before taking action; waiting for backup officers to arrive; positioning vehicles in safe locations; using available cover and concealment; and, maintaining a position of advantage.[36]

e.   Officers are trained that "No arrest is so important that the patrol officers involved should expose themselves to needless danger. In order to meet the safety challenges inherent to the situation, patrol officers must employ tactically sound procedures when effecting any high-risk vehicle pullover."[37]

f.   Sergeant Kittlitz, the CHP's 30(b)(6) witness, said that the basis for a high-risk stop is any circumstances that give an officer reasonable cause to believe an attempt to stop a vehicle will create extraordinary risks,[38] and he agreed that when an officer receives a call where a person is alleged to be waving a gun that it would be a high risk situation.[39]

40.   Officer Cates failed to request backup officers even though he knew a firearm was involved and even though he knew contacting Mr. Couch in these circumstances presented a high-risk situation.

a.   Although he knew that he was engaged in a high-risk situation, Officer Cates did not request the assistance of other officers.  Officer Cates said he chose not to wait for additional officers as he believed it was a crime that needed to be investigated before it escalated into something else and he knew the other CHP officers were a "good distance away or were busy with other calls for services."[40]

b.   Officer Cates said although he was aware that SHASCOM, the dispatch center for the Redding Police Department and the Shasta County Sheriff's Department had been advised of the call,[41] he did not make any effort to request assistance for either the Redding Police Department or the Shasta County Sheriff's Department.[42]  Officer Cates acknowledged that he could have asked his dispatcher to make the request and he could have made the request himself by using the SHASCOM frequency that was available to him, but said it was difficult to change his radio to SHASCOM's frequency, and he had never used that frequency in the past.[43]

---

[36] POST LD 23 at 1-8.
[37] POST LD 22 at 3-7.
[38] Kittlitz deposition at 19-20.
[39] Kittlitz deposition at 21.
[40] CHP 0137.
[41] Cates deposition at 133.
[42] Cates deposition at 140.
[43] Cates deposition at 134.

14

c.    While Officer Cates believed other CHP officers were unavailable, he made no effort to request assistance even though he had time and in fact had radio communications with the dispatcher where he could have requested assistance. Moreover, simply because another officer may be on a call for service, police officers frequently break from calls to respond to emergency situations, particularly in circumstances like this where it was believed that Mr. Couch had pointed a firearm at another motorist.

d.    There was no need for haste in this case.  Officer Cates knew that the crime was reported 15-20 minutes before he arrived at Mr. Couch's residence[44] and that no other crimes or actions of Mr. Couch had been reported to the police.  Moreover, Officer Cates drove by the residence and had the opportunity to wait for an additional officer prior to attempting contact with Mr. Couch.

e.    Sergeant Kittlitz testified that when feasible, an officer in these circumstances should request a backup officer.[45]  Sergeant Kittlitz said if a CHP officer was not available it would be an option to request an officer from another agency and those requests are typically made through the CHP dispatcher.[46]

f.    No reasonable police officer would have failed to request assistance from other officers and would fail to wait for assistance prior to contacting Mr. Couch in these circumstances.

41.    When Mr. Couch exited his vehicle holding a cell phone in both hands, Officer Cates saw that Mr. Couch had knives and an empty handgun holster on his vest.  Officer Cates claims he immediately approached Mr. Couch, fearful that Mr. Couch may re-enter his vehicle and obtain a firearm.

a.    No reasonable police officer would abandon their cover in these circumstances where the officer believes the suspect may be armed and when they responded to a man who pointed a rifle out of a car window on the freeway.

b.    The use of available cover is a basic tactical consideration.[47]  Remaining in a position of cover creates time and distance and provides the officer with an opportunity to engage in de-escalation efforts.  Moreover, now knowing that Mr. Couch was not obeying commands, it created another opportunity for Officer Cates to request emergency assistance from other officers.

---

[44] Cates deposition at 137.
[45] Kittlitz deposition at 28.
[46] Kittlitz deposition at 39.
[47] POST LD 33 at 1-6.

c.      Police officers are trained that cover should be used when involved in an armed encounter if possible,[48] and it was not only possible in this case, but Officer Cates abandoned his position of cover to approach Mr. Couch.

d.      Sergeant Kittlitz testified that the ideal distance for a high-risk car stop is 30-50 feet behind the suspect vehicle.  The purpose of this distance is to allow more time for the officer to react.[49]  Sergeant Kittlitz said CHP officers are trained that time, distance, and cover are "our friends," and an officer would want to have all three both for the officer's and the suspect's safety.[50]

e.      Sergeant Kittlitz said an officer should not walk toward the suspect, rather the officer should call the suspect back to the officer.  In this way, the officer could see the suspect's hands and determine if the suspect is complying with commands.[51]  Sergeant Kittlitz said it is ideal for an officer to remain in a position of cover,[52] and if the suspect is not complying and the officer did not have backup, it provides another opportunity to request a backup officer.[53]

42.    Officer Cates did not tell Mr. Couch why he was stopped, nor did he provide Mr. Couch with any warnings.[54]  Advising a person why they are being detained is important as it advises the person they are required to comply with the officer's commands and may tend to de-escalate a situation.[55]

a.      Police officers are taught that it is generally preferable to avoid conflict (i.e., conflict avoidance) or use communication skills to reduce or resolve conflict (e.g., de-escalation) than it is to use force.  Doing so increases both officer safety and the safety of the individuals with whom officers are interacting.  Not every situation allows for conflict avoidance or allows officers the opportunity to use de-escalation techniques, of course.  In that way, tactical communications are, like any other police tool, appropriate to use in some situations—namely, when they are safe and feasible—but not others.

b.      De-escalation means taking action to stabilize the situation and reduce the immediacy of the threat so that more time, options, and resources are available to resolve the situation.  The goal of de-escalation is to gain the voluntary

---

[48] POST LD 35 at 5-31.
[49] Kittlitz deposition at 26.
[50] Kittlitz deposition at 27.
[51] Kittlitz deposition at 31-32.
[52] Kittlitz deposition at 34.
[53] Kittlitz deposition at 37.
[54] Cates deposition at 96.
[55] POST LD at 1.5, 4.5, and 4.6; National Consensus Policy on Use of Force § IV.D.2 (Jan. 2017; rev. July 2020); Penal Code § 835a(c)(1) - ): "Where feasible, a peace officer shall, prior to the use of force, make reasonable efforts to identify themselves as a peace officer and to warn that deadly force may be used."

16

compliance of subjects, when feasible, and thereby reduce or eliminate the necessity to use physical force.  Police officers are trained that de-escalation is accomplished through verbal persuasion; slowing down a situation allowing for more time, options and resources; avoiding or minimizing physical confrontation; maximizing tactical advantage by increasing distance to allow for greater reaction time; and the use of shielding, when possible, for cover and concealment.[56]

c.      Here, Officer Cates gave Mr. Couch commands to show his hands and to put his hands up.  Mr. Couch exited his vehicle holding his cell phone with both hands and walked toward Officer Cates.  Rather than maintaining a position of cover, giving warnings, and making efforts at de-escalation, Officer Cates acted inconsistently with generally accepted police practices as he immediately abandoned his cover, approaching Mr. Couch with his handgun pointed at Mr. Couch's head resulting in an escalation of the situation.

43.     Officer Cates then tried to grab Mr. Couch's hand while holding his handgun in his right hand.  This action placed Officer Cates in a position of disadvantage as he could not control Mr. Couch with one hand.  Police officers are trained not to be holding their firearm while attempting to control or handcuff a suspect because it is difficult to maintain control of their firearm and a resulting struggle may ensue over control of the handgun.[57]

a.      Police officers are trained that loss of peace officer's firearm may place the officer and others in imminent danger. According to the 2011 LEOKA report, 56 officers were killed feloniously nationally, 7 with their own weapon. In the 2011 LEOKA report, four peace officers were killed in California by firearms, one with

---

[56] *See e.g.*, "De-Escalation: Guidelines for how to begin evaluating your agency's de-escalation practices," IACP (Sept. 2020) https://www.theiacp.org/sites/default/files/Research%20Center/Combined%20v3.pdf#:~:text=De-escalation%20reflects%20a%20style%20of%20policing%20for%20handling,or%20physical%20agitation%2C%20aggression%2C%20violence%2C%20or%20similar%20behaviors. "National Consensus Policy and Discussion Paper on the Use of Force," IACP (Revised July 2020) https://www.theiacp.org/sites/default/files/2020-07/National_Consensus_Policy_On_Use_Of_Force%2007102020%20v3.pdf; "ICAT: Integrating Communications, Assessment, and Tactics," Police Executive Research Forum PERF  (Oct. 2016) https://www.policeforum.org/assets/icattrainingguide.pdf

[57] *See*, "NEVER put your hands on a suspect with a gun in your hand! Holster the weapon!" Police1 Source: Bob Parker, "Causes and cures for the negligent discharge," Police1.com (Oct. 23, 2009), https://www.police1.com/police-products/firearms/articles/causes-and-cures-for-the-negligent-discharge-BGkKMEGfBMy8SAZA/; : Cecil Burch / TSG Defense, "Negligent Discharge: It Could Never Happen to Me, Right?" (Dec. 2021), https://www.tsgdefense.com/post/negligent-discharge-it-could-never-happen-to-me-right; "The thin line between safety and tragedy: Muzzle control in policing," Police1.com (Dec. 2024), https://www.police1.com/police-training/the-thin-line-between-safety-and-tragedy-muzzle-control-in-policing.

17

their own firearm.[58]  Thus, weapon retention is critical training for police officers.[59]

    b.    The primary considerations peace officers need to be aware of when applying a control hold is that the close proximity of the peace officer and the subject means peace officers are within striking distance of the subject and, the peace officers' weapon may be accessible to the subject.[60]

44.    After he failed to control Mr. Couch with one hand, and after two failed taser applications, Officer Cates placed his handgun against Mr. Couch's head.  Police officers are trained not to place a handgun against a suspect's head as a sudden movement may cause the officer to have a negligent discharge of their firearm (never point the muzzle at anything you are not willing to destroy).[61]

45.    Here, Officer Cates' failed to engage in generally accepted police tactics designed for the officer's and the suspect's safety.  Officer Cates failed to wait for backup, he failed to engage in de-escalation, he failed to use time and distance, he abandoned his position of cover, he attempted to control Mr. Couch with one hand while holding a handgun in his other hand, and he held his handgun against Mr. Couch's head even though Mr. Couch did not present an immediate threat of death or serious bodily injury.

**Officer Cates Use of Deadly Force was Excessive, Objectively Unreasonable, and Inconsistent with Generally Accepted Police Practices**

46.    It is well known and generally accepted in policing that the sanctity of human life is the highest priority in policing. This generally accepted principle is reflected in the opening sentence of the National Consensus Policy and Discussion Paper on Use of Force published by the International Association of Chiefs of Police as "a collaborative effort among 11 of the most significant law enforcement leadership and labor organizations in the United States"[62], which states, in relevant part, "It should be the foremost policy of all law enforcement agencies to value and preserve human life."[63] It is further reflected in the Police Executive Research Forum's publication, Guiding Principles on Use of Force, which states, in relevant part, that the document "is about the sanctity of all human life—the lives of police officers and the lives of the people they serve and protect. The

---

[58] POST LD 33 at 5-3.

[59] *See*, POST LD 33 section 5; Mike Rayburn, "Real World Weapon Retention," Police Magazine (March 2009), https://www.policemag.com/weapons/article/15348650/real-world-weapon-retention.

[60] POST LD 33 at 3-9.

[61] "The thin line between safety and tragedy: Muzzle control in policing," Police1.com (Dec. 2024), https://www.police1.com/police-training/the-thin-line-between-safety-and-tragedy-muzzle-control-in-policing.

[62] INTERNATIONAL ASS'N OF CHIEFS OF POLICE, NATIONAL CONSENSUS POLICY & DISCUSSION PAPER ON USE OF FORCE 5 (2020).

[63] INTERNATIONAL ASS'N OF CHIEFS OF POLICE, NATIONAL CONSENSUS POLICY & DISCUSSION PAPER ON USE OF FORCE 8 (2020).

18

preservation of life has always been at the heart of American policing."[64] It further states, "The sanctity of human life should be at the heart of everything an  agency does."[65] This principle has also been reflected outside of policing, including by The United States Conference of Mayors, which has taken the position, "At the core of a police officer's responsibilities is the duty to protect all human life and physical safety."[66]

47.     Police officers are trained about the U.S. Supreme Court's landmark decisions in *Graham v. Connor* and *Tennessee v. Garner.*[67]  Those decisions held that to determine whether the force used to affect a particular seizure is reasonable, one must balance the nature and quality of the intrusion on the individual's rights against the countervailing government interests at stake.  This balancing test is achieved by the application of what the Court labeled the objective reasonableness test.  The factors to be considered include in *Graham* and *Garner*: 1.) The severity of the crime, 2.) Whether the suspect poses an immediate threat to the safety of the officers or others, 3.) Whether the suspect is actively resisting or attempting to evade arrest by flight, and 4.) Whether a warning was given, if feasible.[68]

48.     Whether one's actions were objectively reasonable cannot be considered in a vacuum, but must be considered in relation to the totality of the circumstances.[69]  The standard for evaluating a use of force reflects deference to the fact that peace officers are often forced to make split-second judgments in tense circumstances concerning the amount of force required.  The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.  Police officers are trained and prepared to assess dangerous situations and respond accordingly.  Police officers are trained that for their force to be appropriate the level and manner of force must be proportional to the level of resistance and threat with which they are confronted.  Proportionality is best understood as a range of permissible conduct based on the totality of the circumstances, rather than a set of specific, sequential, predefined force tactics arbitrarily paired to specified types or levels of resistance or threat.

49.     Whether or not the suspect poses an immediate threat to the safety of the officer or others is the most important of the *Graham* and *Garner* factors.  There must be objective factors to justify an immediate threat, as a simple statement by an officer that

---

[64] POLICE EXECUTIVE RESEARCH FORUM, GUIDING PRINCIPLES ON USE OF FORCE 4 (2016)

[65] POLICE EXECUTIVE RESEARCH FORUM, GUIDING PRINCIPLES ON USE OF FORCE 34 (2016).  Also see, CA Penal Code §835a(a)(1) and POST LD 20.

[66] THE UNITED STATES CONFERENCE OF MAYORS, THE MAYORS' 2020 VISION: AN AMERICAN BREAKTHROUGH, Achieve Public Safety and Justice for All (2020).

[67] See, *Graham v. Connor*, 490 U.S. 386 (1989). *Also See*, CHP Use of Force policy CHP 01929 and POST Use of Force Standards and Guidelines (2021).

[68] CA POST LD 20.

[69] "Totality of the circumstances" means all facts known to the peace officer at the time, including the conduct of the officer and the subject leading up to the use of deadly force. *See*, CA Penal Code section 835a(e)(3)

19

he fears for his safety or the safety of others is insufficient.  There is no requirement that a police officer wait until a suspect inflicts harm to confirm that a serious threat of harm exists, but merely a subjective fear or a hunch will not justify the use of force by police.[70]

50.  Police officers are trained, that to use deadly force, there must be an immediate threat of death or serious bodily injury.  An officer's perception that a threat exists is reasonable when the officer has reason to believe that an individual has the ability, opportunity, and intent to cause harm.[71]  Ability means the individual's physical capability to cause an identifiable type of harm.  Opportunity refers to the environment and situation, specifically with regard to the individual's proximity to the potential target were targets. And demonstrable intent refers to the individual's perceived mental state, their apparent desire to cause physical harm to the target or targets.

51.  Where ability and opportunity may be relatively easy for an officer to diagnose based on readily observable physical characteristics, demonstrable intent is more complicated.  Because police officers, like everyone else, lack the ability to divine another's intentions by peering into their mind, officers must rely on behavioral indicators and physical manifestations indicative of intent.  For example, lunging at an officer with a knife is a clear physical manifestation of the intent to stab the officer.  In contrast, an individual who is merely conversing with an officer while standing next to a knife block in a kitchen does not present any physical behaviors from which an officer could identify an intent to use a knife aggressively.  Nor is walking toward an officer. Nor is failing to obey an officer's commands. Nor is merely possessing a weapon.[72]

52.  An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed.[73]

53.  Here, Officer Cates said, "Based on his previous aggressive actions towards me, his combative resistance thus far, his use of techniques to avoid being affected by the ECD, his attempt to take my service pistol from me, and his threatening statements, and the fact that he armed himself with my ECD I believed he had the intention and the ability to use the ECD to cause me injury, incapacitate me, and ultimately disarm me of my pistol, and use the pistol against me to kill me, and I feared for my life. I attempted to eliminate the threat to my life by firing my service pistol and depressing the trigger once. And it

---

[70] *See*, "National Consensus Policy and Discussion Paper on the Use of Force," IACP (Revised July 2020) https://www.theiacp.org/sites/default/files/2020-07/National_Consensus_Policy_On_Use_Of_Force%2007102020%20v3.pdf; POST LD 20, Hemet Police Department policy section 300 (COH001214-1222); and, CHP Use of Force policy (STATEOFCALIFORNIA 001592-1613).
[71] Cates deposition at 125.
[72] Seth W. Stoughton, Jeffrey J. Noble, and Geoffrey P. Alpert, EVALUATING POLICE USES OF FORCE, New York University Press (2020) at 35.
[73] *See*, POST LD 20 at 4-7; CA Penal Code section 835a(e)(2); and CHP Use of Force Policy.

20

did not fire. The suspect stated something along the lines of, 'doesn't work does it,' as he stepped toward me with the ECD pointed at me. I performed a malfunction drill and fired four rounds at the suspect to eliminate the threat to my life."[74]

54.    Officer Cates said it was not feasible for him to warn Mr. Couch that he was going to use deadly force before he shot Mr. Couch,[75] but he acknowledged that Mr. Couch had the time to tell him something similar to "Doesn't work," after his handgun malfunctioned,[76] indicating there was time for Officer Cates to provide a warning.

55.    Officer Cates said he did not have any information that Mr. Couch had fired a weapon,[77] he did not see Mr. Couch holding a firearm, and he did not see a bulge in Mr. Couch's pockets or waistband suggesting that he had a firearm.[78]  Officer Cates said he saw that Mr. Couch had an empty handgun holster on his vest,[79] and he believed due to the empty holster that Mr. Couch may have a firearm on his person or in his vehicle.

56.    Officer Cates said he did not see Mr. Couch reach for the knives on his vest,[80] and Mr. Couch did not reach for his pockets or waistband[81] as though he was trying to access a weapon and the video shows that Mr. Couch was not trying to re-enter his vehicle as though he were trying to retrieve a weapon.

57.    Officer Cates knew that his taser held two cartridges,[82] and he knew that he fired both cartridges at Mr. Couch.[83]  Officer Cates said although both cartridges had been fired, he was aware the taser could still be used to drive stun.[84]  Officer Cates wrongly believed a taser drive stun can cause neuro muscular incapacitation (NMI) and wrongly believed the probes are not required to create NMI.[85]  Officer Cates acknowledged that Mr. Couch did not reach out as though he was trying to touch him with the taser,[86] but he believed the drive stun would incapacitate him and could cause him to lose control of his handgun.[87]

    a.    Drive stun mode is possible whether or not the cartridge has been expended or removed from the ECW. (If the cartridge is not removed, the probes will enter the

---

[74] CHP 0131.
[75] Cates deposition at 26.
[76] Cates deposition at 30.
[77] Cates deposition at 70.
[78] Cates deposition at 73.
[79] Cates deposition at 73.
[80] Cates deposition at 92.
[81] Cates deposition at 94.
[82] Cates deposition at 101.
[83] Cates deposition at 100.
[84] Cates deposition at 117.
[85] Cates deposition at 118.
[86] Cates deposition at 117.
[87] Cates deposition at 126.

21

body.) This action requires pulling the trigger and placing the ECW in direct contact with the subject, causing the electric energy to enter the subject directly. Drive stun is frequently used as a non-incapacitating pain compliance technique.[88]

b.    Drive-stun mode is not designed to cause incapacitation and primarily becomes a pain compliance option. Drive-stun is only effective while the energy weapon is in contact with the subject or when pushed against the subject's clothing. As soon as the energy weapon is moved away, the energy being delivered to the subject stops.[89]

c.    Any reasonable police officer would have known and understood their weapon systems and that a taser cannot produce NMI without the cartridge or in drive stun mode.[90]

58.    Officer Cates used deadly force based on his misunderstanding of the abilities of his taser. Officer Cates' mistaken belief that the taser could cause NMI in the drive stun mode caused him to use deadly force. Moreover, Officer Cates used deadly force even though Mr. Couch did not reach the taser out toward him, when a reasonable police officer would know that the taser device must make physical contact in the drive stun mode and a reasonable police officer would know they could defeat the drive stun mode by simply moving away and breaking contact with the taser.

59.    No reasonable police officer in these circumstances would have used deadly force as Mr. Couch did not present an imminent threat of death or serious harm. Officer Cates' use of deadly force was excessive, objectively unreasonable, and inconsistent with generally accepted police practices.

I declare under penalty of perjury that the foregoing is true and correct. Executed at Rancho Santa Margarita, CA.

_____          ___4/29/26___
Jeffrey J. Noble                                            Date

---

[88] 2011 Electronic Control Weapon Guidelines, PERF (March 2011) at 42.
[89] https://my.axon.com/s/article/Drive-stun-backup-x26p?language=en_US
[90] See, Kittlitz deposition at 75-76.

22

# JEFFREY J. NOBLE

Telephone: (949) 279-4678
Rancho Santa Margarita, CA 92688
*Email:* jeffnoble@cox.net
www.policeconduct.net

## EXPERIENCE

*CONSULTANT/EXPERT WITNESS* (2005 – Present)

Provide consulting and expert witness services on a wide range of law enforcement and personnel issues including misconduct, corruption, use of force, workplace harassment, pursuits, police administration, training, police operations, criminal and administrative investigations, interviews and interrogations, civil rights violations, police procedures, and investigations.

*FEDERAL COURT APPOINTED MONITOR*

Santa Clara, California, Sheriff's Department (March 2019 – present)

Review of policies, procedures and use of force applications in the Santa Clara County Jails as part of a federal court consent decree in the matter of *Chavez v. County of Santa Clara*.

*DEPUTY CHIEF OF POLICE* (April 2014 – January 2015)

Westminster Police Department, California
(Sworn 87; Civilian – 40; Population- 91,377; 10 sq. mi.)

Served as an interim Deputy Chief of Police to review Internal Affairs, auditing processes, department policies and procedures, risk management and to facilitate the efforts of a new external oversight agency.

*DEPUTY CHIEF OF POLICE* (September 1984 – July 2012)

Irvine Police Department, California
(Sworn – 205, Civilian – 100; Population: 217,000; 70 sq. mi.)

Served as a Patrol Officer, Narcotics Detective, Traffic Detective, Training Sergeant, SWAT sergeant and Commander, Internal Affairs, Sergeant, Lieutenant, Commander and Deputy Chief of Police.  As the Deputy Chief of Police, I was responsible for all operations of the Irvine Police Department including Patrol, Traffic and Investigations.

# JEFFREY J NOBLE

## EDUCATION

_Western State University, College of Law_ (Irvine, California)
J.D. _with honors_, 1993.
Assistant Editor, Consumer Law Journal.  California State Bar, 1994, #170911.

_California State University at Long Beach_
B.A. Criminal Justice, 1989

_Senior Management Institute for Police_
Police Executive Research Forum.  Boston University, Boston, Massachusetts, 2002

## PUBLICATIONS

### _Books:_

Stoughton, S., Noble, J. and G. Alpert, _Evaluating Police Uses of Force_, New York University Press (2020).
Noble, J., and G. Alpert, _Managing Accountability Systems for Police Conduct: Internal Affairs and External Oversight_.  Prospect Heights, IL. Waveland Press (2008).

### _Book Chapters:_

Alpert, G., J. Noble and J. Rojek, _Solidarity and the Code of Silence, Dunham_, R. and G. Alpert (Eds.).  Critical Issues in Policing: Contemporary Readings.  Prospect Heights, IL, Waveland Press.  Seventh Edition (2015).
Noble, J., and G. Alpert, _State Created Danger: Should Police Officers be Accountable for Reckless Tactical Decision Making?_ (Updated) Dunham, R. and G. Alpert (Eds.).  Critical Issues in Policing: Contemporary Readings.  Prospect Heights, IL, Waveland Press.  Seventh Edition (2015).
Noble, J., and G. Alpert, _State Created Danger: Should Police Officers be Accountable for Reckless Tactical Decision Making?_ Dunham, R. and G. Alpert (Eds.).  Critical Issues in Policing: Contemporary Readings.  Prospect Heights, IL, Waveland Press.  Sixth Edition (2009).

# JEFFREY J NOBLE

*Articles:*

Stoughton, Seth W., Ian T. Adams, Geoffrey P. Alpert, Gil Kerlikowse, Maureen Q. McGough, and Jeffrey J. Noble, *What Federal Immigration Enforcement Is Doing Isn't Policing—and It Isn't Normal,* (29 Jan. 2026)

Alpert, Geoffrey, Jeff Noble, Seth Stoughton, *Evaluating the Police Shooting of Ashli Babbitt,* Lawfare (Sept. 2021)

Stoughton, S., Noble, J., and Alpert, G., *How to Actually Fix America's Police*, The Atlantic (June 2020)

Stoughton, S., Noble, J., and Alpert, G., *George Floyd's death shows exactly what police should not do,* The Washington Post (May 29, 2020)

Stoughton, S., Alpert, G. and Noble, J., *Why Police Need Constructive Criticism*, The Atlantic (December 23, 2015)  http://www.theatlantic.com/politics/archive/2015/12/officer-porter-mistrial-police-culture/421656/

Stoughton, S., Noble, J. and Alpert G., *Better Information is the Key to Policing Reform,* The Atlantic, (September 24, 2015) http://www.theatlantic.com/politics/archive/2015/09/better-information-is-the-key-to-policing-reform/406696/

Noble, J., *Rethinking Tactical Team Warrant Entries*, The Tactical Edge (Summer 2014).

Noble, J. *Assessing Police Discretion,* The Journal of California Law Enforcement (Vol. 47, No. 4, 2013).

Noble, J. and G. Alpert, *Criminal Interrogations of Police Officers After Use-of-Force Incidents,* FBI Law Enforcement Bulletin (September 2013).

Noble, J. and G. Alpert, *What Do We Really Know About American Policing?* The Journal of California Law Enforcement (Vol. 47, No. 1, 2013).

Noble, J., *Do I Need A SWAT Team?  Threat Assessments for Warrant Services*, The Tactical Edge (Winter 2013).

Alpert, G., J. Rojek and J. Noble, *The Cognitive Interview in Policing: Negotiating Control*. ARC Centre of Excellence in Policing and Security: Briefing Paper, Australian Government Research Council (June 2012).

Noble, J. and G. Alpert, *Evaluating the Quality of Law Enforcement Investigations: Standards for Differentiating the Excellent, Good and Reasonable, From the Unacceptable.*  The Journal of California Law Enforcement (Vol. 46, No. 1, 2012)

Noble, J., *Police Explorers: Protecting a Valued Asset.* The Journal of California Law Enforcement (Vol. 45, No. 3, 2011).

Noble, J., and G. Alpert, *Lies, True Lies and Conscious Deception: Police Officers and the Truth*.  Police Quarterly, Volume 12, Number 2 (June 2009).

Noble, J., Assessing *Witness Credibility*.  International Association of Chiefs of Police, Training Key #597 (2006).

Noble, J., Albertsons *Homicide: An Active "Shooter" Response*, The Tactical Edge (Fall 2004).

Noble, J., Police *Officer Truthfulness and the <u>Brady</u> Decision*, Police Chief Magazine (October

Updated May 11, 2026

# JEFFREY J NOBLE

2003).

Noble, J., *The Boomerang Employee – What to do When a Fired Employee Comes Back*, The Journal of California Law Enforcement (Volume 37, No. 1, 2003).

Noble, J., Why *Appearance Matters*, Network – California Peace Officers' Association Newsletter (August 2001).

Noble, J., *Tactical Team Basics: Warrants*, The Tactical Edge (Summer 2000).

Noble, J., Encouraging *Interaction*, Minnesota Cities Magazine (Volume 84, Issue 11, November 1999).

Noble, J., *Neighborhood Watch Evolves Into Community Engagement Tool in Irvine*, Community Policing Consortium.  www.communitypolicing.org/publications/artbytop/w6/w6noble.htm (October 1999).

Noble, J., Childhood Experiences Find a Place in Today's Public-Safety Strategies, Community Links (Ph. VI, No.3, Issue 9 - Summer 1999).

Noble, J., *Police Pursuits: Law Enforcement or Public Safety?* The Journal of California Law Enforcement (Volume 33, No.1, 1999).

Noble, J., *Alternative Work Schedules can be an Evolution of Team Policing*, Network - California Peace Officers' Association Newsletter (December 1998).

Noble, J., *Continuing Police Training: The Interactive Multimedia Approach*, The Journal of California Law Enforcement (Volume 29, No.1, 1995).

Noble, J., *Environmental Advertising Claims: "Ozone Friendly"* Consumer Protection, 2 W. St. U. Consumer L.J. 95 (1993).

## SELECTED PROFESSIONAL ACTIVITIES

*Peer Review* – "Risk and Public Judgments on Police Pursuits: A Nationally Representative Conjoint Experiment," Police Quarterly (August 2025)

*Peer Review* – Law Enforcement Dog Encounters Training Toolkit for Law Enforcement, DOJ, Office of Community Oriented Policing Services, COPS, (December 2018)

*Presenter* – Developing or Revitalizing an Internal Affairs Unit.  Public Agency Training Council: Internal Affairs Conference (December 2014)

*Presenter* – Addressing Police Misconduct: Standards to Consider.  The International Association of Chiefs of Police Annual Conference (October 2014).

*Presenter* – Reducing Traffic-Related Officer Injuries and Deaths.  The International Association of Chiefs of Police Annual Conference in Orlando, Florida (October 2014).

*Participant* – Reducing Violence and Improving the Rule of Law: Organized Crime, Marginalized Communities, and the Political Machine.  Carnegie Endowment for International Peace. Washington, D.C. (September 2014)

*Presenter* – Preventing Corruption in Police Institutions.  Police Accountability in Democracies: First International Congress on Police Internal Affairs. Los Cabos, Baja California Sur, Mexico (October 2013).

*Presenter* – Testilying: Lies, True Lies, and Conscious Deception: Police Officers' Truth and the Brady Decision. American Psychological Association Annual Conference in Honolulu, Hawaii (July

# JEFFREY J NOBLE

2013).

*Presenter* – Police Misconduct Issues: Police Explorers and Reasonableness of Internal Affairs Investigations, The International Association of Chiefs of Police Annual Conference in San Diego, California (October 2012).

*Peer Review* – Building and Enhancing Criminal Justice Researcher-Practioner Partnerships, National Institute of Justice (June 2012).

*Committee Chairperson* – California Peace Officers' Association Communications Sub-Committee. Responsible for publication of the Journal of California Law Enforcement (Jan. 2012)

*Presenter* – The Lying Police Officer: Is Any Deception Acceptable?  With Karen Kruger.   The International Association of Chiefs of Police Annual Conference in Denver, Colorado (Nov. 2009).

*Presenter* – State-Created Danger: Should Police Officers be Accountable for Reckless Tactical Decision Making?  The Academy of Criminal Justice Sciences Annual Meeting in Boston, Massachusetts. (March 2009).

*Committee Chairperson* – Major Cities Chiefs of Police Task Force in Internal Affairs. Los Angeles, California (2005-2008).

*Peer Review* – Boston Police Department: Enhancing Cultures of Integrity Technical Assistance Guide, Office of Community Oriented Policing Services #TDL 2008-371 (July 2008)

*Peer Review* – Undocumented Immigrants in U.S./Mexico Border Counties: The Cost of Law Enforcement and Criminal Justice Services, National Institute of Justice #TDL 2008- 321 (December 2007).

*Presenter* – Truth or Consequences: Dealing with the Deceitful Police Officer, with Jeffrey Schlanger and Michael Stone, The International Association of Chiefs of Police Annual Conference, Los Angeles, California (November 2004).

*Presenter* - Albertsons Homicide: An Active "Shooter" Response, The California Association of Tactical Officers Annual Conference, Palm Springs, California (September 2004).

*Presenter* – Boomerang Employees, COPS Conference, Washington, D.C. (2002).

## PROFESSIONAL AFFILIATIONS

*California Peace Officers' Association* – Chair, Communications Sub-Committee (2012 – 2018)
*Police Executive Research Forum*
*International Association of Chiefs of Police*
*National Tactical Officers' Association*
*Special Olympics Torch Run* Southern California Region, Assistant Director (1997 – 2012)

## CONSULTING/EXPERT WITNESS

2026    Sashchenko v. City of Vancouver, (Defense) (Expert Report)
        *Monell* Allegations
        Deb Wechselblatt, Assistant City Attorney, City Attorney's Office / Civil Division,

Updated May 11, 2026

# JEFFREY J NOBLE

415 W 6th ST, Vancouver WA 98660

2026  Couch v. CHP, (Plaintiff) (Expert Report)
Officer Involved Shooting
Marcel Sincich, Law Offices of Dale K. Galipo, 21800 Burbank Blvd., Suite 310, Woodland Hills, CA 91367

2026  Gamalier Rivera v. City of Chicago, (Defense) (Expert Report)
*Monell* Allegations
Theresa Carney, Rock Fusco & Connelly, LLC, 333 W. Wacker Drive, 19th Floor Chicago, Illinois 60606

2026  Gecht-Kwil-Hernandez v. City of Chicago, (Defense) (Expert Report)
*Monell* Allegations
Theresa Carney, Rock Fusco & Connelly, LLC, 333 W. Wacker Drive, 19th Floor Chicago, Illinois 60606

2026  Beatz v. City of Escondido (Defense) (Deposition)
Negligence
Mark P. Bookholder, Assistant City Attorney, City Attorney's Office, City of Escondido, 201 North Broadway, Escondido CA, 92025

2026  Martinez v. City of Chicago (Defense) (Expert Report)
*Monell* Allegations
Theresa Carney, Rock Fusco & Connelly, LLC, 333 W. Wacker Drive, 19th Floor Chicago, Illinois 60606

2026  Delgado v. Portland (Defense) (Expert Report) (Deposition)
Officer Involved Shooting
Carey Caldwell, Senior Deputy City Attorney, Portland Office of the City Attorney, 1221 SW Fourth Avenue, Room 430, Portland, OR 97204

2026  Juan Hernandez v. City of Chicago (Defense) (Expert Report) (Deposition)
*Monell* Allegations
Theresa Carney, Rock Fusco & Connelly, LLC, 333 W. Wacker Drive, 19th Floor Chicago, Illinois 60606

2026  Vasquez v. City of Los Angeles (Plaintiff) (Expert Report) (Deposition)
Officer Involved Shooting
Benjamin S. Levine, The Law Offices of Dale K. Galipo, 21800 Burbank Blvd., Suite 310, Woodland Hills, CA 91367

2026  Gue v. City of Hemet (Plaintiff) (Expert Report)
Officer Involved Shooting
Jeremy Jass, Balaban & Spielberger, LLP, 1999 San Vicente Boulevard, Ste.345 Los Angeles, CA 90049

2026  Rodriguez v. City of Chicago (Defense) (Expert Report)
*Monell* Allegations
Theresa Carney, Rock Fusco & Connelly, LLC, 333 W. Wacker Drive, 19th Floor Chicago, Illinois 60606

Updated May 11, 2026

# JEFFREY J NOBLE

2025    <u>Gonzalez v. City of Chicago</u> (Defense) (Expert Report)
*Monell* Allegations
Theresa Carney, Rock Fusco & Connelly, LLC, 333 W. Wacker Drive, 19th Floor
Chicago, Illinois 60606

2025    <u>Rodriguez v. Phoenix,</u> (Defense) Expert Report)
Criminal Investigation
Christina Retts, Partner, Wieneke Law Group, 1225 W. Washington, Suite 313, Tempe, AZ
85288

2025    <u>Gonzalez v. Hemet,</u> (Plaintiff) (Expert Report) (Deposition) (Trial)
Officer Involved Shooting
Marcel Sincich, Law Offices of Dale K. Galipo, 21800 Burbank Blvd., Suite 310, Woodland
Hills, CA 91367

2025    <u>Maccani v. Los Angeles</u> (Plaintiff) (Expert Report) (Deposition)
Officer Involved Shooting
Eric Valenzuela, Law Offices of Dale K. Galipo, 21800 Burbank Blvd., Suite 310, Woodland
Hills, CA 91367

2025    <u>Wilder v Lafayette Police Department, LA</u> (Plaintiff) (Expert Report)
Use of Force
Adrian M. Simm, Jr., Unglesby & Macy, LLC, 607 St. Charles Ave., Ste. 300, New Orleans, LA
70130

2025    <u>Washington v City of Gardena</u> (Defense) (Arbitration)
Use of Force
Scott Tiedemann, Liebert Cassidy Whitmore, 6033 W. Century, Blvd., Fifth Floor, Los Angeles,
CA 90045

2025    <u>Estate of Jones v. City of Lumberton, North Carolina</u> (Plaintiff) (Expert Report)
Officer Involved Shooting
Cate Edwards, Edwards Beightol, 1033 Oberlin Road, Suite 100, Raleigh, North Carolina 27605

2025    <u>Quan v. Los Angeles County Sheriff's Department</u> (Plaintiff) (Expert Report) (Deposition)
(Trial)
Officer Involved Shooting
Hang Le, Law Offices of Dale K. Galipo, 21800 Burbank Blvd., Suite 310, Woodland Hills, CA
91367

2025    <u>Ockinga v. City of Cheyenne, WY</u> (Plaintiff) (Expert Report) (Deposition)
Use of Force
Devon Petersen, Fleener & Petersen, 506 S. 8th Street, Laramie, WY 82070

2025    <u>Stanton v City of Portland</u> (Defense) (Expert Report)
Officer Involved Shooting
Carey Caldwell, Senior Deputy City Attorney, Portland Office of the City Attorney, 1221 SW
Fourth Avenue, Room 430, Portland, OR 97204

2025    <u>Lemagne v. Fairfax County Police, VA</u> (Plaintiff) (Expert Report)
Officer Involved Shooting

Updated May 11, 2026

# JEFFREY J NOBLE

Victor M. Glasberg & Associates, 121 S. Columbus Street, Alexandria, VA 22314

2025    Baxter v. Hardy (Hill County Sheriff, TX) (Plaintiff) (Expert Report)
Use of Force
David James, Edwards Law, 603 W. 17th St.,Austin, Texas 78701

2025    Chavira v West Covina (Plaintiff) (Expert Report)
Failure to Provide Medical Aid
Jerry Steering, 4063 Birch St., Suite 100, Newport Beach, CA 92660

2025    DB v. City of Stockton (Plaintiff) (Expert Report) (Deposition)
Officer Involved Shooting
T. Kennedy Helm, IV, Helm Law Office, PC, MacArthur Annex, 644 40th Street, Suite 305, Oakland, CA 94609

2025    Randolph v Chicago (Defense) (Expert Report)
*Monell* Allegations
Dan Nolan, Burns Noland LLP, 311 S Wacker Drive, Suite 5200, Chicago IL 60606

2025    Johnson v Fairfax County Police (Plaintiff) (Expert Report)
Officer Involved Shooting
Victor M. Glasberg & Associates, 121 S. Columbus Street, Alexandria, VA 22314

2025    Simpson v Loma Linda Hospital (Plaintiff) (Deposition) (Trial)
Use of Force
Jeremy Jass, Balaban & Spielberger, LLP, 1999 San Vicente Boulevard, Ste.345 Los Angeles, CA 90049

2025    Gardner v Newton (Plaintiff) (Deposition)
Officer Involved Shooting
John A. Picerno, 2526 Holmes Street, Kansas City, Mo. 64108

2025    Su v. Seattle (Defense) (Deposition)
Allegation of Vehicle Pursuit
Janay Ferguson, Seattle City Attorney's Office, Civil Division, 701 Fifth Avenue, Suite 2050, Seattle, WA 98104-7095

2025    Pacheco v. Safariland (Plaintiff) (Expert Report)
Police Tactics
Brett Norris, Fox Law, 201 Lomas Santa Fe Dr., Suite 420, Solana Beach, CA 92075

2025    Sims and Lindsey v City of Chicago (Defense) (Expert Report)
*Monell* Allegation
Daniel Nolan, Burns Noland LLP, 311 S Wacker Drive, Suite 5200, Chicago IL 60606

2025    Diaz Cruz v. USA, (Plaintiff) (Expert Report) (Expert Report)
Officer Involved Shooting
Gabriel P. Harvis, Partner / Co-Chair, Civil Rights Division, Elefterakis, Elefterakis & Panek 80 Pine Street, 38th Floor, New York, NY 10005

2025    Blanchard v. County of Los Angeles, et. al. (Plaintiff) (Expert Report) (Deposition)
Use of Force
Jerry Steering, 4063 Birch St., Suite 100, Newport Beach, CA 92660

Updated May 11, 2026

# JEFFREY J NOBLE

2025    Puckett v. County of Sacramento (Plaintiff) (Expert Report) (Deposition)
*Monell* allegation
Chelsea Wein, Simpson Thacher & Bartlett LLP, 2475 Hanover Street, Palo Alto, CA 94304

2025    Mackie v Santa Cruz County Sheriff's Department (Plaintiff) (Expert Report) (Deposition)
Police Created Danger
John Burton, The Law Offices of John Burton, The Marine Building, 128 North Fair Oaks Avenue, Pasadena, California 91103

2025    Hensley v. Teets, et. al. (Plaintiff) (Expert Report) (Deposition)
Use of Force
Cate Edwards, Edwards Beightol, 1033 Oberlin Road, Suite 100, Raleigh, North Carolina 27605

2025    Kirsch v City of Austin (Plaintiff) (Expert Report)
Use of Force
Rebecca Webber, Hendler Flores Law, 901 S. MoPac Expressway, Bldg 1, Suite 300, Austin, TX 78746

2025    Medel v City of Austin (Plaintiff) (Expert Report)
Officer Involved Shooting
David James, Edwards Law, 603 W. 17th St.,Austin, Texas 78701

2025    Ciccarelli v. County of Riverside (Plaintiff) (Expert Report)
Arrest and Use of Force
Jerry Steering, 4063 Birch St., Suite 100, Newport Beach, CA 92660

2025    Jones v Archuleta (Defense) (Expert Report)
Use of Deadly Force
Kerri Booth, Adams County Attorney's Office, 4430 South Adams County Parkway, Suite C5000B, Brighton, CO 80601-8206

2025    Opbroek v. City of Portland (Defense) (Expert Report)
*Monell* claim training and accountability
Mike Porter and Caroline Turco, Portland Office of the City Attorney,1221 SW Fourth Avenue, Room 430, Portland, OR 97204

2025    Schaffer v Thurston County, WA (Plaintiff) (Deposition)
Vehicle Pursuit
Michael Fisher, Rush, Hannula, Harkins & Kyler, 4701 S. 19th St., Tacoma, WA 98405

2025    Cavicante v LAPD (Plaintiff) (Expert Report) (Deposition)
Officer Involved Shooting
Rodney Diggs, Ivie McNeill Wyatt Purcell & Diggs, 444 South Flower Street, Suite 3200, Los Angeles, CA 90071

2024    Koutantos v. County of Los Angeles (Plaintiff) (Expert Report) (Deposition)
High-Risk Car Stop
Brian Olney, Hadsell, Stormer, Renick & DAI, LLP, 128 N. Fair Oaks Ave., Pasadena, California 91103

2024    Lerum v. City of Seattle (Defense) (Expert Report)
Allegation of Vehicle Pursuit

Updated May 11, 2026

# JEFFREY J NOBLE

Rebecca Widen, Seattle City Attorney's Office, Civil Division, Constitutional & Complex Litigation, 701 Fifth Avenue, Suite 2050, Seattle, WA 98104-7095

2024    White v. City of Chicago (Defense) (Expert Report) (Deposition)
*Monell* Allegation
Daniel Nolan, Burns Noland LLP, 311 S Wacker Drive, Suite 5200, Chicago IL 60606

2024    Ortiz v. Trinity County (Plaintiff) (Expert Report)
Civil Standby
Benjamin Mainzer, Law Office of Benjamin Mainzer, A.P.C., 305 K Street, Eureka, CA 95501

2024    Otero v. City of Stockton (Plaintiff) (Deposition)
Vehicle Pursuit
Steven Brady, Brady Law Group, 1015 Irwin Street, San Rafael, CA 94901

2024    Carter v. City of Chicago (Defense) (Expert Report)
*Monell* Allegation
Daniel Nolan, Burns Noland LLP, 311 S Wacker Drive, Suite 5200, Chicago IL 60606

2024    Lopez v. Manhatten Beach (Plaintiff) (Deposition)
Use of Force
Denisse Gastelum, Gastelum Law, APC, 3767 Worsham Ave., Long Beach, CA 90808

2024    Wallis v. County of Riverside (Plaintiff) (Deposition)
Officer Involved Shooting
Christian Contreras, 360 E. 2nd St., 8th Floor, Los Angeles, CA 90012

2024    Whaling v. County of Riverside (Plaintiff) (Expert Report)
Use of Force
Jerry Steering, 4063 Birch St., Suite 100, Newport Beach, CA 92660

2024    Gipson v. City of Chicago (Defense) (Expert Report) (Deposition)
*Monell* Allegations
Daniel Nolan, Burns Noland LLP, 311 S Wacker Drive, Suite 5200, Chicago IL 60606

2024    Coronel v. City of San Bernardino (Plaintiff) (Expert Report)
Unreasonable Investigation and Arrest
Jerry Steering, 4063 Birch St., Suite 100, Newport Beach, CA 92660

2024    Townsend v. Portland (Defense) (Trial)
Officer Involved Shooting
Naomi Sheffield, Senior Deputy City Attorney, Portland Office of the City Attorney, 1221 SW Fourth Avenue, Room 430, Portland, OR 97204

2024    Jones v. St. Mary-Corwin Hospital (Plaintiff) (Expert Report) (Deposition) (Trial)
Use of Force
Michael Harris, Jordan Law, 5445 DTC Parkway, Suite 1000, Greenwood Village, Colorado 80111

2024    Olson v. Escondido (Defense) (Expert Report)
Officer Involved Shooting
Keith Phillips, Assistant City Attorney, City Attorney's Office, City of Escondido

2024    Baker-Glenn v. City of Chicago (Defense) (Expert Report)

Updated May 11, 2026

# JEFFREY J NOBLE

Monell allegations
Daniel Nolan, Burns Noland LLP, 311 S Wacker Drive, Suite 5200, Chicago IL 60606

2024   Doe v. Vanderpool (Plaintiff) (Expert Report) (Deposition)
Sexual Assault by Police Officer
Jack Preis, Professor of Law, University of Richmond School of Law

2024   Cortez v. USC (Plaintiff) (Expert Report) (Deposition) (Trial)
Use of Force
Kaveh Navab, Navab Law, 13160 Mindanao Way, Ste. 280, Marina Del Rey, CA 90292

2024   Gonzales v. Austin (Plaintiff) (Expert Report) (Deposition)
Officer Involved Shooting
Donald Puckett, Devlin Law Firm, LLC, 1526 Gilpin Ave.,Wilmington, DE 19806

2024   Flores v. Austin (Plaintiff) (Expert Report)
Use of Force
David James, Edwards Law, 603 W. 17th St.,Austin, Texas 78701

2024   Nguyen v County of Orange (Plaintiff) (Expert Report)
Officer involved shooting
Jerry Steering, 4063 Birch St., Suite 100, Newport Beach, CA 92660

2024   Smith v. City of Bakersfield (Plaintiff) (Expert Report) (Deposition) (Trial)
Use of Force
Brian Bush, 4695 MacArthur Court, 11th Floor, Newport Beach, CA 92660

2024   Corado v LAPD (Plaintiff) (Deposition)
Officer Involved Shooting of Innocent Bystander
Neil Gehlawat, Taylor Ring, 1230 Rosecrans Ave., Suite 360, Manhattan Beach, CA 90266

2024   Sillah v. City of Madison (Plaintiff) (Expert Report) (Deposition)
Failure to Search and Provide Medical Care
Thomas C. Lenz, First, Albrecht & Blondis, S.C., 158 N. Broadway, Suite 600, Milwaukee, WI 53202

2024   Lowrie v. County of Riverside (Plaintiff) (Expert Report) (Deposition)
Use of Force
Christian Contreras, 360 E. 2nd St., 8th Floor, Los Angeles, Ca 90012

2024   Johnson v City of Austin (Plaintiff) (Expert Report)
Use of Force
David James, Edwards Law, 603 W 17th St., Austin, Texas 78701

2023   Scott v. Riverside County (Plaintiff) (Expert Report) (Deposition)
Use of Force
Jeremy Jass, Jass Law, 4340 Von Karman Avenue, Suite 100, Newport Beach, CA 92660

2023   Pizarro v. City of San Diego (Plaintiff) (Deposition)
Failure to Reasonably Investigate
Deborah Chang, Chang, Klein, LLP, 126 Lomita Street, El Segundo, CA 90245

2023   Maysonet v. City of Chicago (Defense) (Expert Report) (Deposition)
Monell Allegations

Updated May 11, 2026

# JEFFREY J NOBLE

Theresa Carney, Rock Fusco & Connelly, LLC, 333 W. Wacker Drive, 19th Floor Chicago, Illinois 60606

2023 Waddy v. City of Chicago (Defense) (Deposition)
Monell Allegations
Dan Nolan, Reiter Burns, 311 S. Wacker, 5200, Chicago, IL 60606

2023 Corona v. City of Fontana (Plaintiff) (Expert Report) (Deposition)
High-Risk Car Stop
Brian Olney, Hadsell, Stormer, Renick & DAI, LLP, 128 N. Fair Oaks Ave., Pasadena, California 91103

2023 Richards v. City of Tucson (Plaintiff) (Expert Report)
Officer Involved Shooting
John H. Bradley, Strang Bradley LLC, 613 Williamson St, Suite 204, Madison WI 53703

2023 Stephenson v CHP (Plaintiff) (Expert Report) (Deposition) (Trial)
Use of Force
Nicholas Lerman, Steven A. Lerman and Associates, LLC, 6033 West Century Blvd., Suite 740 Los Angeles, CA 90045

2023 Cikes v San Leandro (Plaintiff) (Expert Report)
Use of Force
David M. Helbraun, Helbraun Law Firm, 220 Montgomery Street, Suite 1100, San Francisco, CA 94104

2023 Sullivan v. Buena Park (Plaintiff) (Deposition) (Trial)
Officer Involved Shooting
Bobby Reagan, Dordick Law, 1122 Wilshire Blvd., Los Angeles, CA 90017

2023 Osage v. Borough of State College (Plaintiff) (Expert Report)
Use of Force
Andrew Celli, Emery, Celli, Brinckerhoff, Abady, Ward &Maazel, 600 Fifth Ave., 10th Floor, New York, NY 10020

2023 Keup v. Sarpy County, Nebraska (Plaintiff) (Expert Report)
Use of Force
Brain Fahey, Fraser Stryker PC LLO, 500 Energy Plaza, 409 South 17th Street, Omaha, NE 68102

2023 Gibson v. City of Chicago, (Defense) (Expert Report) (Deposition)
Monell Allegation
Dan Nolan, Reiter Burns, 311 S. Wacker, 5200, Chicago, IL 60606

2023 Estevis v. City of Laredo, TX, ((Plaintiff) (Expert Report)
Officer Involved Shooting
David James, Edwards Law, 603 W 17th St., Austin, Texas 78701

2023 Settle v. Escambia County Sheriff, FL (Plaintiff) (Expert Report) (Deposition)
Officer Involved Shooting
Eric Stevenson, Stevenson Klotz, 510 E. Zaragoza Street, Pensacola, FL 32502

2023 Crosby v. Colleton County Sheriff's Office (Plaintiff) (Expert Report) (Deposition)

# JEFFREY J NOBLE

Officer Involved Shooting
Mullins McLeod, McLeod Law Group, 3 Morris Street, Suite A, Charleston, SC 29403

2023    Ramos v City of Austin (Plaintiff) (Expert Report)
Officer Involved Shooting
Rebecca Weber, Hendler Flores Law, 901 S. MoPac Expressway, Bldg 1, Suite 300, Austin, TX 78746

2023    People v Roedema (Defense) (Expert Report)
Criminal allegation of use of force by a police officer
Donald Sisson, 7100 E Belleview Ave. Suite 101, Greenwood Village, CO 80111

2023    Assiff v Los Angeles County Sheriff's Department (Plaintiff) (Expert Report)
Use of Force
Thomas M. Ferlauto, 25201 Paseo de Alicia, Suite 270, Laguna Hills, CA 92653

2023    Beltran v City of Austin (Plaintiff) (Expert Report)
David James, Edwards Law, 603 W 17th St., Austin, Texas 78701

2023    Espericueta v. Riverside County (Plaintiff) (Expert Report) (Deposition)
Officer involved shooting
Neil Gehlawat, Taylor & Ring, 1230 Rosecrans Ave., Suite 360, Manhattan Beach, CA 90266

2023    Talley/Rodriguez v. City of Austin (Plaintiff) (Expert Report)
Use of Force
Scott Hendler, Hendler Flores Law, 901 S. MoPac Expressway, Bldg. 1, Suite #300, Austin, Texas 78746

2023    Sparks v City of Seattle (Defense) (Expert Report)
Reasonable Policies
Tara Gillespie, Seattle City Attorney's Office, Civil Division – Torts Section, 701 Fifth Avenue, Suite 2050, Seattle, WA 98104-7095

2023    Perez v City of Fontana (Plaintiff) (Expert Report) (Deposition)
Detention and Interrogation
Jerry Steering, 4063 Birch St., Suite 100, Newport Beach, CA 92660

2023    Augustus v LAPD, (Plaintiff) (Expert Report) (Deposition) (Trial) (Second Trial)
High Risk Car Stop Tactics
Brian Olney, Hadsell, Stormer, Renick & DAI, LLP, 128 N. Fair Oaks Ave., Pasadena, California 91103

2023    Goodale v. San Antonio, (Plaintiff) (Expert Report) (Deposition)
Officer Involved Shooting
Patrick Toscano, Toscano Law Firm, PC, 846 Culebra Rd. Suite 500, San Antonio, Texas 78201

2023    McLaughlin v. San Bernadino Sheriff's Department (Plaintiff) (Expert Report)
Officer Involved Shooting
Renée V. Masongsong, Law Offices of Dale K. Galipo, 21800 Burbank Boulevard, Suite 310, Woodland Hills, California 91367

2023    Parsa v. Lopinto (Plaintiff) (Expert Report) (Deposition)
Use of Force

Updated May 11, 2026

# JEFFREY J NOBLE

Andrew C. Clarke, The Cochran Firm – Midsouth, One Commerce Square, Suite 1700, Memphis, Tennessee 38103

2023    Sanders v. Austin (Plaintiff) (Expert Report)
Use of Force
Jeff Edwards, Edwards Law, 603 W 17th St., Austin, Texas 78701

2023    Armijo v. Adams County (Defense) (Expert Report)
Use of Force
Kerri A. Booth, Senior Litigation Attorney, Adams County Attorney's Office, 4430 South Adams County Parkway, 5th Floor, Suite C5000B, Brighton, CO 80601

2022    Rodriguez v. Long Beach (Plaintiff) (Deposition) (Trial)
Search and Control Hold Tactics
Arnoldo Casillas, Casillas & Associates, 3777 Long Beach Blvd, Long Beach, CA 90807

2022    Bhandari v. National City (Plaintiff) (Expert Report) (Deposition)
Use of Force
John Burton, The Law Offices of John Burton, The Marine Building, 128 North Fair Oaks Avenue, Pasadena, California 91103

2022    Huerta v. County of Tulare (Plaintiff) (Expert Report) (Criminal Trial Testimony) (Deposition)
Arrest and use of force
Doug Rochen, ACTS Law, 16001 Venture Blvd., Suite 200, Encino, CA 91436

2022    Bahadoran v. City of New York (Plaintiff) (Expert Report)
Officer Involved Shooting
Jonathan Abady, Emery, Celli, Brinckerhoff, Abady, Ward & Maazel, LLP, 600 Fifth Avenue at Rockefeller Center, 10th Floor, New York, NY 10020

2022    Underwood v. Austin (Plaintiff) (Expert Report)
Use of Force
Jeff Edwards, Edwards Law, 603 W 17th St., Austin, Texas 78701

2022    People v. Simmonds (Prosecution) (Grand Jury Testimony)
Officer Involved Shooting
Anti-Corruption & Civil Rights Division, Office of the Fulton County District Attorney, Atlanta Judicial Circuit, 136 Pryor Street SW| 3rd Floor, Atlanta, GA  30303

2022    Harder v. City of Seattle (Defense) (Expert Report) (Deposition)
Allegation of vehicle pursuit
Tara Gillespie, Seattle City Attorney's Office, Civil Division – Torts Section, 701 Fifth Avenue, Suite 2050, Seattle, WA 98104-7095

2022    Womble v. City of Durham (Defense) (Expert Report)
Allegation of False Conviction
Henry Sappenfield, Kenon Cracer, PLLC, 4011 University Drive, Suite 300, Durham, NC 27717

2022    Oshan v. District of Columbia, (Plaintiff) (Expert Report) (Deposition)
Vehicle Pursuit
Patrick Regan, Regan Zambri & Long, PLLC, 1919 M Street, N.W., Suite 350, Washington, DC 20036

Updated May 11, 2026

# JEFFREY J NOBLE

2022    Denk v. City of Peoria, AZ (Defense) (Expert Report)
Officer Involved Shooting
Amanda C. Sheridan, Senior Assistant City Attorney, Civil Litigation, City of Peoria, City
Attorney's Office, 8401 Monroe Street, Suite 280, Peoria, AZ 85345

2022    State of Missouri v. Prichard and Brummett (Prosecution) (Deposition)
Dion Sankar, Chief Deputy Prosecutor, Jackson County Prosecutor's Office, 415 E 12th Street
Kansas City, Missouri 64106

2022    Ong v. City of Beverly Hills (Plaintiff) (Deposition)
Traffic Control
Stephen Johnson, Berglund and Johnson Law Group, 21550 Oxnard, Suite 900, Woodland Hills,
CA 91367

2022    Kelley v. City of San Marcos, TX, (Plaintiff) (Expert Report)
Use of Force
Rebecca Webber, Hendler Flores Law, 901 S. MoPac Expressway, Building 1, Suite 300, Austin,
TX 78746

2022    Zelaya (Juarez Cedillo) v. LAPD (Plaintiff) (Expert Witness) (Deposition) (Trial)
Use of Force
Miguel Flores, Carrillo Law Firm, LLP, 1499 Huntington Drive, Suite 402, South Pasadena, CA

2022    Cullinan v. LAPD, (Plaintiff) (Expert Report) (Deposition) (Trial)
Use of Force
Peter M. Williamson, Williamson Law Firm, 3200 Foothill Drive, Suite 4, Westlake Village, CA
91361

2022    Jane AM v. LAPD, (Plaintiff) (Expert Report) (Deposition) (Trial)
Detention and Use of Force
Laura Jimenez, Carrillo Law Firm, LLP, 1499 Huntington Drive, Suite 402, South Pasadena, CA
91030

2022    People v. Reynolds, Crestview, FL, (State) (Grand Jury)
Use of Force
Michelle G. Sandler, Assistant State Attorney, Felony Supervisor – Fort Walton Beach Office,
1804 Lewis Turner Boulevard, Fort Walton Beach, FL 32547

2022    Aden v. City of Bloomington, (Plaintiff) (Expert Report)
Officer Involved Shooting
Eva Rodelius, Wilson Law Group, 3019 Minnehaha Ave, Minneapolis, MN 55406

2022    Jackson v. Nassau County, (Plaintiff) (Expert Report) (Deposition)
Allegation of wrongful conviction
Gabriel P. Harvis, Esq., Elefterakis, Elefterakis & Panek, 80 Pine Street, 38th Floor, New York,
New York 10005

2022    Baugus v. Newton (Morrow County Sheriff's Department, Ohio), (Plaintiff) (Expert Report)
Creation of danger that led to death
Connie Gadell-Newton, Fitrakis & Gadell-Newton, LLC, 100 E. Main Street, Columbus, OH
43215

Updated May 11, 2026

# JEFFREY J NOBLE

2022    Rios v. LAPD, (Plaintiff) (Expert Report)
High-Risk Car Stop
Toni Jaramilla, 1900 Avenue of the Stars, Suite 900, Los Angeles, CA 90067

2022    Sloan v. Anderson County Sheriff, SC, (Plaintiff) (Expert Report)
Officer Involved Shooting
Joshua Snow Kendrick, Kendrick & Leonard, P.C., 506 Pettigru Street, Greenville, SC 29601

2022    Jones v. Dupage County Sheriff's Office, (Defense) (Expert Report) (Deposition)
Officer Involved Shooting
Patrick R. Moran, Rock Fusco & Connelly, LLC, 321 N. Clark Street, Suite 2200, Chicago, Illinois 60654

2022    Brown v. Turbyfill (Spotsylvania County Sheriff's Department, VA), (Plaintiff) (Expert Report)
Officer Involved Shooting
Mark J. Krudys, The Krudys Law Firm, PLC, Truist Place, 919 East Main Street, Suite 2020, Richmond, VA  23219

2022    Cruz v. Riverside County Sheriff's Department, (Plaintiff) (Expert Report) (Deposition)
Use of Force
Steven Lerman, Steven A. Lerman and Associates, LLC, 6033 West Century Blvd., Suite 740 Los Angeles, CA 90045

2022    Yancy v. Tillman, Clayton County Police, GA, (Plaintiff) (Expert Report)
Entry and Use of Force
Tanya F. Miller, Dubose Miller, LLC, 75 14th Street NE, Suite 2110, Atlanta, GA 30309

2022    Penny v. LAPD, (Plaintiff) (Expert Report) (Deposition)
Officer Involved Shooting
Shaleen Shanbhag, Hadsell, Stormer, Renick Dai LLP, 128 N. Fair Oaks Ave., Pasadena, California 91103

2022    Herrera v. Austin, (Plaintiff) (Expert Report)
Use of force during demonstration
Jeff Edwards, Edwards Law, 603 W 17th St., Austin, Texas 78701

2022    Barragan v. LAPD, (Plaintiff) (Expert Report)
Positional Asphyxia
Dominique Boubion, Carrillo Law Firm, 1499 Huntington Drive, Suite 402, South Pasadena, CA 91030

2022    Sen v. Los Angeles, (Plaintiff) (Expert Report) (Deposition)
High-Risk Car Stop Tactics
Brian Olney, Hadsell, Stormer, Renick & DAI, LLP, 128 N. Fair Oaks Ave., Pasadena, California 91103

2022    Ibarra v. Lee (Rogers County, OK), (Plaintiff) (Expert Report) (Deposition)
Officer involved Shooting
Dale Galipo, Law Offices of Dale K. Galipo, 21800 Burbank Blvd., Suite 310, Woodland Hills, CA 91367

2022    Tate v. Chicago (Defense) (Expert Report) (Trial)

Updated May 11, 2026

# JEFFREY J NOBLE

*Monell* Allegations
Marion C. Moore, Chief Assistant Corporation Counsel, City of Chicago Department of Law
Federal Civil Rights Litigation Division, 2 N. LaSalle St., Suite 420, Chicago, Illinois 60602

2022    Lunneen v. Berrien Springs (Plaintiff) (Expert Report)
Use of Force
Noah W. Drew, Spence Lawyers, 15 S. Jackson Street, Jackson, WY 83001

2021    Carr v San Diego County Sheriff (Plaintiff) (Expert Report) (Deposition)
Use of Force
Joseph M. McMullen, Law Offices of Joseph M. McMullen, 501 W. Broadway, Suite 1510, San Diego, CA 92101

2021    Mountford v. City of Santa Monica (Plaintiff) (Expert Report) (Deposition)
Officer Involved Shooting
Jeremy D. Jass, 4340 Von Karman Avenue, Suite 100, Newport Beach, CA 92660

2021    State v. Dagas (Prosecution) (Trial Testimony)
Allegation of False Police Report
Judy Taschner, Deputy District Attorney, Special Operations Division, San Diego County District Attorney's Office, East County Regional Center, 250 E. Main Street, El Cajon, CA 92020

2021    Stickney v. City of Phoenix (Defense) (Expert Report)
Use of Force
Christina Retts, Wienenke Law Group, 1095 W. Rio Salado, #209, Tempe, AZ 85281

2021    Evans v City of Austin (Plaintiff) (Expert Report)
Use of Force
Jeff Edwards, Edwards Law, 603 W 17th St., Austin, Texas 78701

2021    Rennells v. Kenealy (Plaintiff) (Expert Report)
Use of Force
James End, First, Albrecht & Blondis, 158 N. Broadway, Suite 600 Milwaukee, WI 53202

2021    Johnson v Baltimore (Defense) (Expert Report)
*Monell* Allegations
Kara K. Lynch, Chief Solicitor, Baltimore City Department of Law, 100 N. Holliday Street, Room 101, Baltimore, Maryland 21202

2021    Brown v City of Chicago (Defense) (Expert Report) (Deposition)
*Monell* Allegations
Dan Nolan, Reiter-Burns, 311 S. Wacker, 5200, Chicago, IL 60606

2021    Gonzalez v. CHP (Plaintiff) (Expert Report) (Deposition)
Use of Force
Dale Galipo, Law Offices of Dale K. Galipo, 21800 Burbank Blvd., Suite 310, Woodland Hills, CA 91367

2021    Baney v City of Chapin (Plaintiff) (Expert Report)
Use of Force
Joshua Snow Kendrick, Kendrick & Leonard, 1522 Lady Street, Columbia, SC 29201

Updated May 11, 2026

# JEFFREY J NOBLE

2021   <u>Washington v City of Chapin</u> (Plaintiff) (Expert Report)
Use of Force
Joshua Snow Kendrick, Kendrick & Leonard, 1522 Lady Street, Columbia, SC 29201

2021   <u>King v. Fontana</u> (Plaintiff) (Expert Report) (Deposition)
Officer Involved Shooting
Hang Le, Law Offices of Dale K. Galipo, 21800 Burbank Blvd., Suite 310, Woodland Hills, CA 91367

2021   <u>Harbin v. City of Breckenridge Hills, Missouri</u> (Plaintiff) (Expert Report) (Deposition)
Use of Force
Javad Khazaeli, Khazaeli Wyrsch LLC, 911 Washington Ave, Suite 211, St. Louis, MO 63101

2021   <u>Green v St. Louis</u> (Plaintiff) (Expert Report)
Officer Involved Shooting
Javad Khazaeli, Khazaeli Wyrsch LLC, 911 Washington Ave, Suite 211, St. Louis, MO 63101

2021   <u>Debeaubien v CHP</u> (Plaintiff) (Expert Report) (Deposition)
Failure to Investigate
Stewart Katz, 555 University Avenue, Suite 270, Sacramento, CA 95825

2021   <u>Love v. Chicago</u> (Defense) (Expert Report) (Deposition)
Officer Involved Shooting
Marion C. Moore, Chief Assistant Corporation Counsel, City of Chicago Department of Law
Federal Civil Rights Litigation Division, 2 N. LaSalle St., Suite 420, Chicago, Illinois 60602

2021   <u>Groom v Paso Robles</u> (Plaintiff) (Expert Report)
Sexual assault by police officer
Neda Lotfi, Taylor & Ring, 1230 Rosecrans Avenue, Suite 360, Manhattan Beach, CA 90266

2021   <u>Barrera v. City of Woodland</u> (Plaintiff) (Expert Report) (Deposition)
Use of Force
Neil Gehlawat, Taylor & Ring, 1230 Rosecrans Avenue, Suite 360, Manhattan Beach, CA 90266

2021   <u>Shorter v. City of Greenville, MS</u> (Plaintiff) (Expert Report)
Officer Involved Shooting
Tiffany Wright, Co-Director, Human and Civil Rights Clinic, Howard University School of Law

2021   <u>Andrich v. City of Phoenix</u> (Defense) (Expert Report)
Officer Involved Shooting
Christina Retts, Wienenke Law Group, 1095 W. Rio Salado, #209, Tempe, AZ 85281

2021   <u>Monk v. Gulick (Chesterfield, VA)</u>, (Plaintiff) (Expert Report)
Use of Force
Thomas Johnson, Bricker, Anderson & Johnson, 411 East Franklin Street, Suite 504, Richmond, VA 23219

2021   <u>Hernandez v. City of Los Angeles</u> (Plaintiff) (Expert Report)
Officer Involved Shooting
Arnoldo Casillas, Casillas & Associates, 3777 Long Beach Blvd, Long Beach, CA 90807

2021   <u>Garten v. City of Costa Mesa</u>, (Plaintiff) (Expert Report) (Deposition)
Detention and search.

Updated May 11, 2026

# JEFFREY J NOBLE

Richard Herman, Law Office of Richard P. Herman, P. O. Box 53114, Irvine, California 92619-3114

2021    Harris v. City of Phoenix, (Defense) (Expert Report)
Officer Involved Shooting
Christina Retts, Wienenke Law Group, 1095 W. Rio Salado, #209, Tempe, AZ 85281

2021    Gagliani v. Lexington County Sheriff, SC, (Plaintiff) (Expert Report) (Deposition)
Use of Force
Eric Cavanaugh, Cavanaugh & Thickens, LLC, 1717 Marion St, Columbia, SC 29201

2021    Torres v. City of Cheyenne, WY (Plaintiff) (Expert Report)
Use of Force
Thomas B. Jubin, Jubin & Zerga, LLC., 2614 Pioneer Avenue, P.O. Box 943, Cheyenne, Wyoming 8203-0943

2021    Velez v. City of Sacramento, (Plaintiff) (Expert Report)
Officer Involved Shooting
Stewart Katz, 555 University Avenue, Suite 270, Sacramento, CA 95825

2021    Mojarrad v.  Edwards, City of Raleigh, NC, (Plaintiff) (Expert Report) (Deposition)
Officer Involved Shooting
Cate Edwards, Edwards Kirby, 3201 Glenwood Avenue, Suite 100, Raleigh, North Carolina 27612

2021    Pope v. Hill, (Plaintiff) (Deposition) (Trial)
Pursuit
Bart Turner, Savage, Turner, Durham, Pinckney & Savage, 102 East Liberty Street, Eight Floor (31401), PO Box 10600, Savannah, GA 31412

2021    Rightsell v. Indiana State Police, (Plaintiff) (Expert Report)
Officer Involved Shooting
Bruce Kehoe, Wilson Kehoe Winingham, 859 N Meridian St, Indianapolis, IN 46208

2021    Mendez v City of Chicago, (Defense) (Expert Report) (Deposition)
Monell Allegation
Marion Moore, Chief Assistant Corporation Counsel, City of Chicago Department of Law, Federal Civil Rights Litigation Division, 2 N. LaSalle St., Suite 420, Chicago, Illinois 60602

2021    Helvie v Jenkins (Adams County Sheriff, CO.), (Defense) (Expert Report)
Use of Force
Kerri A. Booth, Adams County Attorney's Office, 4430 South Adams County Pkwy., 5th Floor, Suite C5000B, Brighton, CO 80601

2021    State of Minnesota v. Chauvin (State) (Expert Report)
Use of Force
Steve Schlescher, Minnesota Attorney General's Office, 445 Minnesota Street, Suite 1400, St. Paul, MN 55101

2021    Humphrey v. Friar (City of Millington, TN), (Plaintiff) (Expert Report) (Deposition)
Sexual Misconduct
Andrew C. Clarke, The Cochran Firm – Midsouth, One Commerce Square, Suite 1700,

Updated May 11, 2026

# JEFFREY J NOBLE

Memphis, Tennessee 38103

2021  Skommesa v. City of Murrieta (Plaintiff) (Expert Report) (Deposition)
Use of Force
Michael R. Marrinan, Law Office of Michael R. Marrinan, 501 W. Broadway, Suite 1510
San Diego, CA. 92101

2021  Dominguez v. City of Escondido (Defense) (Expert Report)
Use of Force
Keith Phillips, Assistant City Attorney, City Attorney's Office, City of Escondido, 201 N.
Broadway, Escondido, CA 92025

2021  Brown v. Ontario (Defense) (Expert Report)
Use of Force
Daniel S. Roberts, Cole Huber LLP, 3401 Centrelake Dr., Ste. 670, Ontario, CA  91761

2021  Galloway v. Nassau County Police (Plaintiff) (Expert Report) (Deposition)
Allegation of wrongful conviction
Gabriel P. Harvis, Elefterakis, Elefterakis & Panek, 80 Pine Street, 38th Floor, New York, New
York 10005

2021  Richards v. Las Vegas Metropolitan Police (Plaintiff) (Expert Report)
Officer involved shooting
E. Brent Bryson, 32302 West Charleston Blvd., Las Vegas, NV 89102

2021  Hall v. City of Atlanta (Plaintiff) (Expert Report) (Deposition)
Monell Allegation
Shean Williams, The Cochran Firm, 100 Peachtree Street NW, Suite 2600, Atlanta, Georgia,
30303

2021  Drew v. Irby, Fauquier County Sheriff, VA (Plaintiff) (Expert Report) (Deposition)
Use of Force, Arrest
Victor M. Glasberg, 121 S. Columbus Street, Alexandria, VA 22314

2021  Alves v. Riverside County Sheriff's Department (Plaintiff) (Expert Report) (Deposition) (Trial)
Use of Force
John Burton, The Law Offices of John Burton, The Marine Building, 128 North Fair Oaks
Avenue, Pasadena, California 91103

Updated May 11, 2026